2024-1616, 2024-1650

---

# United States Court of Appeals
# For the Federal Circuit

---

**SMARTREND MANUFACTURING GROUP (SMG), INC.,**

*Plaintiff-Appellee*

v.

**OPTI-LUXX INC.,**

*Defendant-Appellant*

---

Appeals from the United States District Court for the Western District of Michigan in Nos. 1:22-cv-00915-HYJ-RSK, 1:21-cv-01009-HYJ-RSK, Judge Hala Y. Jarbou.

---

**OPENING BRIEF OF APPELLANT OPTI-LUXX INC.
(CORRECTED)**

Gaëtan Gerville-Réache
Warner Norcross + Judd LLP
150 Ottawa Ave. NW, Ste. 1500
Grand Rapids, MI 49503-2832
Telephone: (616) 752-2207
E-mail:     greache@wnj.com

Vito A. Ciaravino
Warner Norcross and Judd LLP
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
Telephone: (313) 546-6179
E-mail:  vciaravino@wnj.com

Attorneys for Defendant-Appellant

Dated: June 7, 2024

## FROM U.S. DESIGN PATENT NO. D932,930:

### CLAIM

The ornamental design for an LED light panel, as shown and described.



FIG. 1

### DESCRIPTION

FIG. **1** is a front elevation view of the first embodiment of the design; . . . . The oblique shading lines visible in the front and perspective views denote transparency.

## FROM U.S. PATENT NO. 11,348,491:

1. An illuminated school bus sign for direct mounting on a school bus, the sign comprising:

opaque lettering positioned on or over a front surface of a translucent panel;

an opaque rear panel situated opposite to the translucent panel in spaced relation therefrom to define a space therebetween;

a light source comprising a plurality of LEDs positioned in the space adjacent to the rear panel and pointing towards a front of the sign; and

frame surrounding a perimeter of the sign for mounting the sign to the school bus,

wherein the translucent panel is spaced by a spacer from the LEDs thereby creating a gap between the LEDs and the translucent panel,

wherein the spacer surrounds the LEDs and supports a rear surface of the translucent panel along the entire perimeter of the translucent panel, and

wherein the entire perimeter of the translucent panel is sealed in a weather-tight manner by a weather-tight seal between the translucent panel and the spacer.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1616; 2024-1650 |
| **Short Case Caption** | Smartrend Manufacturing Group (SMG), Inc. v. Opti-Luxx |
| **Filing Party/Entity** | Opti-Luxx Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.


Date: 06/07/2024

Signature: /s/ Gaëtan Gerville-Réache

Name: Gaëtan Gerville-Réache

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Opti-Luxx Inc. | | Guangzhou Forda Signal Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Donald C. Darnell<br>Darnell Law Office | | |
| Joseph P. Carrier<br>Carrier, Blackman & Associates | | |
| William P. Hurley<br>Carrier, Blackman & Associates | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

PATENT CLAIM AT ISSUE ........................................................................ ii

CERTIFICATE OF INTEREST ............................................................... iii

TABLE OF CONTENTS .......................................................................... vi

TABLE OF AUTHORITIES ..................................................................... ix

STATEMENT OF RELATED CASES .................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 1

INTRODUCTION ...................................................................................... 2

STATEMENT OF ISSUES FOR REVIEW ........................................... 6

STATEMENT OF THE CASE .................................................................. 6

    Smartrend's D930 Patent ...................................................................... 6

    Smartrend's '491 Patent ...................................................................... 8

    Opti-Luxx's Accused Product ............................................................ 9

    The District Court's Claim Construction on the D930 Patent ...................... 11

    The District Court's Claim Construction on the '491 Patent ...................... 12

    The Trial .......................................................................................... 14

    The District Court's Orders on Post-Trial Motions ..................................... 18

SUMMARY OF THE ARGUMENT ...................................................... 20

ARGUMENT ............................................................................................. 24

I.      The District Court erred in construing the ornamental design in
        the D930 Patent as claiming both a transparent and a
        translucent lens; this warrants a new trial on the D930
        infringement claim .................................................................24

        A.      Review is de novo .....................................................24

        B.      The D930 Design Patent claims only a transparent lens ..........24

        C.      The District Court erroneously relied on inapt case law
                and irrelevant expert testimony to support its claim
                construction .............................................................26

        D.      Because the District Court's claim construction was
                improper, the judgment must be vacated, and the case
                remanded for a new trial ..........................................29

II.     The District Court committed reversible error in admitting
        testimony regarding the ordinary observer's perspective from
        an "expert" lacking knowledge or experience regarding the
        ordinary observer ...............................................................30

        A.      Review is under an abuse of discretion standard .....................30

        B.      Mr. York was not qualified to opine on the perspective of
                an ordinary observer ..................................................31

        C.      Because admitting Mr. York's testimony was highly
                prejudicial, the court should vacate and remand for new
                trial ......................................................................32

III.    The District Court erred in denying Opti-Luxx judgment as a
        matter of law when Smartrend's expert admitted Opti-Luxx's
        integrated tub housing could not perform significant functions
        performed by Smartrend's "separate frame" element .........................34

        A.      Review is de novo ....................................................34

B.    Smartrend cannot meet its burden to show that Opti-Luxx's accused product had a feature equivalent to the claim limitation in the '491 Patent............................................34

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................38

ADDENDUM ........................................................................................40

CERTIFICATE OF COMPLIANCE....................................................................212

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AquaTex Indus., Inc. v. Techniche Sols.*,
    479 F.3d 1320 (Fed. Cir. 2007) ........................................................................35

*Arminak and Assoc., Inc. v. SaintGobain Calmar, Inc.*,
    501 F.3d 1314 (Fed. Cir. 2007) ........................................................................31

*Curver Luxembourg, SARL v. Home Expressions Inc.*,
    938 F.3d 1334 (Fed. Cir. 2019) ........................................................................24

*Edgewell Personal Care Brands, LLC v. Munchkin, Inc.*,
    998 F.3d 917 (Fed. Cir. 2021) ..........................................................................35

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008) ....................................................................31, 33

*Ericsson, Inc. v. D-Link Sys., Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ........................................................................30

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
    796 F.3d 1312 (Fed. Cir. 2015) ........................................................................32

*Field v. Trigg Cnty. Hosp., Inc.*,
    386 F.3d 729 (6th Cir. 2004) ............................................................................33

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
    57 F.4th 1001 (Fed. Cir. 2023) ........................................................................25

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
    339 U.S. 605 (1950)...........................................................................................35

*Honeywell Int'l., Inc.. v. Hamilton Sundstrand Corp.*,
    523 F.3d 1304 (Fed. Cir. 2008) ........................................................................34

Page(s)

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    734 F.3d 1352 (Fed. Cir. 2013) ........................................................34

*Lanard Toys Ltd. v. Dolgencorp LLC*,
    958 F.3d 1337 (Fed. Cir. 2020) ...................................................29, 31

*Nichia Corp. v. Global Value Lighting, LLC*,
    No. CV 19-1388-RGA, 2020 WL 6318688 (D. Del. Oct. 28, 2020) .....12, 26, 27

*Personal Web Tech., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017) ..........................................................24

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................25

*Pluck v. BP Oil Pipeline Co.*,
    640 F.3d 671 (6th Cir. 2011) ............................................................31

*Regents of Univ. of Minn. v. AGA Med. Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) ..........................................................35

*Stockman v. Oakcrest Dental Ctr., P.C.*,
    480 F.3d 791 (6th Cir. 2007) ............................................................33

*Terlep v. Brinkmann Corp.*,
    418 F.3d 1379 (Fed. Cir. 2005) ...................................................25, 26

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..........................................................28

**STATEMENT OF RELATED CASES**

No other appeal in or from the same civil action of proceeding in the originating tribunal was previously before this or any other appellate court. No other cases known to counsel pending in this or any other tribunal will directly affect or be directly affected by this court's decision in the pending case.

**JURISDICTIONAL STATEMENT**

The District Court possessed jurisdiction over Cases 1:21-cv-01009 and 1:22-cv-00915 pursuant to 28 U.S.C. § 1338(a), which gives the district courts original jurisdiction over any civil action arising under any Act of Congress relating to patents. In Case 1:21-cv-01009, Smartrend claimed Opti-Luxx infringed its school bus sign design patent, U.S. Design Patent No. D932,930 (the "D930 Patent"). In Case 1:22-cv-00915, Smartrend claimed Opti-Luxx infringed its school bus sign utility patent, U.S. Patent No. 11,348,491 (the " '491 Patent").

On November 29, 2023, the District Court entered Judgments in both cases in favor of Plaintiff Smartrend Manufacturing Group, Inc., ("Smartrend") and against Defendant Opti-Luxx Inc. ("Opti-Luxx") as to liability and damages only, reserving judgment on injunctive relief for a future order. (Appx0029.) On February 23, 2024, the District Court entered an Order granting Smartrend's motion for permanent injunction, denying Opti-Luxx's renewed motions for

judgment as a matter of law, and denying Smartrend's motion for enhanced damages and declaration of exceptional case. (Appx0003-0004.) This resolved all the parties' remaining requests for relief. Opti-Luxx timely filed its Notices of Appeal on March 22, 2024.

This Court has jurisdiction over both cases pursuant to 28 U.S.C. § 1295(a)(1), which states that the Court of Appeals for the Federal Circuit shall have jurisdiction over appeals from all final decisions of a federal district court arising under an Act of Congress relating to patents.

## INTRODUCTION

This case illustrates the hazards of (1) conflating issues of utility with issues of ornamental significance in adjudicating a design patent and (2) blindly accepting an expert's conclusory assertion of infringement under the doctrine of equivalents, when his own admissions legally dictate a contrary conclusion.

Smartrend and Opti-Luxx are competitors in the business of manufacturing illuminated school bus signs. Smartrend sued Opti-Luxx for infringement of its design and utility patents immediately after the patents were granted, seeking damages and injunctive relief. At the summary judgment stage, Smartrend argued for the first time that its D930 Patent claimed both a transparent and translucent lens for transmitting light around the opaque "school bus" lettering, even though the claimed design comprises a lens with oblique shading lines that the D930

2

Patent itself describes as denoting "transparency." It also argued that Opti-Luxx's sign literally infringed its '491 Patent, even though its '491 Patent teaches a frame element separate and distinct from the sign, an element Opti-Luxx's sign does not have. Smartrend alternatively argued that the integrated housing tub permanently affixed to the other components of Opti-Luxx's sign constituted a "frame" equivalent to Smartrend's separate frame.

After accepting Smartrend's D930 claim construction and rejecting its '491 Patent claim construction, the District Court held there was no literal infringement of the '491 Patent, but that questions of fact remained as to (1) whether Opti-Luxx's sign was plainly dissimilar to the D930 ornamental design and (2) whether the integrated housing tub was equivalent to the '491 Patent's separate and distinct frame. Opti-Luxx was barred from presenting to the jury any dissimilarity in appearance between Opti-Luxx's translucent lens and a transparent lens as a result of the District Court ruling that the D930 Patent claimed both.

At the consolidated trial, Smartrend offered the testimony of a single expert in illuminated signage to support both infringement claims. When Smartrend laid no foundation to show the expert had any experience with purchasing school bus signs or with such purchasers, Opti-Luxx repeatedly objected to the expert testifying that the ordinary observer would confuse its sign with the patented ornamental design. But the District Court overruled the objection and allowed the

3

testimony anyway. That same expert soon admitted that separating the mounting frame from the sign, as claimed in the '491 Patent, provided benefits to the end user that Opti-Luxx's permanently affixed housing tub did not. But he nevertheless testified that Opti-Luxx's integrated housing tub performed the same functions in the same way with the same results as a separate frame. The District Court held that this bald assertion was enough to reasonably support a jury's verdict of infringement.

The District Court reversibly erred in its claim construction of the D930 Patent and in accepting expert opinions lacking foundation and contradicting the expert's own admissions.

In expanding the term "transparency" to mean both transparency and translucency, the Court erroneously relied on extrinsic evidence that transparent and translucent surfaces perform a similar function of transmitting light, when function is irrelevant to the meaning of these terms in a design patent. While the Manual of Patent Examination permits oblique shading lines to denote transparent or translucent surfaces, the D930 Patent expressly limited its claimed design to one of those—transparency—and Smartrend should be bound by that choice.

The District Court conflated design and utility issues once again when it allowed Mr. York to opine on the ordinary observer standard based solely on his credentials as a person of ordinary skill in the art of illuminated signage. Case law

is clear that this qualification is irrelevant. The skilled artisan and the ordinary observer are not the same person, and the record revealed no personal knowledge or experience that would permit Mr. York to otherwise opine on the ordinary observer's perspective. As the sole expert supporting Smartrend's case, the Court's admission of York's opinion on the ordinary observer standard without a proper foundation was highly prejudicial to Opti-Luxx's defense.

Finally, the District Court erred in denying judgment as a matter of law on Smartrend's assertion that Opti-Luxx somehow infringes the '491 Patent under the doctrine of equivalents. Once Mr. York admitted—consistent with the patent body itself—that the patented separate frame performed useful functions not performed by the alleged corresponding element on Opti-Luxx's sign, the test for equivalency fails as a matter of law. The expert's conclusory assertions to the contrary were incompetent to save Smartrend's infringement claim.

For these reasons, appellate relief should be granted in both cases. In the D930 Patent case, this Court should vacate the judgment and remand for new trial under a proper claim construction and excluding testimony from Mr. York regarding the ordinary observer's viewpoint. In the '491 Patent case, this Court should reverse the trial court's order denying judgment as a matter of law and remand for entry of judgment of non-infringement in Opti-Luxx's favor.

## STATEMENT OF ISSUES FOR REVIEW

1. Did the District Court commit reversible error in broadly construing the D930 Patent's ornamental design as encompassing both a transparent and translucent lens when the patent expressly describes the lens as transparent?

2. Did the District Court err in admitting Smartrend's expert testimony that the ordinary observer would find the accused product substantially similar to the D930 Patent when no foundation was laid showing that the expert had the knowledge or experience necessary to opine from the perspective of the ordinary observer?

3. Did Smartrend present sufficient evidence for a reasonable jury to conclude that the accused product's integrated sign-housing tub is equivalent to the separate mounting frame limitation claimed by the '491 Patent, when Smartrend's expert and the patent itself admitted Smartrend's separate mounting frame performed useful functions that Opti-Luxx's integrated sign-housing tub did not?

## STATEMENT OF THE CASE

### Smartrend's D930 Patent

Smartrend's D930 Patent claims an ornamental design for an LED light panel used on school buses. (Appx5557.)



FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 5

FIG. 6

(Appx5559-5560.)

The front of the patent depicts a lens with oblique shading lines. (*Id.*) According to the Manual of Patent Examining Procedure ("MPEP") published by the U.S. Patent and Trademark Office ("USPTO"), "oblique line shading must be used to show transparent, translucent, and highly polished or reflective surfaces, such as a mirror." (9/28/23 Op. on Mot. for Summ. J., Appx0051) (quoting MPEP §1503.02).) However, the D930 Patent's description of the design clarifies that "[t]he oblique shading lines visible in the front and perspective views denote transparency." (D930 Patent, Appx5557.)

## Smartrend's '491 Patent

Smartrend's '491 Patent is a utility patent for "a self-contained illuminated sign which is usable together with a separate mounting frame . . . to enable mounting of the sign to the shell of a vehicle, such as a school bus." ('491 Patent, Col. 4:46-50, Appx5601.) The invention claimed consists of a single independent claim and multiple dependent claims.

The independent claim, in relevant part, states as follows:

1. An illuminated school bus sign for direct mounting on a school bus, the sign comprising:

   [a] frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting the sign to the school bus. (*Id.*, Col. 22:52-53, 62-64, Appx5610.)



**FIG. 31E**

(Appx5584.)

The '491 Patent's disclosure discusses the advantages obtained by providing the frame separate and distinct from the sign itself. For example, the '491 Patent at Column 11:11-67 discusses several advantages, including that "[s]ince the sign is mounted indirectly to the bus via the mounting frame, service or replacement of the sign can be performed without having to remove the entire installation," and use of a separate mounting frame can also "allow an installation-ready sign product that can be used on an on-demand basis." (Appx5605.)

## Opti-Luxx's Accused Product

The accused product is a one-piece illuminated sign. (Trial Tr., Appx1977.) It includes three main structural components: a rigid plastic tub housing, an LED light board fixed within the housing, and a translucent lens. (*Id*., Appx1971, Appx1976-1977.) Opti-Luxx's product does not contain a frame that is separate from the sign; the tub housing "is an integral component of the sign which cannot be removed." (Summ. J. Op., Appx0082-0083.) The D930 figures and the Opti-Luxx sign from the trial exhibits are provided below for side-by-side comparison[1]:

---

[1] There was no dispute that these images of the accused product presented to the court in requesting summary judgment were fair representations of the accused product, which was later introduced to the jury as a physical exhibit. (Appx 5642-5643.)



FIG. 1

Fig. 1 is a front elevation view of the D930 Patent's ornamental design.



Below Fig. 1 is a front view of the accused product.



FIG. 6

Fig. 6 is a rear elevation view of the D930 Patent's ornamental design.



Below Fig. 6 is a rear view of the accused product



FIG. 3

Fig. 3 is a side elevation view of the D930 Patent's ornamental design.

Right of Fig. 3 is a side view of the accused product.

(Opti-Luxx's SJ. Br., Appx0251-0252, Appx0254, Appx0256; Summ. J. Op.,

Appx0053; *see also* D930 Patent, Appx5559-5560.)

10

**The District Court's Claim Construction on the D930 Patent**

Smartrend first sued Opti-Luxx for infringement of the D930 Patent. (Am. Compl., Appx0107-0115.) Opti-Luxx then moved for summary judgment on Smartrend's infringement claim. (Appx0208.) In arguing that its product was plainly dissimilar from the D930 Patent's design, Opti-Luxx pointed out that the D930 Patent described a transparent lens, whereas the accused product's lens was translucent. (Opti-Luxx's Summ. J. Br., Appx0234-0235.) Smartrend in response argued that the term "transparency" in the patent should be interpreted broadly to include "translucency." (Smartrend's Br. in Opp. to Summ. J., Appx0365-0366.) The District Court agreed with Smartrend and interpreted the term "transparency" as synonymous with "translucency" for purposes of Opti-Luxx's summary judgment motion. (Summ. J. Op., Appx0049-0051.)

In reaching this decision on the D930 Patent, the District Court relied on Smartrend's expert, Mr. York, who purported to opine as one skilled in the art of light emitting devices about the functional equivalencies between transparent and translucent materials. (*Id.*, Appx0050.) Oddly, Mr. York begins his discussion by noting the term "transparent or translucent area 22" is used in the '491 Patent and defined as an "area [that] 'will emit light through' or *allow light to pass through* as defined [by the inventor at his deposition]." (York Report ¶ 43, Appx0526-0527.) Mr. York goes on to opine that, in terms of light transmission, there is "no hard

11

line between" translucent and transparent material. (Appx0527.) He then concludes that "transparency" in the D930 Patent simply means at least some light can pass through it, such that it can be used interchangeably with the term "translucency." (Appx0527-0528.) Mr. York offered no opinion that a "transparent" and "translucent" lens were indistinguishable in appearance.

The District Court (and Mr. York) also relied on an unpublished opinion, *Nichia Corp. v. Global Value Lighting, LLC*, No. CV 19-1388-RGA, 2020 WL 6318688 (D. Del. Oct. 28, 2020), which, in the context of a utility patent, held that (1) "transparency" need not be mutually exclusive with "translucency," and (2) "transparency" when construed in reference to the particular patent language in *Nichia*, could have a meaning synonymous with "translucency." (Appx0050.)

## The District Court's Claim Construction on the '491 Patent

In October 2022, Smartrend sued Opti-Luxx for infringement of the '491 Patent. (Appx2364-2374.) Opti-Luxx subsequently filed a motion for claim construction because the parties disagreed on the definition of the term "frame" as used in the '491 Patent. (Appx4599-4600.) The District Court agreed with Opti-Luxx's construction of the term and interpreted the '491 Patent as claiming a sign with "a separate, distinct mounting frame" because the specifications "repeatedly and exclusively refer[] to a separate mounting frame" as distinct from the sign. (Summ. J. Op., Appx0074.)

The parties also cross-moved for summary judgment on Smartrend's infringement claim. (Appx2470-2471, Appx 3205.) Opti-Luxx argued that the accused product did not infringe any claim in the '491 Patent, either directly or under the doctrine of equivalents, because there was no genuine material issue of fact that the Opti-Luxx sign did not include "a frame" as required by the claim limitations in the '491 Patent. (Opti-Luxx's Summ. J. Br., Appx3229-3230.) Opti-Luxx also argued that there was no genuine issue of material fact that the differences between the structure of the Opti-Luxx sign and the claim limitations in the '491 Patent were substantial. (Appx3229.)

The District Court relied on its claim construction of the term "frame" in the '491 Patent, to hold that Opti-Luxx's accused product, which has no separate frame, did not literally infringe the '491 Patent. (Summ. J. Op., Appx0082.)

The District Court ultimately left the question of infringement under the doctrine of equivalents to the jury. (Appx0091.) The District Court observed that there were superficial similarities between the term "frame" in the '491 Patent and the term "frame" in the accused product because the frame of the accused product (1) "surrounds the perimeter of the translucent panel and forms a perimeter of the sign for mounting the sign to the vehicle," and (2) "the frame of the accused product allows for direct mounting via through-holes drilled into it." (*Id.*) The District Court concluded that the primary difference appeared to be the integrality

of the frame to the remainder of the sign and determined that whether this difference is substantial was a question for the jury. (*Id.*)

## The Trial

In November 2023, the District Court held a three-day jury trial. At the end of the first day, the parties asked the District Court to clarify whether its claim construction of the ornamental design in the D930 Patent (to encompass both a transparent and translucent lens) applied beyond its summary judgment ruling. (Trial Tr., Appx1644.) After the parties reargued the merits of the claim construction issue, the District Court ruled that the term "transparent" in the design patent meant transparent <u>or</u> translucent, based entirely on the opinion in *Nichia* construing the meaning of "transparent" in an unrelated utility patent based on intrinsic evidence. (*Id.*, Appx1676-1677.) The District Court's claim construction precluded Opti-Luxx from presenting evidence that the translucent lens on the accused product distinguished it in appearance from the D930 Patent's design (among other distinctions).

Over Opti-Luxx's objections, the District Court then permitted Smartrend to present testimony from its expert, Brent York, that the ordinary observer would find the D930 Patent design and Opti-Luxx's accused product to be substantially

the same in appearance.[2] (Trial Tr., Appx1726-1729.) Opti-Luxx had objected to Mr. York's testimony on the basis that Mr. York is not an ordinary observer and was not qualified to opine on the perspective of the ordinary observer. (*Id.*, Appx1726-1727.) Even Mr. York agreed that the ordinary observer for the D930 Patent is the person making the purchasing decision for a school district or a school bus dealer. (*Id.*, Appx1726-1727.) Yet no foundation was ever laid showing Mr. York had any personal knowledge about, or experience with, such purchasers to qualify him as one who could opine on whether such purchasers would view Opti-Luxx's sign as deceptively similar to the D930 Patent's ornamental design.

To the District Court, that did not matter. In overruling Opti-Luxx's objections, the District Court reasoned that (1) Mr. York was admitted as an expert in LED lighting and illuminated signage, and (2) he did not have to be an ordinary observer to render his opinion on what an ordinary observer would observe. (Trial Tr., Appx1728.)

After Smartrend closed its proofs, Opti-Luxx requested a directed verdict under Rule 50(a) on the D930 infringement claim arguing that (1) Mr. York's testimony should be stricken because he is not an ordinary observer and had not

---

[2] Among other things, Mr. York went so far as to claim that any rounded corner, i.e., anything between square corners and perfectly radiused ends, on the accused product would make the accused product so similar in appearance to the patented design that an ordinary observer would be deceived. (Appx1801-1802.)

otherwise performed a survey of any ordinary observers, and (2) Plaintiff had failed to establish infringement under the ordinary observer test because the claimed design in the D930 Patent and the accused product are plainly dissimilar. (Appx1900-1904.) The District Court rejected the request to strike Mr. York's testimony for lack of foundation, stating "there was no basis cited by [Opti-Luxx], . . . that he's not an ordinary observer" and "no basis cited that he has to be and that he couldn't opine on that." (Appx1923.) The court went on to reason that Mr. York "certainly testified about the ordinary observer standard and what that meant, and based on his experience, as well as the similarities between the signs, and was questioned on cross-examination the dissimilarities as to these signs by defense counsel." (*Id.*) The District Court denied Opti-Luxx's motion in favor of letting the jury decide the question of infringement on the evidence presented. (Appx1923-1924.)

With respect to the '491 Patent, Mr. York stated at trial that under the doctrine of equivalents, a person of ordinary skill in the art would have considered the accused product to have a feature equivalent to the separate and distinct frame claimed by the '491 Patent. (Trial Tr., Appx1739.) But Mr. York also openly admitted at trial that there are several end-user benefits to the separate and distinct frame claimed in the '491 Patent, such as changing out the signs, easily transferring the sign to another bus, assembling in different stages, making the

frame out of metal, replacing a damaged sign, etc. (Appx1822-1836.) After going through the benefits of having a frame separate from the sign, Mr. York conceded (1) that one cannot leave the accused product's housing on the bus and take out the lens and put on a new lens, (2) that Mr. York damaged the accused product when taking it apart, and (3) that the "Opti-Luxx frame was not a separable frame in that sense." (Appx1831-1832, Appx1835-1836.) Mr. York also admitted that this difference impacts the end user, noting that the accused product is "not meant for user serviceability [i]t's a disposable lens" and does not allow the purchaser the "use of a separate mounting frame," as claimed in the '491 Patent, which—unlike the Opti-Luxx product—allows "an installation ready sign product that can be used on an on demand basis, particularly where the individual signs and mounting frames have been prefabricated to reduce lead time." (Appx1831-1832.)

Opti-Luxx requested a directed verdict under Rule 50(a) on the '491 Patent infringement claim, arguing that a jury could not reasonably conclude from the evidence presented that Opti-Luxx's accused product had a feature which was equivalent to the separate and distinct frame under the '491 Patent. (Appx1915-1918.) Specifically, Opti-Luxx argued that Smartrend could not, as a matter of law, satisfy any tests for the doctrine of equivalence and pointed out that Smartrend's expert, Mr. York, had testified as to several substantial differences in the function, way, and result between the frame element as claimed in the '491 Patent and the

integrated tub housing of the accused device. (Appx1917-1918.) In response, Smartrend leaned on its expert's conclusory statement to the contrary. (Appx1921-1922.) The District Court likewise relied on that statement and denied Opti-Luxx's motion in favor of letting the jury decide the question of infringement under the doctrine of equivalents. (Appx1924.)

The jury returned a verdict in Smartrend's favor on both patents and awarded Smartrend $23,307.84 in damages. (Appx0029, Appx1928-1930.)

## The District Court's Orders on Post-Trial Motions

After trial, Opti-Luxx moved under Rule 50(b) for judgment as a matter of law on Smartrend's D930 infringement claim, once again raising the issue of claim construction and also arguing that Mr. York was not an ordinary observer, could not substitute his own knowledge and experience for that of an actual ordinary observer, and had otherwise produced no evidence that he had conducted a survey to determine if the ordinary observer—a purchaser of school bus signs—would be deceived into purchasing the Opti-Luxx sign supposing it to be the patented design. (Appx2262-2265, Appx2271-2272.)

The District Court denied Opti-Luxx's renewed motion for judgment as a matter of law. (Rule 50(b) Op., Appx0010.) With respect to the issue of claim construction, the District Court held that it was not proper to revisit the issue after trial, and that even if it could, it saw no reason to change its ruling. (Appx0007.)

18

With respect to Mr. York's expert testimony, the District Court remarked that Opti-Luxx had not challenged Mr. York's admission despite being aware of the subject matter of his expert testimony, and that although Mr. York did not hold himself out to be an expert in the relevant types of purchasing decisions, Opti-Luxx had provided no authority to suggest that a specific type of expert testimony was necessary. (Appx0009-0010.) The District Court held that it was sufficient for an expert to offer his opinions through the lens of a hypothetical, ordinary observer based on his design expertise and understanding of the typical purchaser. (*Id.*)

With respect to the '491 Patent, Opti-Luxx also moved under Rule 50(b) for judgment as a matter of law, again arguing that there was insufficient evidence to support a jury finding of infringement under the doctrine of equivalents. (Appx5229-5234, Appx5261.) Opti-Luxx reasserted that Smartrend's expert had admitted that an integrated tub housing does not perform the same functions in the same way with the same result as the patented separate and distinct frame claimed in the '491 Patent, and that the missing functions were significant to the end user. (Appx5235-5240.)

The District Court disagreed with Opti-Luxx and denied Opti-Luxx's renewed motion for judgment as a matter of law holding that there was sufficient evidence to support the jury's finding, based on Mr. York's testimony regarding the function-way-result test. (Appx0011, Appx0014.) The District Court also stated

that Opti-Luxx's argument was "akin to reverting the equivalents analysis back to a literal infringement analysis" and that "[u]nder the equivalents analysis, the only evidence the jury had as to how persons skilled in the art would understand frame equivalence was [Mr.] York's testimony—and York testified to precisely the opposite of [Opti-Luxx's] argument." (Appx0012.)

The District Court granted Smartrend's post-trial motion for a permanent injunction ordering Opti-Luxx to no longer make, sell, offer to sell, sell within the United States, or import into the United States the accused product or any products not more than colorably different from that product. (Appx0001-0002.) The District Court also awarded Smartrend costs in the amount of $21,786.40. (Appx0003-0004.)

The District Court denied Smartrend's motion for enhanced damages under 35 U.S.C. § 284 and Smartrend's motion for exceptional case under 35 U.S.C. § 285. (*Id.*) In doing so, the District Court stated that "the evidentiary burden was not Opti-Luxx's to bear," that Opti-Luxx's "core merit arguments were relatively strong," and that both cases were a close call. (Post-Trial Mot. Op., Appx0023-0028.)

## SUMMARY OF THE ARGUMENT

With respect to the D930 Patent, the judgment should be vacated, and the case remanded for a new trial, for two reasons.

*First*, the District Court erred as a matter of law in construing the ornamental design in the D930 Patent as claiming both a transparent and a translucent lens when Smartrend made a deliberate choice to claim only a transparent lens in its design patent, by adding an express description that "[t]he oblique shading lines visible in the front and perspective views [of the lens] denote transparency."

No intrinsic or extrinsic evidence supports the District Court's decision to obliterate this distinction and broadly construe the patent as claiming a transparent or translucent lens. The District Court relied on extrinsic evidence that transparency and translucency both perform the same function by permitting light to pass through. But what matters for purposes of claim construction in a design patent is appearance, not function. And Smartrend presented no evidence that "transparency" would be understood by a skilled artisan as including "translucency" for purposes of ornamental design. And there is a distinction, otherwise the MPEP would not enumerate them as alternative descriptions of oblique shading lines. The patentee's choice of one description and not both is presumptively deliberate and meaningful, particularly in the context of the MPEP. Accordingly, the District Court should have declined to construe the D930 Patent as claiming anything more than a transparent lens.

The District Court's improper claim construction was prejudicial, as it improperly relieved Smartrend of its burden to show that Opti-Luxx's product either had a transparent lens (it did not) or that the ornamental design of a transparent lens was substantially the same in appearance to the ordinary observer as a translucent lens. Conversely, it precluded Opti-Luxx from making any argument to the jury that the yellow, translucent lens on its sign, either by itself, or in conjunction with its other features, rendered its sign plainly dissimilar to the D930 Patent's ornamental design. The jury accordingly never compared Opti-Luxx's product to a properly construed claim, contrary to law. The judgment should be vacated, and the case remanded for a new trial that compares Opti-Luxx's product to the D930 Patent's claim as properly construed.

***Second***, the District Court erred as a matter of law in admitting Mr. York's testimony as to the opinion of an ordinary observer because no foundation was laid that he had any experience or expertise permitting him to opine as to whether the ordinary observer—an individual making a purchasing decision for a school district or a school bus dealer—would confuse Opti-Luxx's sign with the patented design. Admission of Smartrend's expert testimony was not harmless error as it was the only direct evidence Smartrend offered to prove the ordinary observer could confuse Opti-Luxx's sign with the patented design. Accordingly, the jury's verdict should be vacated and the case remanded for a new trial.

With respect to the '491 Patent, the judgment should be reversed because, on this record, no reasonable jury could find that Opti-Luxx's accused product had a feature equivalent to the separate and distinct frame as claimed in the '491 Patent. In denying Opti-Luxx's motion for judgment as a matter of law, the District Court improperly allowed the jury's verdict to rest on conclusory assertions of Smartrend's expert that the integrated housing tub performed the same functions as the separate frame, in direct contradiction to that expert's own particularized admissions on the same point at trial. Smartrend's expert admitted that the separate frame as claimed in the '491 Patent performed functions the Opti-Luxx integrated frame could not perform, and that these functions were significant to the end user. On those undisputed facts, the integrated tub housing cannot be equivalent to the separate and distinct frame claimed in the '491 Patent as a matter of law. The District Court's order denying Opti-Luxx's renewed motion for judgment as a matter of law should be reversed and judgment should be entered in Opti-Luxx's favor on Smartrend's '491 Patent infringement claim.

# ARGUMENT

**I.    The District Court erred in construing the ornamental design in the D930 Patent as claiming both a transparent and a translucent lens; this warrants a new trial on the D930 infringement claim.**

## A.    Review is de novo.

"Claim construction is a legal issue reviewed de novo, based on underlying factual findings that are reviewed for substantial evidence." *Personal Web Tech., LLC v. Apple, Inc.*, 848 F.3d 987, 990 (Fed. Cir. 2017).

## B.    The D930 Design Patent claims only a transparent lens.

When Smartrend filed the design patent application that later issued as the D930 Patent, it was not required to describe any aspect of the claimed design. But, in fact, it did so. Smartrend added an express description that "[t]he oblique shading lines visible in the front and perspective views denote transparency." The claim in the D930 Patent expressly adopts this description: "[t]he ornamental design for an LED light panel, as shown and described."

In constructing design patent claims, courts often look for guidance from the MPEP, published by the USPTO. *Curver Luxembourg, SARL v. Home Expressions Inc.,* 938 F.3d 1334, 1341 (Fed. Cir. 2019). MPEP guidelines note "oblique line shading must be used to show transparent, translucent and highly polished or reflective surfaces, such as a mirror." MPEP §1503.02. Based on the specific wording of MPEP §1503.02, it is clear that the MPEP guidelines draw a distinction

between transparency and translucency. Significantly, rather than relying on the USPTO's broad interpretation of oblique lines, the drafters of the D930 Patent intentionally narrowed the scope of the ornamental design claimed in the D930 Patent by clarifying that "[t]he oblique shading lines visible in the front and perspective views denote transparency." (D930 Patent, Appx5557.)

Smartrend made a deliberate choice not to claim translucency in their design patent. "Where the specification instructs as to the meaning of a claim term, the inventor's lexicography governs." *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1010 (Fed. Cir. 2023) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc)). "[T]he rules of the PTO require that application claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." *Phillips*, 415 F.3d at 1316-1317 (Fed. Cir. 2005).

The terms transparency and translucency are not technical terms when discussed in the context of a design patent. Much like the MPEP, in looking at their ordinary definitions, "transparent stresses complete absence of obstruction to vision" and "translucent applies to that which permits passage of light but bars clear and complete vision." *See Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1384

(Fed. Cir. 2005). The distinction between these terms cannot be ignored. *Id*., citing *Int'l Rectifier Corp. v. IXYS Corp.,* 361 F.3d 1363, 1374 (Fed. Cir. 2004) (holding that it was improper for the district court to adopt a definition that was attributed to a synonym of the disputed term while disregarding the distinction set forth in the usage note).

The ornamental design in the D930 Patent claims only a transparent lens and the District Court erred in construing the patent as claiming both a transparent and a translucent lens when the description expressly uses the term "transparency."

### C.    The District Court erroneously relied on inapt case law and irrelevant expert testimony to support its claim construction.

In construing the D930 Patent as claiming both a transparent and a translucent lens, the District Court relied on a single, nonbinding opinion discussing the issue, *Nichia Corp. v. Global Value Lighting, LLC*, No. CV 19-1388-RGA, 2020 WL 6318688 (D. Del. Oct. 28, 2020). That decision and the extrinsic evidence it presents are inapplicable here.

In *Nichia*, the court construed the term "transparent" as "allowing light to pass through," consistent with Plaintiff's proposed construction, as opposed to Defendant's proposed construction of the term as "transmitting light without appreciable scattering so that objects lying beyond are seen clearly and distinctly." *Id.* at *3-4. The court ultimately relied on the intrinsic record in its claim

26

construction, stating that "the specification's description of light-scattering "transparent" elements is incompatible with the portion of Defendant's construction that requires "transparent" elements to transmit light "without appreciable scattering." *Id.* at *6. The Court noted that the patent specification consistently taught that "transparent" elements provided "effective" and "broad" light emission and many of the embodiments in the patent contained "transparent" elements with "light scattering" features that could make it difficult to see "clearly and distinctly" through those elements, rendering them consistent with the ordinary meaning of the term "translucent" and inconsistent with Defendant's construction of "transparent." *Id.* The court also noted that the patent claimed a light emitting device, and that its *purpose* was "to efficiently transmit light for use as a light source." *Id.* The court reasoned that this *purpose* was satisfied regardless of whether the device's user could see "clearly and distinctly" through its "transparent" elements because the "efficiency of the element's light transmission was independent of the clarity of 'objects lying beyond' the element." *Id.*

*Nichia* can be distinguished from this case because the court analyzed a utility patent where equivalencies in utility matter, not a design patent where such equivalencies are irrelevant. Further, unlike here, the court ultimately relied on intrinsic evidence to support its claim construction, as the patent claim specifications and embodiments clearly did not support a construction of

27

"transparent" as transparent only. The *Nichia* court's observation that transparent and translucent surfaces functioned similarly in the context of the patent and in the field of light emitting devices went only to show how a person of ordinary skill in the art of light emitting devices may have understood the term "transparent" in a utility patent.

The District Court's reliance on this reasoning in *Nichia* is improper when interpreting a design patent, where differences in ornamental appearance are important, regardless of similarities in function, and where the intrinsic evidence is so distinguishable. Importantly, the intrinsic evidence here requires a construction of the patent as claiming only a transparent lens (in the ordinary sense), unlike in *Nichia*. While the patent in *Nichia* defined transparent to include translucent applications, here the only description for the lens was transparency.

The District Court also erred in relying Mr. York's opinion. Expert testimony, which is inconsistent with the specification and file history, should be accorded no weight. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996). Mr. York's testimony here was not just inconsistent with the patent language, it was inapt. He simply imitated the analysis in *Nichia*, which looked at the functional interchangeability of the transparent and translucent surfaces rather than their ornamental differences. Only the latter is relevant in a design patent, but no extrinsic evidence was admitted showing transparent and

28

translucent surfaces were not ornamentally distinct. In fact, his own testimony

demonstrated that they are distinct. Mr. York asserted that "there is no hard line on

the amount of light scattering required to consider a material 'transparent' versus

'translucent' " (Appx0527), which only goes to show there is a gray area between

transparency and translucency depending on the amount of light scattering. If

anything, this suggests that, at some point, a distinction can be drawn between the

two.

Accordingly, the District Court should have declined to construe the

ornamental design in the D930 Patent as claiming both a transparent and

translucent front lens and left it to the jury to decide whether Opti-Luxx's lens fell

into the gray area when determining whether the sign as a whole was confusingly

similar to the patented design under the ordinary observer test.

### D.    Because the District Court's claim construction was improper, the judgment must be vacated, and the case remanded for a new trial.

"Determining whether a design patent has been infringed is a two-part test."

*Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020). First,

the court "construes the claim to determine its meaning and scope." *Id.* Second,

"the fact finder compares the *properly construed* claim to the accused design." *Id.*

(emphasis added). Only after the claim is properly construed can the second part of

the test be correctly applied. Because the District Court improperly construed the

ornamental design in the D930 Patent as claiming both a transparent and translucent front lens, the jury could not properly perform the two-part test for infringement required by law.

Moreover, this error severely prejudiced Opti-Luxx's defense. First, it relieved Smartrend of its burden to show that Opti-Luxx's product either had a transparent lens (it did not) or that the ornamental design of a transparent lens was substantially the same in appearance to the ordinary observer as a translucent lens. Second, it precluded Opti-Luxx from introducing substantial evidence that its translucent sign was visually distinct from the patented transparent design. Opti-Luxx was barred from arguing to the jury that the yellow, translucent lens on its sign, either by itself, or in conjunction with its other features, rendered its sign plainly dissimilar to the claimed ornamental design in the D930 Patent.

For these reasons, the judgment entered on the jury's verdict should therefore be vacated and the case remanded for a new trial.

## II.     The District Court committed reversible error in admitting testimony regarding the ordinary observer's perspective from an "expert" lacking knowledge or experience regarding the ordinary observer.

### A.     Review is under an abuse of discretion standard.

The Federal Circuit reviews decisions on "the admission of expert testimony under the law of the regional circuit." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1225 (Fed. Cir. 2014). The Sixth Circuit reviews the exclusion of expert

testimony for abuse of discretion. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).

### B. Mr. York was not qualified to opine on the perspective of an ordinary observer.

As noted above, determining whether a design patent has been infringed is a two-part test. Under the second prong, after the court construes the claim, "the fact finder then compares the properly construed claim to the accused design." *Lanard Toys Ltd.*, 958 F.3d at 1341. This involves application of the "ordinary observer" test. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008). Under the ordinary observer test, the accused product is compared to the claimed design to determine whether the two designs are substantially the same. *Id.* If the similarities are such that an ordinary observer would be deceived into purchasing the accused design supposing it to be the patented design, then there is infringement. *Id.*

In an infringement analysis, the ordinary observer is a person who is either a purchaser of the item that displays the patented design, or sufficiently interested in the item, and "who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent." *Arminak and Assoc., Inc. v. SaintGobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007). The ordinary observer is not an expert in the claimed designs, but "one of 'ordinary

acuteness' who is a 'principal purchaser[]' of the underlying articles with the claimed designs." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc*., 796 F.3d 1312, 1337 (Fed. Cir. 2015).

At trial, Mr. York agreed that the ordinary observer for the D930 Patent is the person making the purchasing decision for a school district or a school bus dealer.  (Trial Tr., Appx1726-1727.) There is no dispute that Mr. York is not an individual who makes the purchasing decision for a school district or a school bus dealer and is therefore not an ordinary observer. Nor did Mr. York perform a survey of purchasers on which he could base an opinion. Further, while the District Court may have admitted Mr. York as an expert in LED lighting and illuminated signage, the law is clear that being a person of ordinary skill in the art of illuminated signage does not inherently qualify Mr. York to opine on the perspective of an ordinary observer. *Ethicon*, 796 F.3d at 1337. The District Court abused its discretion in admitting Mr. York's testimony as to what an ordinary observer would opine based solely on his qualification as a person of ordinary skill in the art of illuminated signage. (Trial Tr., Appx1728.)

**C.   Because admitting Mr. York's testimony was highly prejudicial, the court should vacate and remand for new trial.**

This erroneous evidentiary ruling by the trial court was not harmless. To make a determination as to whether a trial error is harmless, a court must "examine

the entire record to see if the alleged error tended to prejudice the party." *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 799 (6th Cir. 2007) (citations omitted). Prejudice is defined as a "substantial risk that the jury made a determination of liability on an improper basis—*i.e.,* if the rest of the evidence did not clearly support a finding of liability." *Id.*

Here, the burden rested with the patent holder to show that the ordinary observer would find the claimed design and alleged infringing design to be "substantially the same." *Egyptian Goddess*, 543 F.3d at 678. If Smartrend's expert testimony were appropriately excluded, it would have left Smartrend with no witness to testify that the ordinary observer would find the claimed design in the D930 Patent and Opti-Luxx's accused design to be substantially the same. Without that testimony, the jury would have at best been left to wonder whether an ordinary observer could overlook all the distinctions Opti-Luxx has drawn to show plain dissimilarity between its sign and the patented design. The remaining evidence did not clearly support a finding of liability.

Here, there is more than a substantial risk that the jury relied on Mr. York's improper testimony. "[I]n close cases the improper admission of prejudicial evidence is all the more damaging." *See Field v. Trigg Cnty. Hosp., Inc.,* 386 F.3d 729, 736 (6th Cir. 2004). As the District Court acknowledged, this was a close case. (Appx 0027.) With Mr. York being the only purported expert on the subject, the

jury's verdict of infringement under the ordinary observer test would naturally have rested mostly, if not entirely, on Mr. York's testimony. The District Court's abuse of discretion in admitting his testimony was therefore highly prejudicial to Opti-Luxx's case. The error calls for the judgment to be vacated and the case remanded for a new trial.

### III.    The District Court erred in denying Opti-Luxx judgment as a matter of law when Smartrend's expert admitted Opti-Luxx's integrated tub housing could not perform significant functions performed by Smartrend's "separate frame" element.

### A.    Review is de novo.

This Court reviews the denial of a motion for judgment as a matter of law *de novo*, reversing "when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) (quotation omitted).

### B.    Smartrend cannot meet its burden to show that Opti-Luxx's accused product had a feature equivalent to the claim limitation in the '491 Patent.

Under the doctrine of the equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Honeywell Int'l., Inc.. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1312 (Fed. Cir. 2008).

The doctrine of equivalents applies when the equivalent represents an "insubstantial" change from the claim language. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 610 (1950). It can also apply if the accused product "performs substantially the same function in substantially the same way to obtain the same result." *Id.* at 608; *see also Edgewell Personal Care Brands, LLC v. Munchkin, Inc*., 998 F.3d 917, 924 (Fed. Cir. 2021). This is known as the Function-Way-Results test.

"[T]he difficulties and complexities of the doctrine [of equivalents] require that evidence be presented to the jury or other factfinder through the *particularized* testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (emphasis added). "Conclusory statements by an expert, however, are insufficient to sustain a jury's verdict." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015); *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." (quoting *Sitrick v. Dreamworks, LLC,* 516 F.3d 993, 1001 (Fed. Cir. 2008))).

To establish infringement of the '491 Patent, Smartrend had the burden of proving by a preponderance of the evidence that under the doctrine of equivalents, the Opti-Luxx accused product had a feature equivalent to the claim limitation in the '491 Patent requiring a separate and distinct frame.

At trial, the evidence presented was insufficient for Smartrend to meet its burden. Smartrend solely relied on expert testimony from Mr. York to establish equivalence under the function-way-result test. Mr. York testified that the frame performed the same function as the Opti-Luxx tub housing; it surrounded the perimeter of the panel and other components to provide structural integrity and hold the pieces together for mounting. (Appx1736-1737, Appx1739-1740.) However, in the same breath, Mr. York also admitted that there are several benefits to the separate and distinct frame claimed in the '491 Patent, such as changing out the signs, easily transferring the sign to another bus, assembling in different stages, making the frame out of metal, replacing a damaged sign, etc. (Appx1822-1836.) After going through the benefits of having a frame separate from the sign, Mr. York also conceded that the "Opti-Luxx frame was not a separable frame in that sense." (Appx1836.) Mr. York also admitted that this difference impacts the end user, noting that the accused product does not allow the purchaser the "use of a separate mounting frame," as claimed in the '491 Patent, which—unlike the Opti-Luxx product—allows "an installation ready sign product that can be used on an on

36

demand basis, particularly where the individual signs and mounting frames have been prefabricated to reduce lead time." (Appx1832.) Mr. York's testimony defeats any finding of equivalence under the function-way-result test.

Further, the '491-Patent disclosure itself discusses advantages obtained by providing the frame separate and distinct from the sign itself. For example, the discussion at 11:11-67 discusses three advantages, including that "[s]ince the sign is mounted indirectly to the bus via the mounting frame, service or replacement of the sign can be performed without having to remove the entire installation." (Appx5605.)

In denying Opti-Luxx's renewed motion for judgment as a matter of law, the District Court relied heavily on Mr. York's testimony, noting it was "the only evidence the jury had as to how persons skilled in the art would understand frame equivalence was York's testimony." (Appx0012.) But it improperly relied selectively on Mr. York's conclusory assertions regarding equivalence, while disregarding his particularized testimony that the integrated tub housing did not perform many of the significant functions of the separate frame.

Mr. York's conclusion that the accused product infringes the '491 Patent based on equivalence is simply not supported by his particularized testimony regarding the frame limitation in the '491 Patent. Smartrend cannot establish equivalence under the function-way-result test where Smartrend's expert himself

admits that Opti-Luxx's one-piece product with an integrated tub housing does not perform the same functions as the separate and distinct frame claimed in the '491 Patent. The record is therefore insufficient as a matter of law to support the jury's infringement verdict under the doctrine of equivalents.

The District Court erred in denying Opti-Luxx's motion for judgment as a matter of law on Smartrend's '491 Patent infringement claim.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Opti-Luxx Inc., respectfully requests that this Court grant the following relief: (1) vacate the judgment, permanent injunction, and award of costs with respect to Smartrend's D930 Patent infringement claim and remand the case for a new trial, and (2) reverse the judgment, permanent injunction, and award of costs, and remand for entry of judgment in Opti-Luxx's favor with respect to Smartrend's '491 Patent infringement claim.

Dated: June 7, 2024                    */s/ Gaëtan Gerville-Réache*
                                       Gaëtan Gerville-Réache
                                       Warner Norcross + Judd LLP
                                       150 Ottawa Avenue NW, Suite 1500
                                       Grand Rapids, MI 49503-2832
                                       Telephone: (616) 752-2207
                                       E-mail: greache@wnj.com

                                       Vito A. Ciaravino
                                       Warner Norcross and Judd LLP
                                       2715 Woodward Ave., Ste. 300
                                       Detroit, MI 48201
                                       Telephone: (313) 546-6179
                                       Email: vciaravino@wnj.com

                                       Attorneys for Defendant-Appellant

**Federal Circuit Rule 28(c) Addendum**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

       Plaintiff,                         Case Nos. 1:21-cv-1009; 1:22-cv-915

v.                                     Hon. Hala Y. Jarbou

OPTI-LUXX INC.,

       Defendant.

_____/

## PERMANENT INJUNCTION

Plaintiff Smartrend Manufacturing Group (SMG), Inc. sued Opti-Luxx Inc., alleging infringement of two patents: U.S. Design Patent No. D932,930 and U.S. Patent No. 11,348,491 (collectively, "the Asserted Patents"). The Jury found Defendant's direct mount, self-contained, LED illuminated bus signs, both with and without retroreflectivity, (collectively, "the Infringing Products") infringe on the Asserted Patents. Thereafter, Plaintiff moved for a permanent injunction.

In accordance with the opinion entered this date,

**IT IS ORDERED** that Opti-Luxx, Inc., its parent company, any of their officers, directors, agents, servants, employees, attorneys, subsidiaries, and those persons acting in concert or participation with any of them who receive actual notice hereof, are **HEREBY RESTRAINED** and **ENJOINED**, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from infringing, contributing to the infringement, or inducing the infringement of any of the Asserted Patents, by making, using, offering to sell, selling within the United States, or importing into the United States

**Appx0001**

any of the Infringing Products or any other product not more than colorably different from an Infringing Product.

**IT IS FURTHER ORDERED** that within ten (10) days of the grant of this Permanent Injunction, Opti-Luxx, Inc. must provide a copy of this Permanent Injunction to any customers to which it has shipped any Infringing Product.

Dated: February 23, 2024

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

      Plaintiff,                         Case Nos. 1:21-cv-1009, 1:22-cv-915

v.                                      Hon. Hala Y. Jarbou

OPTI-LUXX, INC.,

      Defendant.
_____/

## <u>ORDER</u>

In accordance with the Opinion entered this date,

**IT IS ORDERED** that Defendant Opti-Luxx, Inc.'s renewed motion for judgment as a matter of law in the D930 Patent Case (ECF No. 143) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Opti-Luxx, Inc.'s renewed motion for judgment as a matter of law in the 491 Patent Case (ECF No. 119) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s motion for a permanent injunction (D930 Patent Case, ECF No. 135; 491 Patent Case ECF No. 110) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s motion for an order declaring exceptional case and enhanced damages (D930 Patent Case, ECF No. 138; 491 Patent Case ECF No. 113) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s proposed bill of costs (D930 Patent Case, ECF No. 142; 491 Patent Case, ECF No. 117) is **APPROVED** in the amount of $21,786.40 as full payment for costs associated with both cases.

**IT IS FURTHER ORDERED** that Defendant Opti-Luxx, Inc.'s motion for a bill of costs allocation (D930 Patent Case, ECF No. 147; 491 Patent Case, ECF No. 123) is **DENIED**.

In light of the foregoing, a permanent injunction will issue while the judgment will remain unchanged.

Dated: February 23, 2024        /s/ Hala Y. Jarbou

HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

      Plaintiff,                      Case Nos. 1:21-cv-1009, 1:22-cv-915

v.                                 Hon. Hala Y. Jarbou

OPTI-LUXX, Inc.,

      Defendant.

_____/

## <u>OPINION</u>

On November 29, 2023, a jury found that Defendant Opti-Luxx, Inc. ("OLI") infringed two patents owned by Plaintiff Smartrend Manufacturing Group (SMG), Inc. ("SMG") (Verdict, ECF No. 103). Before the Court are several post-trial motions. Although the cases were presented to the jury as if they were consolidated, there are two separate cases, one for each patent. Where it is necessary to distinguish between the two cases, the Court will refer to the applicable patent's shorthand description. Thus, Case No. 1:21-cv-1009 will be referred to as the "D930 Case" because that case involves Patent D932,930, a design patent. Case No. 1:22-cv-915 will be referred to as the "491 Case" because that case involves Patent 11,348,491, a utility patent.

Both parties have post-trial motions before the Court. OLI moves under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law notwithstanding the verdict (D930 Case, ECF No. 143; 491 Case, ECF No. 119.) SMG seeks a permanent injunction (D930 Case, ECF No. 135; 491 Case, ECF No. 110) and an order declaring exceptional and enhanced damages (D930 Case, ECF No. 138; 491 Case, ECF No. 113.) Finally, OLI opposes SMG's proposed bill

of costs (D930 Case, ECF No. 142; 491 Case, ECF No. 117) and moves for an alternative allocation of costs between the two cases (D930 Case, ECF No. 147; 491 Case, ECF No. 123).

The factual background and procedural history of these two cases were discussed at length in the Court's September 28, 2023 summary judgment opinion. (D930 Case, ECF No. 89; 491 Case, ECF No. 56.)

## I. OLI'S RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW

After the close of SMG's case at trial, OLI made an oral motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The Court denied that motion. (D930 Case, ECF No. 123; 491 Case, ECF No. 97.) Now, OLI renews its motion under Rule 50(b).

### A. Legal Standard

A court may grant a Rule 50(b) motion "only if in viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010). A district court may not "reweigh the evidence or assess the credibility of witnesses." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).

### B. D930 Case

OLI initially advanced several arguments supporting its renewed motion for judgment as a matter of law on the D930 patent. It has since withdrawn a number of these. (*See* D930 Case, January 9, 2023 Email, ECF No. 152-1.) The Court will only address the non-withdrawn arguments.

#### 1. Transparent Lens

OLI argues that the jury could not have reasonably found that its accused product infringes the D930 patent because the accused product does not have a transparent lens. Rather, the accused

2

product has a *translucent* lens and thus does not meet the required limitation in the D930 patent. But the Court has twice rejected OLI's argument that the term "transparent" cannot mean "translucent." (*See* D930 Case, Summ. J. Op. 13-15, ECF No. 89; D930 Case, November 28, 2023 Order Den. Oral Mot., ECF No. 121.) The Court now rejects this argument for a third time.

First, OLI's claim construction argument at this stage is misplaced—"[t]he purpose of a Rule 50(b) motion is not to rehash decisions that were made pre-trial, but to determine whether the jury verdict was supported by evidence presented at trial." *JP Morgan Chase Bank, N.A. v. First Am. Title Ins. Co.*, No 09-14891, 2012 WL 12930710, at *4 (E.D. Mich. June 20, 2013) (quoting *Martin v. Howard Univ.*, No. 99-1175, 2006 EL 2850656, at *5 (D.D.C. Oct. 4, 2006)). Second, even if the Court were to reconsider this claim construction issue, OLI has not provided new case law or argument that persuades the Court its two previous rulings on this precise question were in error.

### 2. Jury Finding of Infringement

OLI contends that the design of the accused product is "plainly dissimilar" from the D930 patent. It also argues that, in the alternative, an analysis of the design in light of prior art precludes a finding of infringement. The Court rejected OLI's similar argument at the summary judgment stage, noting, "it is clear from the record that, when drawing all reasonable inference in favor of SMG, it has at least created a genuine dispute of material fact as to whether an ordinary observer would find the D930 patent and the accused product to be 'substantially the same.'" (Summ. J. Op. 19.) The Court also rejected OLI's Rule 50(a) motion on this matter. (D930 Case, Order Den. Def.'s Oral Mot. for J. as a Matter of Law 1, ECF No. 97.)

Design patent infringement is found when "two designs would appear 'substantially the same' to the ordinary observer[.]" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008). When the question is a close call, prior art should be considered as "a frame of

3

reference[.]" *Id.* at 677; *see also ABC Corp. I v. P'ship & Unincorporated Ass'ns*, 52 F.4th 934, 942 (Fed. Cir. 2022) ("Where a patented design and an accused product are not 'plainly dissimilar,' the court must conduct a threeway analysis comparing the accused product, the patented design, and the prior art."). This is a task uniquely suited to jury resolution. *See Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1371 (Fed. Cir. 2006) ("[C]onclusions about reasonable jurors are difficult to make on an issue of this factual dimension.") And the jury should focus its analysis on "overall designs, not similarities of ornamental features in isolation." *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020).

As part of evidentiary record, the jury considered the D930 patent, samples of the accused product, technical drawings of the accused product, and expert testimony. This is ample evidence from which a reasonable jury could find design patent infringement. OLI stresses individual differences such as the lack of a black band around the outside perimeter of the accused product or the "larger radii" of its curves. (D930 Case, Br. in Supp. of Mot. for J. as a Matter of Law 13-14, ECF No. 144.) As discussed in the Court's summary judgment opinion (Summ. J. Op. 19), OLI is attempting to improperly "concentrate on small differences in isolation, distract[ing] from the overall impression of the claimed ornamental features." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303-04 (Fed. Cir. 2010).

OLI repeats several legal arguments that this Court has already rejected, including the categorization and impact of the D930 patent's functional elements as well as the relevance of prior art. The Court will not reconsider these issues. The only issue for Rule 50(b) is whether, based on the evidence, a reasonable jury could find that the accused product infringed the D930 patent. The Court concludes that a reasonable jury could do so. OLI's attempts to persuade

otherwise would require the Court to improperly reweigh evidence or assess witness credibility. The Court will not disturb the jury's finding.

### 3. Ordinary Observer

OLI argues that SMG failed to meet its burden to "introduce evidence as to the views of a qualified ordinary observer" because SMG's expert, Brent York, was an expert in lighting design, not school bus sign purchasing. (D930 Case, Br. in Supp. of Mot. for J. as a Matter of Law 10-12.) OLI fails to convince the Court that this distinction makes a difference.

First, the *Egyptian Goddess* test requires the jury to "compar[e] two items through the eyes of the ordinary observer," "giving such attention as a purchaser usually gives." *Egyptian Goddess*, 543 F.3d at 670, 675-76. To assist the jury in reaching the appropriate mindset, York testified as to who the ordinary observer would be ("the ones who make the purchasing decision[s]") and what they would likely focus on. (D930 Case, Trial Tr. II, 334-36, ECF No. 98.) Although York did not hold himself out to be an expert in the relevant types of purchasing decisions, OLI provides no authority that suggests this specific type of expert testimony is necessary. In contrast, SMG provides numerous cases, albeit in out-of-circuit districts, holding the opposite. *See, e.g.*, *Kitsch LLC v. Deejayzoo, LLC*, No. SACV1902556JAKRAOX, 2023 WL 4291445, at *8-9 (C.D. Cal. May 8, 2023) ("Because [the expert] offers his opinions through the lens of the hypothetical, ordinary observer based on his *design expertise* and *understanding* of the typical purchaser, these opinions are admissible."). This Court, too, held that York "doesn't have to be the ordinary observer to give [his] opinion[.]" (Trial Tr. II, 337.)

Second, if OLI wished to challenge York's qualifications to testify as to certain aspects of the legal test, it should have done so prior to his admission. But OLI did not challenge York's admission. (Trial Tr. II, 312.) And despite its contention that "we didn't know [York's] testimony before he got up there[]" (*Id.* at 511), OLI was well aware of both the legal analysis governing this

5

case and of York's intended contribution to that analysis by way of his expert report. (*See* D930 Case, York Opening Rep. ¶¶ 28, 75, ECF No. 77-15.) It is too late to disqualify the portion of York's expert testimony relating to the ordinary observer test. The jury appears to have credited York's testimony as to who the ordinary observer would be in this case; it would be inappropriate for this Court to undertake a reassessment.

### 4. Conclusion

Drawing all reasonable inferences in favor of SMG, OLI has failed to persuade the Court that no reasonable jury could have found that OLI's accused product infringed the D930 Patent. SMG adduced sufficient evidence to support the jury's finding. OLI's motion for judgment as a matter of law on the D930 Patent will be denied.

### C. 491 Case

As with the D930 Patent, OLI has withdrawn several arguments since filing its motion for judgment as a matter of law for the 491 Patent. (*See* January 9, 2023 Email.) The remaining arguments relate to two limitations of the 491 Patent which OLI contends SMG failed to demonstrate.

### 1. Frame

The 491 Patent includes a limitation requiring a "frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting to the school bus[.]" (491 Case, 491 Patent 22:62-63, ECF No. 32-1.) In its summary judgment opinion, the Court construed the term frame to be "a separate, distinct component[.]" (Summ. J. Op. 41.) As a result, the Court resolved the cross motions for summary judgment on the question of literal infringement in OLI's favor. (*Id.* at 46.) This left SMG to argue infringement under the doctrine of equivalents. The Court concluded that there was sufficient evidence to permit a reasonable jury to find infringement based on the doctrine of equivalents:

6

> While this Court found that the frame described in the 491 Patent was a distinct component, separate from the rest of the sign, there are certainly superficial similarities between the frame of the 491 Patent and the frame of the accused product.
>
> The frame of the accused product, like the 491 Patent, surrounds the perimeter of the translucent panel and forms a perimeter of the sign for mounting the sign to the vehicle. The frame of the accused product, like the 491 Patent, allows for direct mounting via through-holes drilled into it. The primary difference, then, appears to be the integrality of the frame to the remainder of the sign. Whether this difference is substantial is a question for the jury.

(*Id.* at 55.)

OLI argues the jury had no reasonable basis to find infringement under the doctrine of equivalents. But SMG's expert, York, presented the following testimony while physically demonstrating with the accused product:

> There's a frame . . . [t]he frame surrounds a perimeter of the translucent panel . . . [a]nd it forms a perimeter of the sign for mounting to the school bus. So the frame—here's the way to think about that. It performs exactly the same function. Surrounding. Mounting. It performs it in the same way . . . and it achieves exactly the same result . . . . That's important. What that means is you can't just say that well, it's separate. It does everything the same way. That still infringes the claim.

(Trial Tr. Vol. 345-346.) York's testimony maps onto one of the "linguistic framework[s]" courts use to determine equivalence, "the so-called 'triple identity test'[.]" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co*, 520 U.S. 17, 39-40 (1997). This test focuses "on the *function* served by a particular element, the *way* that element serves that function, and the *result* obtained by that element." *Id.* This test is also commonly called the function-way-result test. *See, e.g.*, *BOS GmbH & Co. KG v. Macauto USA, Inc.* 515 F. Supp. 3d 651, 675 (E.D. Mich. 2021).

Ultimately, "infringement by equivalents is an issue of fact ordinarily preserved for the jury[.]" *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1319 (Fed. Cir. 2000). York's expert testimony is evidence that fits within the proper legal framework. The jury credited York's testimony when it found in SMG's favor. OLI argues that the accused product

7

**Appx0011**

"has no 'frame' as understood by persons skilled in the art and reasonable minds could come to but one conclusion that the [accused product] does not contain a frame that [is] a separate, distinct component." (491 Case, Br. in Supp. of Mot. for J. as a Matter of Law 5, ECF No. 120.) But OLI's argument is akin to reverting the equivalents analysis back to a literal infringement analysis. Under the equivalents analysis, the only evidence the jury had as to how persons skilled in the art would understand frame equivalence was York's testimony—and York testified to precisely the opposite of OLI's argument. Perhaps reasonable minds could disagree with York, but reasonable disagreement falls well short of the substantial burden a Rule 50(b) motion entails.

OLI makes one additional argument related to the frame limitation: claim vitiation. Claim vitiation is a doctrine of equivalents formulation that "has its clearest application 'where the accused device contain[s] the antithesis of the claimed structure." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013). It is not clear if OLI raises a new legal argument or merely reframes the well-established equivalents tests discussed at length during the trial and above. If this is a new legal argument, it is not properly before the Court. OLI raises claim vitiation for the first time in its Rule 50(b) motion. It was not raised in OLI summary judgments motions, nor at trial, nor in OLI's Rule 50(a) motion. It is too late to raise a new legal theory now. *See, e.g.*, *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 493 (6th Cir. 2008) (concluding a legal argument was waived when raised for the first time in a Rule 50(b) motion "because such a motion could not be used 'as a vehicle to introduce a legal theory not distinctly articulated in its . . . motion for a directed verdict'" (internal quotation marks omitted)).

However, to the extent this is a simple reframing of the other equivalents tests, the claim vitiation argument should not reach a different result. As the Federal Circuit has explained, "vitiation applies when one of skill in the art would understand that the literal and substitute

limitations are not interchangeable, not insubstantially different, and when they do not perform substantially the same function in substantially the same way to accomplish substantially the same result." *Brilliant Instruments*, 707 F.3d at 1347. In other words, the test is "akin to saying that there is no equivalent to the claim element in the accused device based on the well-established 'function-way-result' or 'insubstantial differences' tests." *Id.* As discussed, SMG presented sufficient evidence for a reasonable jury to conclude infringement under those frameworks.

### 2. Spacer

OLI also argues that SMG failed to present sufficient evidence for a reasonable jury to conclude that the accused product meets the "spacer" limitation[1] of the 491 Patent. While OLI raised this issue during its summary judgment motion, it did not raise it in its Rule 50(a) motion at the close of SMG's case. (*See generally* Trial Tr. II, 524-530.) This alone is reason enough to reject OLI's argument. *See Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 780 (6th Cir. 2020) ("A Rule 50(b) motion is only a renewal of the preverdict motion and it can be granted only on grounds advanced in the preverdict motion." (internal quotation marks omitted)).

Regardless, SMG did present sufficient evidence to support the jury's finding that the accused product met the spacer limitation. In his testimony, York discussed the importance of space in illuminated signage and demonstrated how, in his opinion, the accused product contained not one, but two spacers. (Trial Tr. II, 350-351; *see also id.* at 455, 456-462.) OLI's own witness, Colin Carpenter, also provided testimony which a reasonable jury could have considered to be an admission that the accused product met the spacer limitation:

---

[1] Limitation 1.6 of the 491 Patent reads, "wherein the translucent panel is spaced by a spacer from the LEDs thereby creating a gap between the LEDs and the translucent panel." (491 Patent 22:65-67.)

**Appx0013**

Q:    All right.  In this—in your sign, the Opti-Luxx sign, as shown in your drawing here, what's providing the space between the LED and the lens?

A:    The—so the lens rests on a shelf in there.  So there's—and that little shelf is recessed.

(491 Case, Trial Tr. III, 580, ECF No. 104.)

Taken together, and with no expert testimony to rebut York's conclusion, a reasonable jury could have concluded that the accused product met the spacer limitation of the 491 Patent.  OLI has not met its substantial Rule 50(b) burden to overturn the jury's finding.

Note, the Court also declines to evaluate OLI's remaining arguments about the effect of patent prosecution history on the limitations involving "spacer" and the "weather-tight seal."  (*See* Br. in Supp. of Mot. for J. as a Matter of Law 18-22.)  These arguments relate to matters of law which the Court has either previously ruled on or which have been raised too late in the litigation and are waived.  At any rate, none of these arguments were appropriately raised in OLI's Rule 50(a) motion and are thus not properly before the Court on the present motion.

### 3. Conclusion

Drawing all reasonable inferences in favor of SMG, OLI has failed to persuade the Court that no reasonable jury could have found that OLI's accused product infringed the 491 Patent.  SMG adduced sufficient evidence to support the jury's finding.  OLI's motion for judgment as a matter of law on the 491 Patent will be denied.

### II. SMG'S MOTION FOR A PERMANENT INJUNCTION

SMG seeks a permanent injunction preventing OLI from further infringing both the D930 Patent and 491 Patent by continuing to sell its illuminated school bus sign ("Infringing Product").  (*See generally* Mot. for Permanent Inj.)

10

**Appx0014**

**A. Legal Standard**

A patent holder seeking a permanent injunction must satisfy a four-factor test. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Here, SMG must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the hardships between [SMG] and [OLI], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

**B. Irreparable Injury**

Prior to *eBay*, many lower courts applied "a general rule that an injunction normally will issue when a patent is found to have been valid and infringed." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). Although this general rule is now no longer applicable, "it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude." *Id.* To account for this "fundamental nature," courts often consider "the nature of the competition between the parties." *Id.* Irreparable harm is likely to be present in situations involving direct competitors where there is "loss in market share and access to potential customers resulting from [the infringing party's] introduction of infringing [products.]" *Id.* at 1151. *See also, e.g.*, *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 793 (Fed. Cir. 2019) ("Head-to-head competition and lost market share tend to evidence irreparable harm.").

SMG and OLI are direct competitors in the school bus lighting industry. (*See, e.g.*, 491 Case, Def.'s Mot. to Reconsider 11/22/23 Order 2, ECF No. 86.) According to unrebutted trial testimony, this industry has three major bus manufacturers—Navistar, Blue Bird, and Thomas Buses. (491 Case, Trial Tr. I, 104.) By late 2021, SMG had secured the business of two of these manufacturers, Navistar and Thomas Buses, and was actively pursuing Blue Bird. (*Id.*)

Apparently, SMG had made headway with Blue Bird and appeared to be on the brink of securing their business when "Blue Bird sends an e-mail and says, sorry to get your hopes up, but we're flushing this project in favor of a lower cost supplier . . . that supplier was [OLI]." (*Id.* at 105.) This is not disputed by OLI.

In other words, SMG has put forth evidence showing "[h]ead-to-head competition and lost market share[.]" *TEK Global*, 920 F.3d at 793. In fact, SMG asked for monetary damages equal to its lost profits (*see* Trial Tr. III, 493), which the jury awarded (491 Case, Jury Verdict, ECF No. 103). A lost profits award "squarely supports a finding of irreparable harm." *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) (concluding that a jury award of lost profits necessarily implied a jury finding of lost market share and thus irreparable harm).

OLI does not dispute that it is a direct competitor with SMG, nor that its success with Blue Bird resulted in a loss of market share for SMG. Instead, OLI posits that "SMG cannot establish that the competition between SMG and [OLI] was meaningful in a manner that would result in irreparable harm to SMG." (D930 Case, Def.'s Resp. in Opp'n to Pl.'s Mot. for Perm. Injunction 3, ECF No. 145.) Said another way, OLI argues that SMG was already too successful to be harmed by any market share gained by OLI.

OLI's argument is unpersuasive. First, it cites no authority directly supporting the idea that head-to-head competition and lost market share matter *unless* that competition is between competitors of different sizes. Second, the only authority OLI does cite, *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328 (Fed. Cir. 2017), involved parties who primarily sold to different types of customers (distributors versus consumers) and only overlapped in a "very small area of possible competition." *Id.* at 1342. In fact, the court in *Nichia* concluded that "there was an

Appx0016

absence of actual competition." *Id.* (internal quotation marks omitted.) Here, the Court cannot conclude that there is an absence of actual competition simply because SMG secured two of the three major customers in the market while OLI secured only one. Indeed, this is a far cry from the *Nichia* case where the plaintiff "identified 516 sales opportunities, with [the defendant] as a competitor in only 3." *Id.* SMG has identified three sales opportunities—OLI is a competitor in all three.

SMG has established direct competition and lost market share. These are the hallmarks of irreparable injury in a patent infringement case.

### C. Remedies Available at Law

Money damages are less likely to be adequate when a patentee "will continue to suffer irreparable harm due to lost market share, lost business opportunities, and price erosion[,]" absent a permanent injunction. *Robert Bosch*, 659 F.3d at 1155. The continuing nature of such harm, especially when the infringing acts may "significantly change the relevant market," can make monetary damages "difficult to quantify." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

OLI has provided "no reason to believe that [it] will stop infringing, or that the irreparable harms resulting from its infringement will otherwise cease, absent an injunction." *Robert Bosch*, 659 F.3d at 1155. Rather, it offers two arguments as to why remedies at law are adequate. First, OLI suggests that the mere fact that the jury awarded lost profits is enough to show that money damages are in fact quantifiable and thus more likely to be adequate. Second, OLI argues that a royalty or license agreement is a more appropriate remedy and asks this Court to direct the parties to negotiate.

The Court is not persuaded by either argument. First, OLI misunderstands the relevance of the jury award. The jury awarded *past* lost profits. These lost profits were indeed quantifiable,

but this says nothing about the *continued* or *future* harm stemming from OLI's infringement. As in *i4i Ltd.*, OLI's infringement has the potential to significantly change the relevant market by introducing a lower cost product and siphoning off the business of one of three major bus manufacturers. The harm from OLI's ongoing infringement is difficult to quantify, and a jury award for past lost profits does not meaningfully alter this observation.

Second, the Court concludes that an ongoing license or royalty payment in lieu of a permanent injunction is not warranted here. OLI cites instances where courts have ordered such arrangements after concluding that a permanent injunction was otherwise inappropriate. *See, e.g.*, *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1302, 1315 (discussing the district court's conclusion that a permanent injunction was not warranted due in part to an absence of irreparable harm and noting that, in such circumstances, a district court "may wish to allow the parties to negotiate a license amongst themselves . . . before imposing an ongoing royalty"). But the potential availability of an ongoing royalty arrangement does not amount to a general proposition that royalties are preferable to permanent injunctions in most instances.

OLI's citation of *Bard Peripheral Vascular, Inc. v. W.L. Gore Associates, Inc.*, 670 F.3d 1171 (Fed. Cir. 2012), illustrates this latter point. In *Bard Peripheral*, a case dealing with vascular grafts used in cardiac surgeries, the Federal Circuit approved the district court's royalty award, noting that "[t]he award of an ongoing royalty instead of a permanent injunction to compensate for future infringement is appropriate in *some* cases." *Id.* at 1192 (emphasis added). The district court had determined that an injunction would not be in the public interest and set a royalty rate on the infringing medical product instead. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, No. CV-03-0597-PHX-MHM, 2009 WL 920300, at *5-9 (D. Ariz. Mar. 31, 2009). After reviewing the equitable factors, the district court concluded that "the value of the Patent Act and

the protections that it offers to the patentee are sometimes outweighed by the Court's equitable concern for the greater public good, particularly in the realm of vascular surgery and other potentially life saving technologies." *Id.* at *8.

Thus, the cases that OLI cites do not support its proposition that royalties are generally preferable to permanent injunctions. Rather, they suggest that royalties can be appropriate when a permanent injunction is *otherwise* not appropriate, as when there is no irreparable harm or where the greater public interest (*e.g.*, public health) is at stake. This falls short of OLI's contention that courts are increasingly disfavoring permanent injunctions.

Here, SMG has "never licensed the Asserted Patents. Nor would [SMG] ever license them to a competitor." (491 Case, Smith Decl. ¶ 3, ECF No. 111-1.) And beyond OLI's suggestion that a royalty could be adequate, no party has presented any evidence establishing what a fair royalty would be in this case. The Court thus has no basis to determine a fair royalty, and it is disinclined to force the parties to the negotiating table to determine one. Rather, the Court concludes that monetary damages would be inadequate to compensate SMG based on the continuing irreparable harms inherent in OLI's infringement, the inherent difficulty in quantifying such harms, the lack of any indication that OLI will cease to infringe absent an injunction, and the lack of any special circumstances that would warrant an alternative remedy such as an ongoing royalty.

**D. Hardship Balancing**

The third equitable factor "assesses the relative effect of granting or denying an injunction on the parties." *i4i Ltd.*, 598 F.3d at 862. A court may consider several factors in its analysis, including "the parties' sizes, products, and revenue sources." *Id.* A court should not, however, give much weight to the harmful effects an injunction would have on a party who based their business on an infringing product. *See Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012) ("As we have noted, '[o]ne who elects to build a business on a product found to infringe

15

**Appx0019**

cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.'" (quoting *Broadcom Corp. v. Qualcomm Inc*, 543 F.3d 683, 704 (Fed. Cir. 2008))).

The Court does not have significant record evidence detailing the parties' relative sizes, products, or revenue sources. But OLI does offer numerous products other than the infringing sign, including "a full line of lights for school buses and commercial vehicles," and "a driver alert sign." (Trial Tr. III, 560-561.) As OLI notes in its reply to SMG's motion, "if a permanent injunction is granted, [OLI] could feasibly offer an alternative product." (Def.'s Resp. in Opp'n to Pl.'s Mot. for Permanent Inj. 6.) This of course tips in favor of granting the injunction, not against it. *Cf. Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1379 (Fed. Cir. 2020) (reversing the district court's grant of a permanent injunction because it had failed to consider the lack of non-infringing products for two out of five of the defendant's product lines).

On the one hand, SMG has suffered irreparable harm to its business due to OLI's infringement. The harm will be ongoing absent an injunction. Although not dispositive, the Court finds it significant that OLI's infringement was found by a jury to be willful. (Jury Verdict 3.) On the other hand, OLI will undoubtedly suffer from a permanent injunction, losing sales and market share. But two considerations discount the impact of this harm to OLI in the Court's analysis. First, the harm would be the direct result of OLI's own infringement. Second, OLI has admitted that it has other product lines and would be able to feasibly offer an alternative product. Thus, the balance of hardships clearly favors SMG.

### E. Public Interest

"The touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public form the injunction's adverse effects." *TEK Global*, 920 F.3d at 793. Judicial protection of property rights in inventive technology is always a relevant public interest factor favoring a

permanent injunction, even if it is not dispositive. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013). And cheaper goods alone are not a compelling public interest factor disfavoring a permanent injunction because "[w]hile the general public certainly enjoys lower prices, cheap copies of patented inventions have the effect of inhibiting innovation and incentive." *Id.*

OLI primarily asserts that "the public has an overwhelming interest in the safety of children," and that enjoining the sales of its infringing product harms that interest. (Def.'s Resp. in Opp'n to Pl.'s Mot. for Permanent Inj. 7.) But OLI has not established that its products are safer than SMG's or that SMG would be unable to meet customer demand. To the contrary, SMG testified as to the safety of its products (Trial Tr. I, 162-163) and that it had the manufacturing capacity to cover, for instance, the lost Blue Bird business (*id.* at 194-195).

The Court concludes that the public interest is best served by enforcing SMG's patent rights. While OLI's asserted public interest of child safety is indeed important, there is no indication that a permanent injunction will harm that interest. SMG has the capacity to cover the portion of the market that would be served by OLI, and SMG's property rights in its inventive technology should be respected.

### F. Scope

The Court finds that all four equitable factors weigh in favor of granting a permanent injunction. The Court also concludes that SMG's proposed injunction is appropriately narrow in scope and otherwise conforms to the requirements of Federal Rule of Civil Procedure 65.

OLI makes two arguments against this conclusion, but neither is persuasive. First, OLI contends that the proposed injunction is inappropriate because it extends beyond the term of the asserted patents. This is not true. The proposed injunction limits itself to enjoining infringing activity (D930 Case, Am. Proposed Inj., ECF No. 150-4), which logically cannot extend beyond

17

the term of the patents.  Second, OLI takes issue with the language in the injunction that refers to "any other product no more than colorably different from an Infringing Product."  This language comes directly from Federal Circuit precedent.  *See United Constr. Prods. Inc. v. Tile Tech, Inc.*, 843 F.3d 1363, 1371 (Fed. Cir. 2016) ("this court has held that injunctions have satisfactory scope when they prohibit infringement of the patent by the adjudicated devices and infringement by devices *not more colorably different* from the adjudicated devices." (emphasis added, internal quotations omitted)).

### G. Conclusion

SMG's proposed permanent injunction is appropriately narrow in scope and is well supported by all four equitable factors.  SMG's motion for a permanent injunction will be granted.

## III. SMG'S MOTION FOR EXCEPTIONAL CASE AND ENHANCED DAMAGES

SMG seeks attorney's fees and treble damages under 35 U.S.C. §§ 285 and 284, respectively.

### A. Attorney's Fees Under § 285

"The Court in exceptional cases may award reasonable attorneys fees to the prevailing party."  35 U.S.C. § 285.  An "'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

Courts are to consider the totality of the circumstances under a preponderance of the evidence standard.  *Id.* at 554, 557.  Those circumstances may include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 554

n.6; *see also Rothschild Connected Devices Innovations, LLC v. Guardian Prot. Servs., Inc.*, 858 F.3d 1383, 1387 (Fed. Cir. 2017).

SMG is the prevailing party for both cases. It argues that OLI's willful infringement, weak litigation positions, and litigation misconduct make this case exceptional. The Court disagrees.

The jury found that OLI's infringement was willful. (Jury Verdict 3.) While a finding of willfulness may be "among the reasons that a court may find a case to be exceptional," *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 516 (Fed. Cir. 2014), "an attorney fee award is not mandatory when willful infringement has been found," *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 1336, 1349 (Fed. Cir. 2012). *See also SiOnyx LLC v. Hamamatsu Photonic K.K.*, 981 F.3d 1339, 1355 (Fed. Cir. 2020). OLI's willfulness, then, must be considered as one part of the totality of circumstances.

In this regard, the merit of OLI's defense is instructive. SMG moved for summary judgment only as to the 491 Patent, which this Court denied. And OLI scored a significant victory when the Court granted summary judgment on the question of literal infringement. Thus, key questions remained for the jury to decide at trial—questions that went to the heart of the merits of this case.

While SMG argues that "[t]his case was not close—the jury found willful infringement in less than two hours" (491 Case, Pl.'s Reply in Supp. of Motion for Exceptional Case and Enhanced Damages 13, ECF No. 125), the Court disagrees—particularly with respect to the 491 Patent. Here, the jury acted reasonably in finding infringement under the doctrine of equivalents, but the opposite finding would have been reasonable as well. SMG stresses that OLI presented minimal evidence to support its defense and failed to offer expert testimony. But the evidentiary burden was not OLI's to bear. The burden remained with SMG throughout the trial and the jury may have,

**Appx0023**

for example, found noninfringement under the doctrine of equivalents by choosing to discount SMG's expert testimony.

The closeness of this case cuts against the egregiousness of OLI's willful infringement. Although other aspects of the case, such as OLI's asserted invalidity defenses and its antitrust and tortious interference counterclaims, were not nearly as close a call as the core infringement issue, the Court views these as relatively run-of-the-mill defense strategies that naturally changed over the course of the litigation. In other words, this case is less an "egregious case of misconduct" than it is a "garden-variety hard-fought patent case." *Presido Components, Inc. v. Am Tech. Ceramics Corp.*, 875 F.3d 1369, 1382 (Fed. Cir. 2017). The Court is thus unconvinced that OLI's conduct alone, separate from its attorney's conduct, merits an attorney's fee award under § 285.

This leaves the conduct of OLI's counsel, namely Don Darnell. SMG argues that Darnell's misconduct occurred throughout the course of the litigation. It emphasizes Darnell's failure to cooperate during discovery, his failure to cooperate in pre-trial matters such as the preparation of the joint final pre-trial order, and his improper conduct at trial. Much of the misconduct is outlined in a declaration by SMG's attorney. (*See generally* 491 Case, Cunningham Decl., ECF No. 114-4).

As an initial matter, the Court credits SMG's account of Darnell's conduct. The Court experienced some of the conduct firsthand (*see* 11/22/2023 Order Sanctioning Def.), while other conduct is corroborated by evidence included in SMG's motion for exceptional damages. To be sure, the Court does not condone Darnell's conduct and shares in SMG's frustration. However, Darnell's conduct is not so far out of the ordinary as to warrant a finding of an exceptional case under § 285. SMG has not, for instance, shown that Darnell's litigation conduct was due to bad faith. *See Horatio Washington Depot Techs. LLC v. Tomar, Inc.*, 844 F. App'x 368, 369 (Fed. Cir.

**Appx0024**

2021) (upholding district court's denial of attorney's fees under § 285 where district court considered the lack of bad faith as party of its totality of the circumstances analysis).

Further, the Court finds it significant that OLI received both direct monetary sanctions (11/22/2023 Order Sanctioning Def.) and several evidentiary exclusions (*see, e.g.*, 491 Case, Order Regarding Mots. in Limine, ECF No. 79) as a direct result of Darnell's conduct. *See, e.g.*, *vPersonalize Inc. v. Magnetize Consultants Ltd.*, 841 F. App'x 234, 238-39 (Fed. Cir. 2021) (upholding district court's denial of attorney's fees under § 285 despite discovery misconduct where district court had issued sanctions); *Khan v. Hemosphere Inc.*, 825 F. App'x 762, 772 (Fed. Cir. 2020) (same where "the conduct described in the motion [for attorneys' fees] was largely identical to the conduct already presented in the defendants' earlier sanctions motion and was already considered by the court in granting sanctions against the [plaintiffs]"). While the issued sanctions do not completely cover the litigation misconduct about which SMG complains, the Court does not find the additional misconduct so egregious as to warrant attorney fee shifting.

Considering the substantive strength of OLI's litigating position, the jury's finding of willful infringement, and the manner in which the case was litigated, the Court concludes that this case is not so exceptional as to award attorney's fees under § 285. OLI's core merits argument was relatively strong, as indicated by key summary judgment wins and the need for a jury to weigh in on both patents. This undercuts the impact of the willfulness finding. And at bottom, the manner in which the case was litigated likely contributed to OLI's eventual loss as key evidence was excluded and defenses were dropped at trial. The Court declines to push the loss further by approving the fee shifting SMG requests.

**B. Enhanced Damages Under § 284**

Courts may, but are not required to, consider several factors when determining whether to enhance damages under 35 U.S.C. § 284. These factors, called *Read* factors, include:

**Appx0025**

(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct[.]

*Liquid Dyanamics Corp v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (cleaned up, citing *Read Corp. v. Portec. Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)).

SMG focuses primarily on the first factor, deliberate copying, which is supported by the jury's finding of willfulness. The Court agrees that this factor weighs in favor of enhanced damages.

SMG also argues that all remaining factors, except factor (9), favor enhancement. It points to OLI's litigation conduct, discussed at length above, as pushing factor (3) in SMG's favor. It also emphasizes the length of jury deliberations to suggest that factor (5), closeness, favors SMG. Finally, it argues that OLI's infringement has endured since it first encountered SMG's product in 2019, that OLI has taken no steps to remedy the infringement, and that a consistent refusal to stop suggests a motivation for harm, thus factors (6), (7), and (8) should each be construed towards SMG. Finally, SMG points to the lack of evidence regarding good-faith belief, factor (2), and financial hardship, factor (4), as favoring enhancement while the lack of evidence regarding concealment, factor (9), should be viewed neutrally.

The Court largely disagrees with SMG's analysis of the remaining *Read* factors. For one, SMG as the plaintiff and movant bears the burden on this motion. A lack of evidence regarding good faith belief, financial hardship, and concealment thus does not favor SMG. Because the *Read* factors are not mandatory, the Court will view these neutrally.

Further, the Court disagrees with SMG's analysis of closeness. The length of the jury's deliberation is less important than the fact that the jury had to deliberate in the first place. As discussed above, the fundamental merits of this case were close, particularly as it relates to the 491 Patent. The jury was reasonable in its finding, but it would have been reasonable for it to decide another way. Factor (5) thus weighs in OLI's favor.

The closeness of the case cuts against the importance of the jury's willfulness finding. As a result, it also undercuts factors (6), (7), and (8) dealing with the length and degree of OLI's misconduct as well as its motivation. SMG's cursory analysis of these factors is unconvincing, but even if the Court were convinced that these cut in SMG's favor, they would do so only marginally considering the case's closeness.

Neither SMG nor this Court are required to fully analyze the *Read* factors, but SMG has failed to persuade the Court that enhanced damages are warranted. Neither OLI's conduct in developing and marketing its product, nor OLI's attorney's conduct individually or together warrant treble damages under § 284. This is primarily due to the closeness of the case, despite the jury's finding of willfulness.

## IV. ALLOCATION OF COSTS

SMG submits its bill of costs pursuant to Federal Rule of Civil Procedure 54(d)(1). It asks that the Court award $21,289.40 in both cases, to be paid once. It also asks for an additional $497 in the 491 Case, for a total award of $21,786.40. OLI does not dispute the amount, but it does dispute the manner of allocation. OLI argues that instead of the Court awarding the overlapping $21,289.40 in both cases, the Court should instead allocate the award 50/50.

SMG counters that a 50/50 allocation would result in a reimbursement shortfall should one case be overturned on appeal because the total costs incurred were necessary for *each* case. OLI appears to recognize this as it notes that "all of the witnesses' testimonies were relevant to both

23

**Appx0027**

cases." (Def.'s Mot. to Allocate Costs 2). Both SMG and OLI cite case law to support their position.

The Court concludes that SMG has the better argument. These cases "have in many respects been handled jointly" such that the two should be viewed "as a continuum of proceedings necessary to achieve the relief finally granted." *Montera v. Premier Nutrition Corp.*, No. 16-cv-06980-RS, 2023 WL 5054225 (N.D. Cal. Aug. 7, 2023). Allocating the costs 50/50 would result in under-compensation should one case be overturned on appeal since virtually all costs were necessary in achieving each result. Rather, in that eventuality, OLI could potentially submit its own bill of costs post appeal.

## V. CONCLUSION

For the reasons stated above, the Court will: (1) deny OLI's renewed motion for judgment as a matter of law on infringement of the D930 Patent; (2) deny OLI's renewed motion for judgment as a matter of law on infringement of the 491 Patent; (3) grant SMG's motion for a permanent injunction; (4) deny SMG's motion for exceptional case and enhanced damages; and (5) deny OLI's motion opposing SMG's proposed bill of costs.

An order will enter consistent with this Opinion.

Dated: February 23, 2024          /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

       Plaintiff,                        Case Nos. 1:21-cv-1009; 1:22-cv-915

v.                                    Hon. Hala Y. Jarbou

OPTI-LUXX INC.,

       Defendant.

_____/

## JUDGMENT

Plaintiff Smartrend Manufacturing Group (SMG), Inc. sued Opti-Luxx Inc., alleging infringement of two patents: U.S. Design Patent No. D932,930 and U.S. Patent No. 11,348,491. The jury found in favor of Plaintiff and against Defendant on both patents and awarded Plaintiff $23,307.84 in damages.

Consistent with the Jury's findings and verdict (Case No. 1:21-cv-1009, ECF No. 128; Case No. 1:22-cv-915, ECF No. 103), the Court **ENTERS JUDGMENT** for Plaintiff and against Defendant Opti-Luxx Inc., which is liable to Plaintiff for $23,307.84 in damages.

With this Judgment, all claims have been resolved. What remains is the portion of Plaintiff's requested relief that may be granted by the Court. The Court will rule separately on the requested relief and enter such judgment as may be warranted upon further motion from the parties.

Dated: November 29, 2023              /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

      Plaintiff,                    Case No. 1:21-cv-1009; 1:22-cv-915

v.                                Hon. Hala Y. Jarbou

OPTI-LUXX INC.,

      Defendant.

_____/

## **<u>ORDER DENYING MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

This matter is before the Court on Defendant's oral motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure made during trial and at the close of Plaintiff's proofs. For the reasons and grounds set forth in the opinion from the bench which are incorporated herein by reference, Defendant's motions for judgment as a matter of law as to each patent are **DENIED**.

**IT IS SO ORDERED**.

Dated: November 28, 2023          /s/ Hala Y. Jarbou
                                     HALA Y. JARBOU
                                     CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

      Plaintiff,                       Case No. 1:21-cv-1009

v.                                      Hon. Hala Y. Jarbou

OPTI-LUXX INC.,

      Defendant.

_____/

## <u>CORRECTED ORDER DENYING MOTION FOR JUDGMENT AS A MATTER OF LAW</u>

This matter is before the Court on Defendant's oral motions for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure made during trial and at the close of Plaintiff's proofs.  For the reasons and grounds set forth in the opinion from the bench which are incorporated herein by reference, Defendant's motions for judgment as a matter of law as to each patent are **DENIED**.

      **IT IS SO ORDERED**.

Amended to correct typographical error.

Dated: November 29, 2023             /s/ Hala Y. Jarbou
                                         HALA Y. JARBOU
                                         CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

       Plaintiff,                       Case No. 1:21-cv-1009, 1:22-cv-215

v.                                    Hon. Hala Y. Jarbou

OPTI-LUXX INC.,

       Defendant.

_____/

## **ORDER**

Defendant Opti-Luxx, Inc. moves this Court to construe the term "transparency" in U.S Design Patent No. D932,930 ("the D930 Patent") as mutually exclusive with the term "translucent." Plaintiff Smartrend Manufacturing Group (SMG), Inc. contends "transparency" can mean both transparent and translucent.

For purposes of Opti-Luxx's summary judgment motion on impairment of the D930 patent, this Court agreed with Plaintiff's construction. (ECF No. 56.) Now, after trial has already begun, Opti-Luxx again moves this Court to construe the term. To support this motion, Opti-Luxx has submitted a recent Federal Circuit case, *ABS Global, Inc. v. Cytonome/St, LLC*, 84 F.4th 1034 (Fed. Cir. 2023). After reviewing this opinion, the Court finds that *ABS Global* provides no new law that is on-point for the issue at hand; namely, the definition of "transparency." With no new persuasive or controlling authority to the contrary, the Court construes "transparency" as capable of meaning both transparent and translucent, consistent with this Court's previous opinion.

Accordingly,

**IT IS ORDERED** that Defendant Opti-Luxx, Inc.'s oral motion for claim construction on the D930 Patent Case related to the term "transparency" is **DENIED**.

Dated: November 28, 2023 /s/ Hala Y. Jarbou

HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

      Plaintiff,                       Case Nos. 1:21-cv-1009, 1:22-cv-915

v.                                 Hon. Hala Y. Jarbou

OPTI-LUXX, INC.,

      Defendant.

_____/

## ORDER

In accordance with the Opinion entered this date,

**IT IS ORDERED** that Defendant Opti-Luxx, Inc.'s motion for summary judgment on the D930 Patent Case (ECF No. 53) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s motion for summary judgment on evidentiary issues related to the D930 Patent Case (ECF No. 80) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Opti-Luxx, Inc.'s motion for claim construction on the 491 Patent Case (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** with respect to its request for a construction of "frame" and **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that "frame" as used in the 491 Patent be construed to mean a separate and distinct component.

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s and Defendant Opti-Luxx, Inc.'s cross-motions for summary judgment or partial summary

judgment (ECF No. 26) and (ECF No. 30) related to the 491 Patent Case are **GRANTED IN PART AND DENIED IN PART** as set forth herein.

(1) Summary judgment is **DENIED** to Plaintiff Smartrend Manufacturing Group (SMG), Inc. on Claim 1 with respect to literal infringement of the 491 Patent.

(2) Summary judgment is **GRANTED** to Defendant Opti-Luxx, Inc. on Claim 1 with respect to literal infringement of the 491 Patent.

(3) Summary judgment is **DENIED** to Defendant Opti-Luxx, Inc. on Claim 1 with respect to infringement of the 491 Patent under the doctrine of equivalents.

(4) Summary judgment is **GRANTED** to Plaintiff Smartrend Manufacturing Group (SMG), Inc. on Defendant Opti-Luxx, Inc.'s affirmative defense of invalidity of the 491 Patent for anticipation and obviousness.

(5) Summary judgment is **DENIED** to Defendant Opti-Luxx, Inc.'s affirmative defense of invalidity of the 491 Patent for lack of written description.

**IT IS FURTHER ORDERED** the Court finds in favor of Defendant Opti-Luxx, Inc.'s defense regarding literal infringement.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiff Smartrend Manufacturing Group (SMG), Inc. as to Defendant Opti-Luxx, Inc.'s affirmative defense regarding invalidity for anticipation.

**IT IS FURTHER ORDERED** that the Court finds in favor of Plaintiff Smartrend Manufacturing Group (SMG), Inc. as to Defendant Opti-Luxx, Inc.'s affirmative defense regarding invalidity for obviousness.

**Appx0035**

**IT IS FURTHER ORDERED** that Plaintiff Smartrend Manufacturing Group (SMG), Inc.'s motion to dismiss Counterclaims II and III of the 491 Patent Case (ECF No. 19) related to antitrust violations and tortious interference is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Opti-Luxx, Inc.'s Counterclaims II and III of the 491 Patent Case are **DISMISSED** for failure to state a claim.

In light of the foregoing, what remains are: (1) the D930 Patent infringement claim, (2) the D930 invalidity affirmative defense, (3) the 491 Patent infringement claim under the doctrine of equivalents, (4) the 491 written description invalidity affirmative defense. All other claims, counterclaims, and affirmative defenses have been dismissed or resolved.

Dated: September 28, 2023

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE

**Appx0036**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SMARTREND MANUFACTURING
GROUP (SMG), INC.,

       Plaintiff,                      Case Nos. 1:21-cv-1009, 1:22-cv-915

v.                                  Hon. Hala Y. Jarbou

OPTI-LUXX, INC.,

       Defendant.
_____/

## **<u>OPINION</u>**

Plaintiff Smartrend Manufacturing Group (SMG), Inc. ("SMG") brings this action for patent infringement against Defendant Opti-Luxx, Inc. ("OLI"). Plaintiff alleges that Defendant infringed two of its patents, a design patent and a utility patent. There are two patents and two cases before the Court. For ease of discussion, these cases will generally be referred to as one case, as if they were consolidated. Where it is necessary to distinguish between the two cases, such as when referencing exhibits, the Court will refer to the applicable patent's shorthand description. Thus, Case No. 1:21-cv-1009 will be referred to as the "D930 Case," because that case involves Patent D932,930, while Case No. 1:22-cv-915 will be referred to as the "491 Case" because that case involves Patent 11,348,491.

Before the Court are multiple cross motions for summary judgment (D930 Case, ECF Nos. 53, 80; 491 Case, ECF Nos. 26, 30), Plaintiff's motion to dismiss certain counterclaims (491 Case, ECF No. 19), and Defense's motion for claim construction (491 Case, ECF No. 46). This Court has subject matter jurisdiction under 20 U.S.C. § 1331 and § 1338(a).

## I. FACTUAL BACKGROUND

Plaintiff SMG is a Canadian manufacturer and supplier that manufactures illuminated school bus signs through its First Light Safety Products division.  SMG holds the two patents at issue in this case: U.S. Design Patent No. D932,930 (the "D930 Patent") and U.S. Patent No. 11,348,491 (the "491 Patent").  (*See* D930 Case, Am. Compl., ECF No. 19; 491 Case, Compl., ECF No. 1.)

Defendant OLI is a Michigan-based designer and developer of vehicle-related illuminated safety signage.  It also markets illuminated school bus signs, originally through its predecessor corporation, SoundOff Commercial Vehicle Solutions, and now through its current legal and trade name, Opti-Luxx.  (*See* 491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J., ECF No. 31.)

### A. The D930 Patent

SMG's D930 patent is an "ornamental design for an LED light panel[.]" (*See* D930 Case, D930 Patent, ECF No. 53-2, PageID.765.)  For illustration purposes, figures 1 and 2 of the patent are reproduced below.  (*See id.*, PageID.765, 767.)  The shading lines visible in both figures "denote transparency." (*Id.*, PageID.765.)  The patent application was submitted on December 20, 2017, and issued on October 12, 2021.  (D930 Case, Def.'s Br. Mot. for Summ. J. 9, ECF No. 53-1.)  SMG claims, and OLI does not appear to dispute, a priority date for this patent of December 20, 2017.



FIG. 1



FIG. 2

2

**B. The 491 Patent**

SMG's 491 patent is a utility patent that describes a self-contained illuminated sign designed to be mounted onto vehicles, including, but not limited to, school buses. (491 Case, 491 Patent 4:46-50, ECF No. 32-1.) The invention claimed consists of a single independent claim and multiple dependent claims. The independent claim, in full, is as follows:

> 1. An illuminated school bus sign for direct mounting on a school bus, the sign comprising:
>
> opaque lettering positions on or over a front surface of a translucent panel;
>
> an opaque rear panel situated opposite to the translucent panel in spaced relation therefrom to define a space therebetween;
>
> a light source comprising a plurality of LEDs positioned in the space adjacent to the rear panel and pointing towards a front of the sign; and
>
> frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting the sign to the school bus,
>
> wherein the translucent panel is spaced by a spacer from the LEDs thereby creating a gap between the LEDs and the translucent panel,
>
> wherein the spacer surrounds the LEDs and supports a rear surface of the translucent panel along the entire perimeter of the translucent panel, and
>
> wherein the entire perimeter of the translucent panel is sealed in a weather-tight manner by a weather-tight seal between the translucent panel and the spacer.

(*Id.* at 22:52-23:6.)

There are several dependent claims that flow from Claim 1. Most relevant to this case are the following:

> 3. The sign of claim 1, wherein the frame comprises one or more through holes for direct mounting the sign to the school bus
>
> . . .

3

5. The sign of claim 1, wherein the LEDs are arranged in rows.

6. The sign of claim 1, wherein the LEDs are mounted to the rear panel.

. . .

8. The sign of claim 1, wherein the frame is a single piece.

9. The sign of claim 1, wherein the gap is sized to provide substantially uniform illumination emitted from the translucent panel.

. . .

11. The sign of claim 1, wherein a contact between the translucent panel and the spacer is sealed in a weather-tight manner.

12. The sign of claim 1, wherein the translucent panel is adhered to the spacer.

13. The sign of claim 1, wherein the spacer is connected to the rear panel.

14. The sign of claim 1, wherein the spacer has a width parallel to the translucent panel and is positioned behind the perimeter of the translucent panel.

(*See id.*)

The patent includes many possible iterations of the invention, called embodiments. These embodiments are described both through written description, called specifications, and representative illustrations. While these illustrations should not be taken as the only possible configuration of the invention claimed, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005), they do provide useful context for understanding the content of the claims. One such useful illustration is figure 32, reproduced here:

4



FIG. 32

(*See* 491 Patent, PageID.1001.)

The patent application was first filed as a provisional application on March 1, 2018, and eventually issued in its final form on May 31, 2022. (*See id.* at 1-2.) SMG modified and refined its claims throughout the approval process, in conversation with the patent officer. This patent prosecution history is included in evidence (*see* 491 Case, Patent Prosecution, ECF No. 32-5), but will not be recounted in detail here. Relevant portions of the prosecution history will be included in the analysis below.

### C. The Accused Product

This lawsuit was set in motion when SMG became aware that OLI was "likely developing a competing," allegedly infringing, "illuminated school bus sign." (*See* D930 Case, Am. Compl. ¶ 12, ECF. No. 19.) As OLI describes its product, its illuminated sign includes "three main structural components": a rigid plastic housing shaped as a "tub," an LED light board fixed within the housing, and a translucent yellow cover panel bonded to the inwardly extending "lip" of the tub. (*See* 491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J. 13, ECF No. 41.) The product also contains built-in mounting holes for mounting the sign onto a school bus. (*See* 491 Case, March 12, 2022 Letter from OLI to SMG, ECF No. 27-10, PageID.619.)

5

Photographs and technical drawings comprise the bulk of the direct evidence related to the accused product.  Two representative depictions are reproduced here:

 

(*See* 491 Case, ECF Nos. 27-5, 27-9.)

The parties disagree on the design and function of particular elements of the sign.  For example, Plaintiff contends the LED panel (components 7 and 8 in the preceding "exploded view" illustration) is spaced between the translucent panel and the back panel by the walls of the plastic housing (component 10).  (*See* 491 Case, York Report ¶ 72, ECF No. 27-6.)  Defendant, by contrast, maintains such spacing is achieved by "projections" of different lengths extending up from the bottom panel of the housing.  The LED panel rests on the shorter projections and are attached via screws (component 6), while the translucent panel rests on the longer projections. (*See* 491 Case, Carrier Report ¶ 61, ECF No. 27-8.)  The parties dispute other aspects as well, discussed in more detail in the analysis section below.

## II. PROCEDURAL HISTORY

The procedural history of this case is convoluted and will not be recounted in detail here. SMG ultimately seeks (1) declaratory judgment that its patents are valid, and that OLI has infringed

those patents; (2) injunctive relief; and (3) treble damages and attorney's fees. (*See* D930 Case, Am. Compl. 8; 491 Case, Compl. 10, ECF No. 1.)

OLI denies that its product infringes on either patent. (*See* D930 Case, Def.'s Answer to Am. Compl., ECF No. 21, PageID.197-201; 491 Case, Def.'s Answer 12-16, ECF No. 11.) It also asserts several affirmative defenses, including patent invalidity, failure to mitigate damages, and laches, waiver, equitable estoppel, prosecution history estoppel, and unclean hands. (*See* D930 Case, Def.'s Answer to Pl.'s Am. Compl, PageID.202-204; 491 Case, Def.'s Answer 16-19.) Finally, OLI also counterclaims, seeking (1) declaratory judgment that both the D930 and 491 patents are invalid and unenforceable; (2) treble damages and attorney's fees for SMG's alleged violation of federal antitrust laws; and (3) damages and injunctive relief for alleged tortious interference. (*See* D930 Case, Def.'s Answer to Pl.'s Am. Compl., PageID.207-209; 491 Case, Def.'s Answer 21-27.)

While there are numerous claims, counterclaims, and affirmative defenses, this Opinion will be limited to those issues involved in the motions before the Court. Those motions are as follows. For the D930 Case, OLI's motion for summary judgment on patent invalidity and infringement (ECF No. 53) and SMG's motion for partial summary judgment on prior art (an issue related to patent invalidity) (ECF No. 80). For the 491 Case, SMG's motion for summary judgment on infringement (ECF No. 26), OLI's motion for summary judgment on infringement (ECF No. 30), and OLI's motion for claim construction (ECF No. 46). Also for the 491 Case is SMG's motion to dismiss OLI's second and third counterclaims related to alleged antitrust violations and tortious interference (ECF No. 19).

7

**Appx0043**

### III. STANDARDS AND LEGAL BACKGROUNDS

#### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 411 (6th Cir. 2021). "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)). Further, summary judgment on affirmative defenses is appropriate. *Speedeon Data, LLC v. Integrated Direct Marketing, LLC*, 718 F. App'x 333, 337 (6th Cir. 2017). "For an affirmative defense, the defendant has the burden to show that it is entitled to the defense." *Id.*

#### B. Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint for failure to state a claim. "While a complaint need not contain detailed factual

**Appx0044**

allegations, a plaintiff's allegations must include more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or "formulaic recitations of the elements of a cause of action," *Twombly*, 550 U.S. at 555.

Courts are generally bound to consider only the complaint when resolving a motion to dismiss unless the Court converts the motion to one for summary judgment. *Wysocki v. Int'l Bus. Mach. Corp.*, 60 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

9

**Appx0045**

# IV. ANALYSIS

## A. Cross Motions on the D930 Patent

OLI seeks summary judgment on SMG's patent infringement claim and its affirmative defense that the D930 patent is invalid. SMG filed a motion for summary judgment on an evidentiary issue related to invalidity. To reiterate, D930 is a design patent.

### 1. Defendant's Motion for Summary Judgment on Patent Infringement

35 U.S.C. § 171 allows an inventor to obtain a patent for "any new, original and ornamental design for an article of manufacture." A design patent "protects the nonfunctional aspects of an ornamental design as shown in the patent." *See Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

Design patent infringement is assessed using the ordinary observer test. The aim of this test is to determine whether "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, . . . inducing [the purchaser] to purchase one supposing it to be the other." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008). The test is comprised of two parts; the first part is resolved by the Court while the second part is resolved by the finder of fact. "(1) The court first construes the claim to determine its meaning and scope; [and] (2) the fact finder then compares the properly construed claim to the accused design." *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020).

### (a) Design Patent Claim Construction

Claim construction in the design patent context focuses more on pictorial description than written. Indeed, the Federal Circuit "has cautioned, and continues to caution, trial courts about excessive reliance on a detailed verbal description in a design infringement case." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010). Thus, this Court will not undertake a

10

detailed written description of the D930 patent and instead will rely on the applicable exemplary drawings contained in the patent.

The D930 contains 10 exemplary figures.  Figures 1-6 are the embodiments most relevant to this case, while Figures 7-10 merely repeat Figures 1-2 with different wording on the illuminated sign.  Figures 1-3 depict the sign directly from the front, angled from the front and top, and directly from the side.  Figures 4-6 depict the sign directly from the top, bottom, and back.  (*See* D930 Patent, PageID.767-768.) These are produced below:





Note, the line protruding from behind the sign (e.g., behind the "S" in Figure 2) is not a claimed element of the design.   Note also, the diagonal striping behind "School Bus" denotes "transparency" (a contentious point discussed further below).  (*Id.*, PageID.765.)

The Court next considers the functional features of the design.  Functional elements are not protected by a design patent, and thus "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010).  "If . . . a design contains both functional and ornamental

11

features, the patentee must show that the perceived similarity is based on the ornamental features of the design" and "that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental." *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

*OddzOn* illuminates a key distinction between an ornamental aspect and a functional one. At issue in that case was a design patent for a "rocket-like tossing ball." *Id.* The ornamental features were those elements that produced "the overall 'rocket-like' appearance of the design." *Id.* The functional features, on the other hand, were those elements necessary to create a ball "specifically designed to be thrown like a football, yet travel farther than a traditional foam football." *Id.* Thus, the "football shape combined with fins on a tail" were the unprotected functional elements while the "football-shaped ball, slender tailshaft, and three fins which seemingly protrude out of the football and gently flare outwardly" were the protected ornamental elements that created the rocket-like appearance. *Id.* at 1406.

In its argument that the design patent is invalid, OLI asserts that "all elements of the claimed designed are clearly dictated by function." (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 15.) To support this contention, it cites deposition testimony of the D930 inventor, Kevin Smith, who said, "I think for product [design] . . . it needs to be both functional . . . and . . . aesthetic." *Id.* at 16. But this statement merely confirms that design patents often feature elements that are both ornamental and functional, an unremarkable point well supported in case law. *See, e.g.*, *Lanard Toys*, 958 F.3d at 1342.

OLI also points to the National Highway Traffic Safety Administration (NHTSA)'s Uniform Guidelines for State Highway Safety Programs as evidence that the particular phrase, "formatting[,] and stroke of the characters are dictated by federal and/or state law." (D930 Case,

Def.'s Br. in Supp. of Mot. for Summ. J. 21.) Setting aside the fact that NHTSA guidelines are not federal law and merely provide "strategies for minimizing . . . death or injury" (*see* D930 Case, NHTSA, *Highway Safety Program Guideline No. 17 Pupil Transp. Safety* 1 (2009), ECF No. 77-8), the guideline cited does nothing more than advise that "the words 'School Bus' [be] printed in letter not less than eight inches high." (*Id.*) In its rebuttal brief, OLI does cite a few state statutes and regulations to bolster its contention. (*See* D930 Case, Def.'s Reply to Pl.'s Br. Opp. to Summ. J. 17-18.) Ultimately, these citations do not move the needle for OLI, as discussed in further detail in the invalidity section below.

The Court disagrees with OLI that the evidence adduced establishes that "each and every aspect claimed" is functional or otherwise "dictated . . . by statute." (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 16.) Without reducing the patented design to a written description, much of what gives this design its overall appearance is not functional. The general shape of the rectangular sign with rounded corners is not functional—such a shape is not necessary for an illuminated sign. Nor is the width, height, or thickness of the sign. Nor is the black border enclosing the phrase "SCHOOL BUS." Relatedly, while the phrase "SCHOOL BUS" itself is likely functional or otherwise unpatentable, the specific style of the lettering is not. Beyond this, the only elements that this Court views as functional are the transparent panel and the opaque lettering of "SCHOOL BUS." The transparency and opacity of these elements are necessarily functional in the context of an illuminated school bus sign. The transparency allows light to pass through the panel in order to emphasize the featured phrase, which can only be achieved if the phrase itself does not allow the light to pass through (*i.e.*, is opaque).

The Court notes the disagreement between the parties' definition of "transparency." SMG contends that transparent in its patent is interchangeable with translucent, while OLI contends that

**Appx0049**

the two are mutually exclusive.  This Court agrees with SMG's definition for purposes of OLI's motion for summary judgment.  OLI provides no evidence for its definition of transparency while SMG cites case law, its expert report, and the Manual of Patent Examining Procedure ("MPEP").

SMG cites *Nichia Corp. v. Global Value Lighting, LLC.*, No. CV 19-1388-RGA, 2020 WL 6318688 (D. Del. Oct. 28, 2020).  Although this is a single, nonbinding opinion, it does support SMG's contention that "transparent" need not be mutually exclusive with "translucent."  That court, in a patent case in the field of light emitting devices, rejected the defendant's construction which would have required "one be able to see 'clearly and distinctly' through any 'transparent' element of the device."  *Id.* at *6.  OLI argues that the case is inapposite because SMG specifically and exclusively chose the term "transparent" in its patent whereas the *Nichia* patent mentioned both words.  The point is well taken.  But the *Nichia* court examined the intrinsic record of the patent as a whole to make its determination.  It did not resort to the popular definition of words to construct the claim.  *Nichia*, therefore, supports the idea that "transparent" needs to be construed by reference to the patent itself, and that in doing so it is possible to give it a meaning synonymous with translucent.

SMG's expert represents that he is "an expert in lighting and electronic systems."  (D930 Case, York Report ¶ 6, ECF No. 77-15.)  He further represents that the definition "where 'transparent' simply means that a medium or material is able to transmit at least some of the . . . light through it" is "important in light emission design" because many materials that "are classically thought of as 'transparent'" in fact have varying degrees of "imperfections" that "give rise to a spectrum of possible behavior." (*Id.* ¶ 44.)  In other words, "there is no hard line on the amount of light scattering required to consider a material 'transparent' versus translucent[.]"  (*Id.*)  OLI does not offer evidence of a competing industry definition.

14

SMG also cites MPEP guidelines that note "oblique line shading must be used to show transparent, translucent and highly polished or reflective surfaces, such as a mirror." MPEP 1503.02. Thus, it suggests that the oblique line shading can represent both transparency and translucency so the terms must not be mutually exclusive. The Court finds this less persuasive. As OLI points out, SMG did not merely use oblique lines or quote directly from the MPEP in its patent claim. It did choose the word transparent. This is not to say that the definitions cannot co-exist, merely that citation to the MPEP does not meaningfully bolster SMG's argument.

Weighing the evidence proffered in favor of SMG, this Court agrees with SMG's construction of transparency as capable of being synonymous with translucency for purposes of this motion. This is OLI's motion for summary judgment, and OLI has not persuasively met each of SMG's pieces of evidence.

### (b) Design Patent Infringement

Once a claim is properly construed by the Court, the finder of fact takes over to apply the ordinary observer test. Infringement is found "[i]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other." *Egyptian Goddess*, 543 F.3d at 670. The focus of the comparison must be on "overall designs, not similarities of ornamental features in isolation." *Lanard Toys*, 958 F.3d at 1343.

The identity of the ordinary observer is a predicate question. *See Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1321 (Fed. Cir. 2007), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d at 678. The appropriate ordinary observer is not necessarily the end-user or retail customer; rather, it can be the "commercial or industrial buyers of designed items that are used as component parts assembled into a retail product." *Id.* at 1322.

15

SMG and OLI disagree about who the appropriate ordinary observer should be in this instance. OLI argues it should be "a commercial purchaser who is more sophisticated than a normal retail purchaser" and who is "attuned to the requirements of his employer . . . the school bus manufacturer." (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 24.) OLI provides no evidence for its conclusion. SMG argues the ordinary observer "is far less sophisticated." (D930 Case, Pl.'s Resp. to Def.'s Mot. for Summ. J. 25, ECF No. 77.) While SMG sells its products "across the entire school bus supply chain," it notes that "the main driver of sales [is] the individual school districts." (*Id.*) School districts, as opposed to more sophisticated buyers up the chain, "do not care about minute aspects of the sign, as long as the look is correct and it can be installed on buses." (*Id.*) To support this contention, it points to a declaration by its president and D930 inventor, Kevin Smith, as well as the findings of its expert.

For purposes of OLI's summary judgment motion, OLI has failed to present evidence to support its relatively more sophisticated ordinary observer. Drawing all inferences in favor of SMG, the Court will consider the school district as the ordinary observer.

OLI argues that no matter the relative level of sophistication, any ordinary observer would "readily perceive the striking differences in ornamental appearance between the D930 Patent claim and the Accused Device." (D930 Case, Def.'s Reply 11-12, ECF No. 78.) It points to differences such as the accused product's beveled frame, the lack of a black band around the perimeter of the sign, the positioning of the lettering, the appearance of mounting holes, and a backside with "a thin lip and recessed area . . . rather than the border disclosed in the D930 Patent." In its rebuttal

brief, OLI presents a series of side-by-side demonstrations of the photographs and drawings in evidence, reproduced here with the accused product on the left and the D930 figures on the right:

 

  

 

 

 



17

(*See* D930 Case, ECF Nos. 69, 70).

To OLI, "[t]he striking differences are readily perceived from [these] images[.]" (*Id.* at 5.) The Court is not convinced. While individual differences are indeed visible, OLI does not connect these differences to how the ordinary observer would perceive the overall design. In other words, OLI improperly "concentrate[s] on small differences in isolation[,] distract[ing] from the overall impression of the claimed ornamental features." *Crocs*, 598 F.3d at 1303-04.

SMG meets OLI's contentions, at least raising a genuine dispute of material fact as to the impact of the perceived differences. For instance, regarding the bevel noted by OLI, SMG argues that "[t]he slight angle identified by [OLI] is a draft angle of no more than five degrees, which is difficult to even distinguish when compared side-by-side with the D930 patent." (D930 Case, Pl.'s Resp. to Def.'s Mot. for Summ. J. 28-29.)

Two asserted differences warrant further discussion. OLI contends its product "does not practice the ornamental design of the frame and back side . . . for the reason that [its] frame contains square holes/depressions around the perimeter . . . and has a back-side which is remarkably dissimilar to the D930 back-side in every way." (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 22.) Regarding the holes in the perimeter, SMG argues that OLI admitted these holes are "recessed and into the border of the illuminated sign" such that they wouldn't be visible to the ordinary observer when mounted. (D930 Case, Pl.'s Resp. to Def.'s Mot. for Summ. J. 30.)

Regarding the backside, SMG argues two points. First, that a reasonable jury could find that the recessed area creates a similar impression to the D930 backside, "namely a surrounding border or edge[.]" Second, that "the rear of the design is not viewable once installed" such that "the ordinary observer would not find the rear recessed area to affect [the] overall impression of the designs when installed." (*Id.* at 31.)

18

As a matter of law, the ordinary observer test "must encompass all ornamental features visible at any time during normal use of the product," which extends from the point "beginning after completion of manufacture or assembly and end[s] with the ultimate destruction, loss or disappearance of the article." *Contessa Good Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1379, 1381 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d at 678. The purchase of the school bus sign and the subsequent mounting are both relevant points during the life of the product, between which points the holes and backside would be visible. Thus, the Court disagrees with SMG's implied argument that these differences are irrelevant because they are invisible once mounted.

These differences should, however, be put in the proper context of a test which calls for "the eye of an ordinary observer, giving such attention as a purchaser usually gives." *Egyptian Goddess*, 543 F.3d at 670. As such, it would be reasonable to conclude that the ordinary observer (for purposes of this summary judgment motion, a school district) would focus more on the visible portion of the sign rather than those portions of the sign which will be obscured or invisible once mounted. This is not to say the differences are irrelevant. Rather, it is to give proper weight to the various features, with their similarities and dissimilarities, in determining the effect on the overall appearance. This is the sort of evidentiary weighing that a reasonable jury would do.

Without recounting each and every contention of the parties, it is clear from the record that, when drawing all reasonable inferences in favor of SMG, it has at least created a genuine dispute of material fact as to whether an ordinary observer would find the D930 patent and the accused product to be "substantially the same." At this stage, OLI has not established that no reasonable jury could find the accused product to have infringed the D930 patent.

19

### 2. Patent Invalidity

Patent invalidity is an affirmative defense to patent infringement.  The burden rests on the party asserting it.  35 U.S.C. § 282.  A patent, whether design or utility, "shall be presumed valid." *Id.* § 282(a), § 171(b).  This presumption requires a party to prove patent invalidity by clear and convincing evidence.  *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015).  OLI asserts several grounds for why this Court should invalidate SMG's D930 patent: (1) the design is entirely dictated by functional considerations, (2) the design is obvious in light of prior art, and (3) the design patent is indefinite.  (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 13-19.)

#### (a) Functionality

"A design patent can be declared invalid if the claimed design is primarily functional rather than primarily ornamental[.]"  *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1315 (Fed. Cir. 2013) (internal quotations omitted).  Whether a design is dictated by function can be assessed using the factors laid out in *PHG Technologies, LLC v. St. John Cos.*, 469 F.3d 1361 (Fed. Cir. 2006):

> [1] whether the protected design represents the best design; [2] whether alternative designs would adversely affect the utility of the specified article; [3] whether there are any concomitant utility patents; [4] whether the advertising touts particular features of the design as having specific utility; [5] and whether there are any elements in the design or an overall appearance clearly not dictated by function.

*Id.* at 1366.  OLI argues factors 1-3 and 5 tip in its favor.  Although the Court has already embarked on claim construction and thus sorted out the functional from the ornamental, it will address OLI's points in turn.

*Factor One.*  First, OLI argues "[t]he D930 Patent not only represents the best design for the product, it represents the only design for the product because the shape, stroke and size of the characters are dictated by statute."  It points only to the NHTSA guidelines in its initial brief as

evidence supporting this contention.  (*See* D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 13.)  As discussed above, the NHTSA guidelines are not required by law and thus do not support this claim.

To correct for this, OLI then points to three state statutes or regulations in its reply brief (*See* D930 Case, Def.'s Reply 17-18.)  Notably, a reply is not the proper time to raise new arguments or submit new evidence, and OLI does not provide an argument as to why this Court should allow it in this instance.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).  Regardless, the evidence is not persuasive.  Oregon's regulations require capital letters and provide minimum and maximum dimensions.  *See* Or. Dept. of Educ., Rule 581-053-0240(35); Indiana's require "School Bus" in black lettering against "school bus yellow" background and further specify the lettering must "conform to Series 'B'" of the standard alphabets for highway signs." 575 Ind. Admin. Code 1-9-16(m), (p); Michigan's statute requires that buses be "chrome yellow" with "school bus" in black lettering no less than eight inches in height.  Mich. Comp. Laws § 257.1833.

OLI has successfully pointed out that there are some applicable statutes and regulations that dictate some aspects of the D930 patent.  But unanswered questions remain.  Are Oregon, Michigan, and Indiana the only states in which either SMG or OLI operate?  Indiana requires "Series B" lettering, do Oregon and Michigan?  Does the D930 patent use Series B lettering?  Does the accused product?  In short, it is not enough for OLI, on a motion for summary judgment for an affirmative defense which requires clear and convincing evidence, to put some statutes on the table and conclude, without demonstrating, the "font, height, shape and stroke of the indicia[] are all required by law."  Even if it were sufficient, this Court has already concluded that the phrase "School Bus" is not covered by the D930 patent.  But OLI offers no evidence that the other parts

21

**Appx0057**

of the design are themselves dictated by statute or function, or otherwise represent the best design. Thus, OLI has failed to prove factor one tips in its favor.

*Factor Two.* OLI argues that SMG "testified that the design is the only way to attach the sign to a school bus without creating a hole or cavity for a grommeted lens[,]" and thus, alternative designs would adversely affect the utility (factor two). (*See* D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 14 (citing D930 Case, Ex. M to Def.'s Br. in Supp. of Mot. For Summ. J, ECF No. 53-4).) This too falls short of Defendant's burden. Again, OLI focuses on one aspect of the D930 design (here, how the design facilitates attachment) to the exclusion of all others. As SMG counters, for instance, "the shape of the sign need not be rectangular, need not have rounded corners, and need not feature any border surrounding the text." (D930 Case, Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. 9.) OLI homes in on a single aspect of the design and does not address how alternative designs for the *other* aspects would adversely affect utility. OLI has failed to prove factor two tips in its favor.

*Factor Three.* OLI argues that the existence of a related utility patent, the 491 Patent, suggests that the D930 patent is entirely functional. Further, it contends that the 491 Patent claims are identical to those in the D930 Patent.

This factor is a closer call than the previous factors. For one, there appears to be little case law expounding on this factor. *PHG* asks "whether there are any concomitant utility patents," and the literal answer to that question is yes. The 491 Patent can be fairly called a concomitant utility patent. If that is all there is to the factor, then it tips in favor of OLI. But this factor should be put in the proper context of the Court's task—to determine whether a design is completely functional.

OLI argues that the 491 Patent covers "the exact same design" as the D930 Patent, but points only to a single embodiment of the 491 Patent as proof of this. (D930 Case, Def.'s Br. in

Supp. of Mot. for Summ. J. 14.)  But that single embodiment of the 491 Patent is not the sum total

of that patent. *See Phillips*, 415 F.3d at 1323.  The 491 Patent is plainly more concerned with the

*functioning* of the illuminated bus sign, including numerous claims for the internal structure of the

sign, for the mounting of the sign to vehicles, and for the use of specific component parts.  (*See*

491 Patent.)

      The primary aspect of the 491 Patent that overlaps with the D930 Patent is the portion of

independent claim 1 specifying "an illuminated school bus sign" and dependent claim 10 "wherein

the lettering spells the words SCHOOL BUS." (*See id.*, 22:52, 24:5-6).  No other claims in the 491

Patent go towards ornamental design, unlike the D930 patent.  There is no discussion of the design

of the lettering, the black border, the spacing between the lettering and the black border, the general

shape, etc.  Although some of the figures of the 491 Patent depict these features, a utility patent is

emphatically not limited to the illustrated embodiments.  This is a key distinction between utility

patents and design patents.  *Compare Phillips*, 415 F.3d at 1323 *with Lanard Toys*, 958 F.3d at

1341-32.

      In short, the D930 Patent primarily covers the ornamental aspects of the illuminated sign

while the 491 Patent covers its functional aspects.  In the broader context of sorting function from

ornament, courts have stressed "[t]he function of the article itself must not be confused with

'functionality' of the design of the article."  *See High Point Design*, 730 F.3d at 1316 (quoting *L.A.*

*Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993)).  Still, the fact that a

utility patent exists does fit the text of the *PHG* factors.  Thus, for purposes of this summary

judgment motion, the Court will view this factor as weighing in neither party's favor.

      *Factor Four*.  OLI does not address this factor; therefore, the Court will construe it in favor

of SMG on summary judgment.

**Appx0059**

*Factor Five.* Finally, OLI argues that "each and every aspect claimed in the D930 Patent is either dictated by function or by statute." The Court discussed this issue in its claim construction analysis above, but it bears repeating here. To reiterate, OLI points to two pieces of evidence. First, it references the deposition transcript of Kevin Smith where he acknowledged a "product . . . needs to be both . . . functional . . . and . . . aesthetic." Second, OLI again points to statutory requirements. (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 16.) The first point amounts to an acknowledgment that patents comprise both functional and utilitarian considerations and does not help OLI's case. The second point is a repeat of its *Factor One* claim which this Court rejects. OLI has failed to prove factor five tips in its favor.

OLI has not pointed to a single *PHG* factor that tips conclusively in its favor. At this summary judgment stage, it simply has not met its burden to produce by clear and convincing evidence that the patent is invalid due to functionality.

### (b) Obviousness

OLI argues that the D930 patent is invalid because it is obvious in light of prior art. To assess obviousness,

> a finder of fact employs two distinct steps: first, 'one must find a single reference, a something in existence, the design characteristics of which are basically the same as the claimed design; second, once this primary reference is found, other references may be used to modify it to create a design that has the same overall visual appearance as the claimed design.

*High Point Design*, 730 F.3d at 1311 (internal quotations omitted). The ultimate inquiry is "whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Id.* Note, the ordinary designer is distinct from the ordinary observer used to determine infringement. *Id.* at 1313.

Before the Court can begin its analysis, it must first address evidentiary issues raised by SMG. Central to an obviousness-based invalidity defense is prior art. An inventor is entitled to a

24

patent unless "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a); *see also id.* § 171(b). OLI has produced four pieces of purported prior art: U.S. Patent No. D913,177 S ("D177 Patent") (D930 Case, ECF No. 63-1); U.S. Patent No. D712,968 S ("D968 Patent") (D930 Case, ECF No. 64-1); U.S. Patent No. D516,125 S ("D125 Patent") (D930 Case, ECF No. 65-1); and its own lighted sign which it purchased from a manufacturer, depicted by a photograph and a still image from a YouTube video (D930 Case, ECF Nos. 66-1, 67-1). It withdrew a fifth piece of art, a technical drawing from a school bus manufacturer, following SMG's motion for partial summary judgment. (D930 case, Def.'s Resp. to Pl.'s Mot. Partial Summ. J. 1.)

SMG challenges the D177 Patent and OLI's own lighted sign as failing to qualify as admissible prior art. Curiously, SMG has filed a motion for partial summary judgment to disqualify this purported evidence. But evidentiary matters are not resolved on a motion for summary judgment. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (quoting *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984)). It points to no authority authorizing the Court to do so, and thus the Court declines.

Nevertheless, a motion for summary judgment must be made on evidence that will ultimately be admissible at trial in some form. *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986). Thus, the Court will consider SMG's objections to OLI's prior art references in the context of OLI's motion for summary judgment, without making a final ruling on any reference's ultimate admissibility. Any factual disputes surrounding an individual piece of evidence will be viewed in the light most favorable to SMG.

**Appx0061**

*D177 Patent.* SMG argues that the D177 Patent cannot qualify as prior art because it has a later priority date and is not directed to the same article of manufacture as the D930 Patent. If true, SMG is correct that OLI would be precluded from submitting the D177 Patent as a prior art reference. *See* 35 U.S.C. § 102(d) (on priority dates); *In re SurgiSil, L.L.P.*, 14 F.4th 1380 (Fed. Cir. 2021) (on article of manufacture). OLI argues that the D177 Patent's priority date is the initial application date of December 10, 2015, of which the D177 Patent is a continuation-in-part. SMG counters that the D177 Patent cannot claim the earlier continuation-in-part priority date because the final, issued patent covered additional material. Both point to the patent history, which shows the 2015 patent application's inclusion of one view of what would eventually be covered by the D177 Patent. (*See* D930 Case, D177 Patent History, ECF No. 81-7, Page.ID.1901.) OLI does not meet the charge that D177 is directed towards a different article of manufacture as the D930 Patent.

Viewing this in the light most favorable to the non-movant, SMG, the Court finds that a genuine dispute of material fact exists as to the qualification of the D177 Patent as prior art. Namely, whether the earlier patent application's inclusion of the design embodied in D177 was inconsequential and incomplete, and whether D177 and D930 are directed towards the same article of manufacture. Thus, the prior art will be excluded from the obviousness analysis for purposes of this opinion.

*OLI's Own Lighted Sign.* OLI has offered images of its own lighted sign on display at a trade show (D930 Case, ECF No. 67-1) and a still from a YouTube video purporting to show its sign installed on a school bus (D930 Case, ECF No. 66-1) as prior art. SMG challenges that evidence as inadmissible on authentication grounds. After SMG raised this challenge, OLI offered, for the first time, an unsigned affidavit of its sales manager, David Lantzy, verifying that the photo depicts a sign that he displayed at trade shows from July 2016 to 2018, and a sales invoice

26

from the manufacturer of the sign from 2015. (*See* D930 case, ECF No. 82, PageID.1955-1959, 1959-1961.) Note, Lantzy did eventually sign the affidavit, which was offered as evidence in the 491 case, after the time for briefing in this case had passed. (*See* 491 Case, Lantzy Aff., ECF No. 32-4.) OLI also claimed, again seemingly for the first time, that the photograph and YouTube stills were not themselves prior art references, but rather depictions of the sign purchased from the manufacturer in 2015. That sign purchased from the manufacturer is the purported prior art reference.

A reply brief is not the proper time to raise new evidence. *Scottsdale Ins. Co.*, 513 F.3d at 553. Without deciding on the ultimate admissibility of this prior art, the Court finds that OLI has asserted new evidence and recharacterized old evidence too late in the process to credit. The YouTube still and photograph, as timely submitted, are too indefinite and lack authentication, as SMG argues in its response. But even if the Court were to credit the late affidavit as authenticating these pieces of evidence relating to the prior art reference, the reference itself leaves too many questions to resolve at this stage. The photograph of the prior art lacks the detail required to evaluate a design infringement claim. The YouTube still depicts the prior art mounted, whereas the design patent depicts an unmounted sign. And the Court has no information relating to the trade show so as to decide the extent of the reference's public use. For all of these reasons, the prior art will be excluded from the obviousness analysis for purposes of this Opinion.

In summary, OLI is left with two pieces of prior art at this summary judgment stage: the D968 patent and the D125 patent. The Court now turns to the application of the two-step test for invalidity based on obviousness.

*Step One*. To reiterate, the first step is to find a single reference which features "basically the same" design characteristics as the claimed design. *See High Point Design*, 730 F.3d at 1311.

This first step involves both (1) discerning the correct visual impression by the patented design as a whole and (2) determining whether there is a single reference that creates "basically the same" visual impression. *Id.* at 1312 (citing *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996)). The Court must provide sufficient reasoning for both, including a translation of the patented design to a verbal description. *Id.* at 1314. The Federal Circuit has cautioned against translating a design patent "too broadly," and has required a focus "on visual appearances rather than design concepts." *Durling*, 101 F.3d at 104.

*Step One, Part One—Verbal Description of D930.* The D930 patent creates a visual appearance of a rectangular sign, elongated horizontally. It features opaque, large lettering, prominently placed, and a surrounding black border spaced minimally apart. The letters are placed over or under a transparent panel. The horizontal and vertical dimensions of the sign are driven primarily by the letters displayed, sufficiently sized to fit a word or phrase up to roughly 12 characters. The sign is further surrounded by a frame, visually distinct from the lettering and the black border. The sign features curved corners. When viewed from the side and top, the sign is relatively thin. When viewed from the back, the sign is relatively featureless. It appears flat and opaque and lacks both the lettering and the black border of the front.

*Step One, Part Two—The Single Reference.* While OLI dutifully recounts its burden to point to a single reference which has the same design characteristics as the claimed design, it fails to actually do so. Pointing to a single reference is crucial. The analytical steps are clear. First, a single, primary reference is identified. Then, other references may be asserted that modify the design of the primary reference "to create a design that has the same overall visual appearance as the claimed design." *High Point Design*, 730 F.3d 1301. This analytical process describes evaluating the evolution of a design if a single design is not itself enough to establish obviousness.

28

Looking at the remaining prior art references, OLI appears to elevate D968 as the most on-point design. (*See* D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 18 ("[I]n particular . . . the D968 Paten[t] ha[s] virtually the same overall visual appearance as the D930 Patent.").) Thus, for purposes of this summary judgment motion, the Court will consider this design as OLI's offered primary reference. The most relevant depictions are reproduced here, side-by-side with the relevant views of the D930 patent:



(D930 Case, D968 Patent, ECF No. 64-1.)

The D968 patent creates a visual appearance of a rectangular sign, elongated horizontally. It features two separate spaces for lettering, vertically bisecting the sign roughly one-third of the way from the left side. The smaller space created by this bisection is relatively more square-shaped while the larger is more rectangular. The lettering appears to be placed over or under a transparent panel, which is recessed from the surrounding frame. The sign is surrounded by a frame, visually distinct from the lettering and transparent panels. The sign features curved corners. When viewed from the side and top, the sign is relatively thin. When viewed from the back, the rear side of the lettering in the smaller panel is visible. The smaller panel is also recessed from the surrounding frame. The rear side of the larger panel is not visible and instead appears opaque and flush with the frame.

Compare this discussion of the visual appearance of the D968 patent to the discussion of the visual appearance of the D930 appearance and it is clear that the two do not share "basically the same" design characteristics. Even a layperson can appreciate major overall differences with the D968 patent, particularly that of a bisected sign where one panel is visible from both sides. But the test doesn't reference the ordinary person, it references the ordinary designer. Thus, a designer presumably would be tuned into even more subtle differences. This is an appropriate inference to draw given the procedural posture.

*Step Two—Additional References.* Even though OLI fails to point to a single reference that is "basically the same," it does include an additional reference, the D125 Patent. The Court will consider this additional reference for purposes of this summary judgment motion. Critically, OLI has not attempted to show how this additional prior art reference combines with its primary single reference to create a design that is substantially the same. This Court will not embark on a detailed

**Appx0066**

analysis of the secondary reference, but will reproduce it here side-by-side with D930 for comparison purposes and provide a brief verbal description:



(D930 Case, D125 Patent, ECF No. 65).

The visual differences between D125 and D930 are readily apparent. D125 is slanted, creating a parallelogram rather than a rectangle. It features indicia made up of individual lighted components rather than solid, opaque lettering. There is no black border. The panel is not claimed to be transparent. It is, overall, a different design in the eyes of the ordinary designer. Furthermore, OLI has failed to explain, and this Court fails to understand, how D125 combines with D968 to create a design substantially the same as D930. Relevant pictures from each are reproduced below (with D930 on the right):



FIG. 1



FIG. 1



FIG. 3

Simply put, OLI has not carried its burden at this summary judgment stage. It has failed to adduce sufficient clear and convincing evidence that would preclude a reasonable jury from finding for SMG on the issue of invalidity based on obviousness.

### (c) Indefiniteness

OLI includes an indefiniteness section in its brief, but merely quotes from an uncited source. (D930 Case, Def.'s Br. in Supp. of Mot. for Summ. J. 18-19.) There is neither argument nor evidence. To the extent OLI makes this indefiniteness argument, the Court rejects it.

To summarize, OLI has not carried its burden on any one of its invalidity arguments. Genuine disputes of material fact remain. This Court will deny OLI's motion for summary judgment. This Court will also deny SMG's motion for summary judgment to exclude the prior art references, reserving resolution of the evidentiary questions raised for an appropriate evidentiary proceeding.

### B. Cross Motions on the 491 Patent

Before the Court are several motions related to the 491 Patent. OLI filed a motion requesting claim construction of ambiguous claim terms. SMG and OLI filed cross motions on

32

the issues of infringement and OLI's patent invalidity defense. To reiterate, the 491 Patent is a utility patent.

### 1. Defendant's Motion for Claim Construction

The parties dispute several terms throughout their summary judgment briefing as well as their claim construction briefing. The terms, with their disputed meanings, are summarized as follows:

| Claim Term (OLI's assertion of ambiguity in **bold**) | Plaintiff SMG's Construction | Defendant OLI's Construction |
|---|---|---|
| "a **frame**" | Ordinary meaning<br><br>*or*<br><br>Structure having substantially any configuration suitable for providing structure and support | A component distinct and separate from an illuminated sign, which may include a single part or a plurality of parts, which may be provided together with the illuminated sign, and which may be used for supporting and indirectly mounting the illuminated sign to a surface |
| "for **direct mounting** on a school bus" | Ordinary meaning | "This is a statement of intended use and not a required limitation of the claimed invention since it is in the claim preamble, rather than being recited as a claim feature. It means that the illuminated sign is capable of being mounted to a school bus without a frame." |
| "the translucent panel is spaced by a **spacer** from the LEDs thereby creating a gap between LEDs and the translucent panel" | Ordinary meaning<br><br>*or*<br><br>A structure that creates or maintains space | A separate component or layer of the illuminated sign disposed between the LEDs and a translucent panel to create a gap between the LEDs and the translucent panel |
| "The spacer **surrounds** the LEDs" | Ordinary meaning | The spacer extends entirely around the LEDs |
| "**The spacer . . . supports** a rear surface of the translucent panel along the entire perimeter of the translucent panel" | Ordinary meaning | The spacer bears all or part of the weight of the rear surface of the translucent panel |

| "**weather-tight seal**" | Ordinary meaning | A silicone seal which encloses the outer peripheral edge of the entire illuminated sign including all layers from a translucent cover to an opaque rear panel of the illuminated sign |
|---|---|---|

### (a) Legal Background

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A court resolves, as a matter of law, disputes that arise as to a claim term's meaning and scope. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The goal of claim construction is to interpret claims from the perspective of "a person of ordinary skill in the art," rather than a layperson. *Phillips*, 415 F.3d at 1313. This inquiry "provides an objective baseline from which to begin claim interpretation." *Id.*

The Federal Circuit has provided a hierarchy of evidence to consider, beginning with the claim itself and ending with extrinsic evidence and canons of construction. "[T]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* at 1324. For ease of analysis, this Court will discuss its approach to the evidentiary hierarchy in steps.

The first step in claim construction is to determine whether the ordinary meaning of claim language as understood by a person of ordinary skill in the art is "readily apparent." If so, further elaboration is likely unnecessary. *See id.* at 1314 (quoting *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). Indeed, "district courts are not (and should not be) required to construe *every*

34

limitation in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (emphasis in original). "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *Id.*

The second step in claim construction, if necessary, is to examine the claims as part of a "fully integrated written instrument" by looking at the patent's "intrinsic evidence." *Phillips* 415 F.3d at 1315. This intrinsic evidence consists of everything included in the patent itself, such as the claims at issue, the specifications, and other claims, as well as the prosecution history. The specification in particular "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal quotations omitted).

The third step in claim construction, if ambiguities remain, is to resort to extrinsic evidence. This includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317. Note that this extrinsic evidence must still be considered in the context of the intrinsic evidence; it does not stand alone. *Id.* at 1319.

Finally, if ambiguity persists up to this point, a court may employ various doctrines to resolve the dispute. One such doctrine, argued by OLI here, is to construe claims to sustain their validity. The Federal Circuit has cautioned that this doctrine is "of limited utility" and is not a regular component of claim construction. *Id.* at 1327-28.

### (b) Disputed Terms Related to "Frame"

The disputes surrounding "frame" and "direct mounting" boil down to a single issue—whether the frame is necessarily a distinct component, separate from the remainder of the sign. First, the Court notes that the term "frame" itself is easily understood. This term should be afforded

its ordinary meaning, read in conjunction with the remaining limitations contained in the claim (*i.e.*, a "frame . . . for mounting[,]" (*see* 491 Patent 22:62-63)).

Affording frame its ordinary meaning does not resolve the primary issue raised by the parties. The next step is to view the term in the context of the patent as a fully integrated written document. In other words, the Court must construe the relevant terms with reference to the intrinsic evidence.

Looking at just the language of the claim itself, SMG argues that the "proposed construction that the 'frame' is 'distinct and separate' from the illuminated sign is *directly contrary to the language of claim 1*." (491 Case, Pl.'s Reply to Mot. for Claim Construction 10, ECF No. 54) (emphasis in original).) SMG focuses on the word "comprising" in the preamble to claim 1 such that everything that follows indicates a single invention.

The problem for SMG is that "comprising" does not conclusively decide whether the claimed invention is a singular article or whether it is made up of distinct, component parts. Indeed, courts often grapple with enumerating the components of a given patent claim to afford the claim its proper scope. *See, e.g.*, *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1304-05 (Fed. Cir. 2011) (construing a syringe "body" to be limited to a one-piece structure, rather than a two-piece structure, in light of the specifications where the text of the claim itself was open to either construction). In fact, "comprising" itself is well-established as an "open transition phrase" that allows coverage of technologies beyond the recited elements of a claim. *See AFG Indus., Inc. v. Cardinals IG Co.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001). It should not be viewed as limiting or requiring a single, fully integrated invention.

"Frame," as used in the claim, can thus support two meanings—(1) an integral and necessary component of the illuminated sign which provides support and/or structure, or (2) a

36

**Appx0072**

separate component unnecessary to the functioning of the separate illuminated sign.  The plain and ordinary meaning of frame does not favor either construction.  As a result, resort to the rest of the patent document is necessary, and the specifications take on primary importance.  *See Phillips*, 415 F.3d at 1315 ("Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.").

Evaluating the specifications to determine a claim's disputed meaning involves a well-known and well-trod "tightrope."  *Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007).  There is a fine "distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim."  *Phillips*, 415 F.3d at 1323.  The former is appropriate, the latter is not.

The Federal Circuit, in some cases, has stressed that "[t]he patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."  *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  The standard for redefining a term or disavowing the full scope has been described as "exacting."  The disclaimer must be "clear and unmistakable[.]"  *Id.* at 1366-67.  The court has found no disavowal even where the patentee criticizes a certain embodiment or where "the only, or all of the embodiments, contain a particular limitation."  *Id.*

But the Federal Circuit has also found that "even when guidance is not provided in explicit definition format, the specification may define claim terms by *implication* such that the meaning may be found in or ascertained by a reading of the patent documents."  *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (internal quotations omitted) (emphasis added).  So, "while the claims leave open the possibility" of one or more constructions, the Court should choose

37

**Appx0073**

the construction that "tether[s] the claims to what the specifications indicate the inventor actually invented." *Retractable Techs.*, 653 F.3d at 1305.

   *Thorner* itself recognized the possibility of disclaimer by implication. "[T]he 'implied' redefinition must be so clear that it equates to an explicit one. In other words, a person of ordinary skill in the art would have to read the specification and conclude that the applicant has clearly disavowed the claim scope or has acted as its own lexicographer." *Thorner*, 669 F.3d at 1362. What these lines of cases do agree on is that "[i]t is axiomatic that the claim construction process entails more than viewing the claim language in isolation. Claim language must always be read in view of the written description." *Retractable Techs.*, 653 F.3d at 1305.

   Still, the Federal Circuit cases in the intervening years since *Phillips* appear to point in conflicting directions. *See* Federal Judicial Center, *Patent Case Management Guide* § 5:59 (3d ed. 2016). The best way to avoid adhering too closely to one interpretation over the other, then, is to hew to the language of *Phillips* itself:

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so . . . . One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.

*Phillips*, 415 F.3d at 1323.

   "Upon reading the specification in that context," it becomes clear that the 491 Patent sets out an illuminated sign with a separate, distinct mounting frame (or, a "frame . . . for mounting" in the language of the claim, (491 Patent 23:63-64)). The 491 Patent repeatedly and exclusively refers to a "separate mounting frame," as distinct from the sign, throughout the specifications (for

38

a relatively small collection of these references, *see, e.g.*, 491 Patent 2:5-9, 47-48; 4:46-48; 6:12-15; 7:42-51; 10:57; 11:41-45). For example, the 491 Patent describes one embodiment as "a self-contained illuminated sign . . . which is usable together with a separate mounting frame" (*see id.* at 2:5-9), and another where "[t]he overall sign construction . . . is frameless" and that "[t]o support the frameless sign . . . , a separate mounting frame is thus provided" (*see id.* at 7:42-51). The patent describes a number of potential embodiments for the frame itself, including some where the frame is a single piece (*see id.* at 14:65), and some where it is comprised of multiple pieces (*see id.* at 9:32-35).

The 491 Patent extols the virtues of its separate mounting frame, noting "[s]ince the sign is mounted indirectly to the bus via the mounting frame, service or replacement of the sign can be performed without having to remove the entire installation." (*Id.* at 11:11-13.) While the 491 Patent notes that "[w]hat has been described is merely illustrative of some embodiments of the present disclosure[,]" it also sets out to identify "[o]ther embodiments [that] are possible and will now be described." (*Id.* at 12:1-3.) Those other possible embodiments include a camera which may be included in the sign or "[a]lternatively . . . may be mounted in the upper corner of the frame of the sign." (*Id.* at 12:11-18.) They also include a "sensor" which "could be located anywhere practical on the outside of the frame or sign assembly." (*Id.* at 12:37-39.)

The 491 Patent goes on, never once indicating that the mounting frame is anything other than a separate, distinct component. SMG's attempts to say otherwise are unconvincing. In fact, SMG's arguments hurt its case, not help it. At one point, SMG notes "the specification describes signs both with and without frames. It discloses a 'frameless sign' that may be framed to make a 'framed' sign." (491 Case, Pl.'s Reply in Supp. of Mot. for Summ. J. 4.) In other words, the sign may, but does not have to be, framed, which suggests that the frame is a separate component.

39

SMG also points to a figure that depicts the sign as installed on a bus with "frame material." Figure 23 of Patent 491, to which SMG refers, depicts a sign assembly without a "mounting frame" that is installed in a "bus chamber." (*See id.* at 14:6-9.) If the mounting frame was an integral component of the sign, it would be depicted along with the illuminated sign installed in the bus chamber. But the sign is, as explained throughout the patent, "self-contained" and separate from the mounting frame.

SMG's other examples support this interpretation. SMG confirms that the "sign" as described in the patent is capable of being mounted *either* via the mounting frame *or* via other methods (*e.g.*, a "mounting bracket," *id.* at 14:58). This necessarily excludes the frame as an integral component to the sign itself. In other words, the sign can exist, and indeed is designed to exist, separate from the mounting frame. The patent does not describe an invention requiring the mounting frame to provide "structure" to the sign. Instead, it describes a sign that has its own, self-contained structure, and merely needs a way to be mounted onto a vehicle. The separate mounting frame provides one way to do that.

The closest the patent comes to describing the frame as integral to the sign is where it notes "[i]n some embodiments, the frame may be a single piece frame whereby the sign is enclosed by means of intentional deformation of the frame (crimping, stamping, pressing, etc.)." (*Id.* at 15-6-9.) Although SMG does not explicitly make this argument, this statement could be seen as indicating that the frame is more permanently affixed to the rest of the sign. But this weakens the claimed benefit of the separate mounting frame structure by presumably making it more difficult to remove the sign assembly from the mount. At any rate, even this specification describes the sign as separate from the frame. The frame, while now permanently attached to the sign, is still unnecessary to give structure and function, other than mounting, to the sign itself.

Unlike the specifications, the patent prosecution history does not help elucidate the claim language.  It appears that, initially, "frame" was modified by "single-piece."  But how the frame itself is constructed does not bear on whether the frame is an integral part of the illuminated sign or whether it remains a distinct component.

The only other intrinsic evidence to consider are the other claims.  The only dependent claim that mentions frame is dependent claim 8, which notes that the frame is a "single piece." (*See* 491 Patent 24:1.)  As with the prosecution history, this evidence does not help elucidate the claim language.

Using *Phillips* as a lodestar and examining the intrinsic evidence in the context of a person ordinarily skilled in the art, this Court finds that the invention claims the frame as a separate, distinct component.  This is in large part due to the repeated, consistent, and exclusive description of the frame as separate and distinct in the patent specifications.  Thus, resort to extrinsic evidence and the canon to preserve patent validity are unnecessary.

Importantly, the Court is not departing from the ordinary and plain meaning of "frame" or redefining it.  Rather, it is giving content to a term that can only be tethered to its invention by reference to the specifications, as a person ordinarily skilled in the art would do.  This Court views *Retractable Technologies* as more instructive than *Thorner*.  Like *Retractable Technologies*, the 491 Patent touts its separate mounting frame as a *feature* of its invention.  *See Retractable Techs.*, 653 F.3d at 1305.  Like *Retractable Technologies*, the specifications expressly state that the frame is a separate piece from the self-contained sign.  *See id.*  Like *Retractable Technologies*, each figure depicts a sign with a separate mounting frame.  *See id.*  And like *Retractable Technologies*, the specifications do not disclose a frame that is integral to the sign and provides both structure and support to the self-contained sign.  *See id.*  Thus, "while the claims leave open the possibility"

41

that frame may encompass an integral component or a distinct one, "the specifications tell us otherwise." *Id.* Indeed, the disclaimer in the 491 Patent is much stronger than the supposed disclaimer in *Thorner* where the patentee "simply refer[ed] to two terms as alternatives or disclos[ed] embodiments that all use the term the same way."

It bears emphasizing that "this court may reach a narrower construction, limited to the embodiment(s) disclosed in the specification, when the claims themselves, the specification, or the prosecution history clearly indicate that the invention encompasses no more than that confined structure or method." *Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1287 (Fed. Cir. 2009) (internal quotations omitted). That is especially true where a patent "repeatedly, consistently, and exclusively" depicts a given invention as embodying only one of multiple potential interpretations of claim language. *See In re Abbott*, 696 F.3d at 1150; *see also Phillips*, 415 F.3d at 1328-29 (Lourie, J., concurring in part and dissenting in part) ("[C]laims need not necessarily be limited to specific or preferred embodiments in the specification, although they are limited to what is contained in the overall disclosure of the specification."). The 491 Patent does so here.

### (c) Disputed Terms Related to "Spacer"

OLI seeks to construe the claim related to "the spacer [that] surrounds the LEDs and supports a rear surface of the translucent panel" (491 Patent 23:1-3), to mean a "separate component or layer of the sign positioned between the LEDS and the translucent panel that extends entirely around the LEDs and bears all or part of the weight of the rear surface of the translucent panel." The Court fails to see how OLI's construction is meaningfully different from the claim itself or is helpful to a fact finder. Rather, this appears to be an exercise in redundancy, creating a definition that is more confusing than the claim itself.

None of the terms that OLI seeks to construe are ambiguous on their face, nor does OLI explain how the claims in light of the specification create ambiguity. Rather, it cites the single

discussion of spacer in the patent as evidence that SMG "clearly indicated its intention to restrict the scope of the claims to the [relevant] embodiment." (Def.'s Mot. for Claim Construction 25, ECF No. 47.) But the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323.

Patent 491 contains numerous embodiments. OLI needs more than a brief discussion of a single one to import a more specific (and arguably more confusing) construction of a claim. "A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004); *see also Thorner*, 669 F.3d at 1367. The Court finds the comparison to its construction of frame and *Thorner* useful here. The intrinsic evidence provides some evidence of "spacer" being used in the way OLI contends, but it does not rise to the level of a clear disavowal that is apparent with "frame."

Thus, the Court declines to construe spacer or any related words. These terms should be given their ordinary meaning. As SMG notes, the claim itself provides further structural limitations that the accused product must meet to establish infringement. This is sufficient for a finder of fact to evaluate infringement.

### (d) Disputed Terms Related to "Weather-Tight Seal"

OLI provides little intrinsic support for its definition of "weather-tight seal." It points to a single embodiment contained in the patent which states, "[i]n some embodiments a silicone seal encloses the edge of the sign unit between the layers and prevents dust and moisture from penetrating the unit." (*See* 491 Patent 16:36-39.) From here, its expert concludes the term "to have a plain and ordinary meaning of—a silicone seal . . . which encloses" the sign. (*See* Carrier Report ¶ 55, ECF No. 27-4.)

43

The Court recognizes the inherent inconsistency of OLI describing a "plain and ordinary meaning" of "weather-tight seal" as encompassing a specific material. To use this specific definition, however, would be to improperly read a limitation from the written description into the claims. While there is sometimes "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," *see Phillips*, 415 F.3d at 1323 (internal quotations omitted), this Court finds the line is relatively clear here.

The claim mentions only that the "entire perimeter [of the sign] . . . is sealed in a weather-tight manner by a weather-tight seal." (491 Patent, 23:4-6.) Here, "weather-tight" has an ordinary meaning that would be understood by a person ordinarily skilled in the art. This is "readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. In layman's terms, weather-tight means something like, but not exclusively, "proof against wind and rain." *See, e.g., Weathertight, Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/weathertight (last visited Sept. 27, 2023). Expounding upon the definition would be in exercise in redundancy and would be unhelpful to the jury. A single mention of "silicone" in the specifications does not change that.

Thus, the Court finds that "weather-tight seal" needs no construction and should be afforded its ordinary meaning, as understood by a person ordinarily skilled in the art.

### 2. Infringement

With the claims properly construed, the Court now turns to the parties' cross motions for summary judgment on infringement. SMG moves for summary judgment on literal infringement. OLI moves for summary judgment on both literal infringement and infringement under the doctrine of equivalents. While the motions will be discussed together, each will be evaluated on its merits and all reasonable inferences will be drawn against the moving party. *Redbubble*, 989 F.3d at 442.

**(a) Literal Infringement**

"A claim is literally infringed when the accused device literally embodies each limitation of the claim." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed. Cir. 2000) (citing *Pall Corp v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995)). Literal infringement analysis requires "application of the properly-construed claim to the accused device" and is a question of fact. *Id.* (citing *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 612 (Fed. Cir. 2008)).

*The first four limitations of claim 1.* SMG asserts OLI's product literally embodies the first four limitations of claim 1. These limitations are:

1. An illuminated school bus sign for direct mounting on a school bus, the sign comprising:

Opaque letterings positioned on or over a front surface of a translucent panel;

An opaque rear panel situated opposite to the translucent panel in spaced relation therefrom to define a space therebetween;

A light source comprising a plurality of LEDs positioned in the space adjacent to the rear panel and pointing towards a front of the sign.

(491 Patent 22:52-61.)

OLI concedes that its product embodies each of these limitations. (See Carrier Report, ¶¶ 69-71.) It cabins its concession to the first of these limitations by arguing it is a preamble that should be "non-limiting for purpose of determining infringement." (Id. ¶ 68). But this neither helps nor hurts OLI's case. Infringement does not turn on whether the sign is capable of being direct mounted—both the accused product and the invention claim may be direct mounted. No dispute exists on this point, and thus the accused product literally infringes on the first four limitations of the claim.

*Frame.* The Court's construction of "frame" as a distinct component separate from the remainder of the sign largely resolves literal infringement on this limitation. There appears to be no dispute that the accused product features a frame that is literally different than the distinct frame of Patent 491.

SMG does not offer an argument in the alternative should OLI's claim construction prevail. SMG's argument relies on "frame" being construed as allowing for both a distinct component and an integral component. The evidence it cites shows the accused product as having a frame that is integrally connected to the remainder of the sign (see representative images reproduced below). Indeed, OLI asserts, and SMG does not dispute, its accused product has a "one-piece, tub-shaped, rigid, plastic housing with a bottom panel, an outer peripheral sidewall that extends upward from the bottom panel and a lip/ledge that projects inward form the upper end of the sidewall defining an opening." (*See* 491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J. 17.)







(491 Case, York Report ¶¶ 72, 86, ECF No. 27-6.)

The periphery of this structure is what SMG asserts is the accused product's frame because it surrounds the sign and has through-holes for mounting. While this may be a frame in one sense, it is not a frame in the sense of the 491 Patent. The frame is not separate from the remainder of the sign; it is an integral component of the sign which cannot be removed.

The only suggestion of the accused product featuring a frame in the same sense as the 491 Patent is in SMG's expert report. The report states, "The [accused product] further includes a separate mounting frame . . . the mounting frame having a space for removably receiving the sealed sign as a single unit." (*Id.* ¶ 31.) This statement is insufficient to create a dispute of fact

47

for summary judgment purposes. The expert points to no evidence which suggests the accused product has a "separate mounting frame" and his statement directly contradicts his repeated references to "direct mounting." It is clear from the images and technical drawings of the accused product, which both parties rely on, that its frame is integral to the sign as a whole and not a separate component.

Based on the foregoing, OLI's accused product does not literally infringe on the limitation that the sign contain a frame for mounting, properly construed as a separate and distinct component.

*Spacer.* Claim 1 mentions "spacer" in two instances:

> wherein the translucent panel is spaced by a spacer from the LEDs thereby creating a gap between the LEDs and the translucent panel,

> wherein the spacer surrounds the LEDs and supports a rear surface of the translucent panel along the entire perimeter of the translucent panel . . .

(491 Patent 22:65-23:3.) The Court determined that spacer is to be given its plain and ordinary meaning. The parties agree that a spacer is used in the accused product in the sense that something is creating space between the LEDs and the translucent panel. They disagree on what creates that space.

SMG contends that the sidewall of the plastic housing creates the space and should thus be considered the spacer. If that is true, then SMG has an argument for literal infringement as the spacer surrounds and supports the rear surface of the translucent panel.

However, OLI counters that "such spacing is achieved by first (shorter) and second (longer) projections extending up from the bottom panel," where the shorter projections place the LEDs and the longer projections place the translucent panel, "such that the differen[ce] in axial

48

length . . . corresponds to the gap." (*See* 491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J. 35.) A visual depiction of the different interpretations is as follows (SMG's above, OLI's below):



(491 Case, York Report ¶¶ 78.)



(491 Case, Carrier Report ¶ 55.)

This Court finds that what precisely creates the space between the LED panels and the translucent panel is a factual question that cannot be decided on summary judgment based on the evidence presented. Both interpretations are plausible from the drawings. Thus, drawing reasonable conclusions against the movant of each summary judgment motion, a genuine dispute of material fact exists.

*Weather-tight seal.*  Claim 1 requires that "the entire perimeter of the translucent panel is sealed in a weather-tight manner by a weather-tight seal between the translucent panel and the spacer." (491 Patent 23:4-6.)  OLI's infringement argument on this limitation is hard to discern. It appears to rely on its proposed construction of "weather-tight seal" to specifically mean silicone. (*See* Carrier Report ¶ 88 ("[w]hether or not the [accued product] includes this limitation is fully dependent on the meaning of "weather-tight seal[.]").)  This Court has rejected that construction and afforded "weather-tight" its ordinary meaning.

Further, OLI appears to have admitted its accused product literally infringes on this limitation.  In a letter from then-counsel to SMG, OLI described its accused product as having a translucent panel "fixed/permanently bonded to the one-piece housing so as to fully [ ] weather-seal the large recess . . . ." (3/12/2022 Letter, ECF No. 27-10, PageID.619.)   OLI does not offer a rebuttal to this fact.

Here, no dispute of material fact exists.  This Court finds the accused product literally infringes on the limitation requiring it be sealed in "weather-tight manner by a weather-tight seal."

*Dependent Claims 3, 5, and 6.*  SMG also moves for summary judgment on dependent claims 3, 5, and 6. OLI's only counterargument is that these dependent claims cannot be literally infringed if the independent claim is not literally infringed.  While correct as a pure legal matter, it is useful at summary judgment to resolve the issues that can be resolved.  SMG may still be able to succeed under the doctrine of equivalents, and claims found to have been literally infringed will suffice for this theory.  Thus, because the determination of literal infringement on these dependent claims will eventually need to be resolved, the Court will proceed to consider SMG's motion.

Dependent claim 3 relates to the frame.  The limitation reads "the sign of claim 1, wherein the frame comprised one or more through holes for direct mounting the sign to the school bus."

**Appx0086**

(491 Patent 23:8-10.) Because claim 3 is directly dependent on a limitation in claim 1 that this Court finds has not been literally infringed, the accused product does not and cannot literally infringe claim 3.

Dependent claims 5 and 6 are a different matter. Both relate to the LEDs. These claims read "the sign of claim 1 wherein the LEDS are arranged in rows" (dependent claim 5) and "mounted to the rear panel" (dependent claim 6). (491 Patent 23:13-16.) The evidence in the record indicates that there is no dispute of material fact here. The LEDs are arranged in rows and mounted to the rear panel according to OLI's own technical drawings:





51



(*See* Carrier Report, PageID.608; 491 Case, Technical Drawings, ECF No. 27-5, PageID.330 (image of LED components 7 and 8 from "view 4" above enlarged).)

Thus, this Court finds that dependent claim 3 is not literally infringed while dependent claims 5 and 6 are literally infringed.

*Summary*.  This Court finds that OLI's accused product does not literally infringe on Patent 491 because not every limitation is met.  Specifically, the accused product does not meet the limitation requiring a "frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting the sign to the school bus."  (491 Patent 22:62-64.)

#### (b) Infringement Under the Doctrine of Equivalents

SMG's motion for summary judgment does not include infringement under the doctrine of equivalents.  OLI's motion broadly speaks to non-infringement and its brief in support argues non-infringement under the doctrine of equivalents.  The Court will thus consider OLI's motion and construe all reasonable inferences in favor of SMG.

"A device which does not infringe a patent claim literally may still infringe the claim under the doctrine of equivalents if each and every limitation is literally or equivalently present."  *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318-19 (Fed. Cir. 2000) (internal citations omitted).  A limitation is "equivalently present in an accused device if there are only insubstantial differences between the limitation and the corresponding aspects of the device."  *Id.* (internal quotations omitted).  "[I]nfringement by equivalents is an issue of fact ordinarily

preserved for the jury," though courts are obliged to grant summary judgment if "no reasonable jury could determine two elements to be equivalent." *Id.*

This doctrine is limited by a separate doctrine, the doctrine of prosecution history estoppel. Prosecution history estoppel doctrine "provides that a patent owner can be estopped from relying upon the doctrine of equivalents when the patent applicant relinquishes coverage of subject matter during the prosecution of the patent, either by amendment or argument." This issue is a question of law. *Id.* (internal quotations and citations omitted).

OLI argues that the Supreme Court's decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 525 U.S. 722 (2002), requires that "any substantive amendment made to the claims during prosecution, for any statutory reason, will raise a presumption that the patent owner is completely barred from the availability of any equivalents under the Doctrine of Equivalents." (Def.'s Mot. for Summ. J. 18, ECF No. 30.) OLI overstates the application of this presumption. While *Festo* imposes a presumption, the substantive amendment must relate in some way to the limitation in order to trigger it. The text of the opinion is instructive:

> This presumption is not, then, just the complete bar by another name. Rather, it reflects the fact that the *interpretation of the patent must begin with its literal claims, and the prosecution history is relevant to construing those claims*. When the patentee has chosen to narrow a claim, *courts may presume the amended text was composed with awareness of this rule and that the territory surrendered is not an equivalent of the territory claimed*. In those instances, however, the patentee still might rebut the presumption that estoppel bars a claim of equivalence. The patentee must show that at the time of the amendment one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent.

*Festo*, 535 U.S. at 741 (emphasis added). Thus, for the presumption to apply, the patent amendment must relate in some way to the "territory" encompassed by the limitation.

The Court has already found literal infringement on several limitations and has found a material dispute of fact on the limitation involving a spacer. Thus, the only limitation to which

53

the doctrine of equivalents applies at this stage is the one requiring a "frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting the sign to the school bus." (491 Patent 22:62-64.)

*Doctrine of prosecution history estoppel.*  OLI does not point to any substantial amendment relating to the frame of Patent 491.  The prosecution history reveals three amendments relating to frame.  The first was to add the article "a" before frame.  (491 Case, 491 Prosecution History, ECF No. 40-4, PageID.1645.)  The second was to remove the modifier "single piece."  (*Id.*, PageID.1763.)  Note, the single piece frame limitation later became dependent claim 3.  (491 Patent 23:8-10.)  The third was to remove a clause from the spacer limitation language noting "the frame having a thickness at least as thick as the space between the rear and translucent panels." (491 Prosecution History, PageID.1777.)

OLI does not argue, and this Court does not find, that any of these amendments are "substantial" or that they in any way narrowed the relevant "territory" of the frame limitation.  The first amendment is de minimis.  The second amendment expanded, rather than narrowed, the scope of the limitation.  The third amendment appears to have related more to removing extraneous verbiage from a limitation involving a different claim element.  This too expanded, rather than narrowed, the frame limitation, if it had any effect at all.

At this summary judgment stage, OLI has not presented sufficient evidence that warrants a grant of its motion on the basis of the doctrine of prosecution history estoppel.  Even if the presumption of *Festo* were to apply here, the Court finds that the prosecution history itself rebuts the presumption, and OLI should be allowed to proceed to argue infringement under the doctrine of equivalents.

**Appx0090**

*Infringement under the doctrine of equivalents.* The arguments and counterarguments surrounding the frame are, at this point, well known. While this Court found that the frame described in the 491 Patent was a distinct component, separate from the rest of the sign, there are certainly superficial similarities between the frame of the 491 Patent and the frame of the accused product.

The frame of the accused product, like the 491 Patent, surrounds the perimeter of the translucent panel and forms a perimeter of the sign for mounting the sign to the vehicle. The frame of the accused product, like the 491 Patent, allows for direct mounting via through-holes drilled into it. The primary difference, then, appears to be the integrality of the frame to the remainder of the sign. Whether this difference is substantial is a question for the jury.

At this stage, drawing all inferences in favor of SMG, this Court cannot conclude that no reasonable jury would find the accused product to be equivalent to the 491 Patent.

### 3. Invalidity

OLI asserts an affirmative defense of anticipation invalidity under 35 U.S.C. § 102, obviousness invalidity under § 103, and lack of written description invalidity under § 112(a). It moves for summary judgment for written description invalidity. SMG moves for summary judgment on anticipation and obviousness invalidity. Because a patent is presumed valid, 35 U.S.C. § 282, invalidity must be proven by an accused infringer by clear and convincing evidence, *Microsoft v. I4I Ltd.,* 564 U.S. 91, 95 (2011).

Relevant to all three invalidity contentions are three prior art references cited by OLI: U.S. Patent No. 2012/0036750 (491 Case, 750 Patent, ECF No. 32-1), U.S. Patent No. 6,698,118 (491 Case, 118 Patent, ECF No. 32-3), and an early prototype of its own sign held by its predecessor corporation, SoundOff CVS (491 Case, SoundOff prototype, ECF Nos. 66, 67). Notably, each of

**Appx0091**

these prior art references was disclosed in some form to the Patent and Trademark Office (PTO) during the 491 Patent approval process. (*See* 491 Patent 2).

### (a) Anticipation

"A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Generva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Anticipation is a question of fact. *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1347 (Fed. Cir. 2013). OLI only asserts invalidity for anticipation if the "Court were to adopt the broad meanings of the claim terms 'a frame' or 'a spacer' being asserted by the plaintiff[.]" (491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J. 45.) Further, OLI cites only the SoundOff Prototype as anticipating the 491 Patent.

With the Court's construction of "frame," OLI is unable to make a prima facie case of invalidity for anticipation. The SoundOff Prototype prior art reference does not disclose a frame as used in the claimed invention. Even without the Court's construction of "frame," OLI does not show how its use of the sign, either via tradeshows or a YouTube video, constitutes public disclosure of the applicable limitations. There is no evidence indicating a public disclosure of the internal components of the sign, nor is there an explanation as to how a person of ordinary skill in the art would "inherently" anticipate such limitations absent express disclosure. *See Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) (explaining claim anticipation may either be express or inherent, with anticipation by inherency occurring where it would be appreciated by one of ordinary skill in the art). Summary judgment for SMG is appropriate.

### (b) Obviousness

Invalidity for obviousness is a question of law, "based on underlying factual findings," including "(1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) evidence of

secondary factors . . . ." *Cheese Systems*, 725 F.3d at 1347-48, 1352. The secondary factors are objective considerations that "protect against the prejudice of hindsight bias" in an obviousness analysis. *Id.* at 1352. This objective evidence "can include copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *Id.*

Like anticipation, OLI notes that it only asserts an obviousness defense under § 103 if the Court were to adopt SMG's preferred constructions. Indeed, because the Court has construed "frame" as a separate and distinct component, it is that much more difficult for OLI to make the required showing of invalidity for obviousness.

Furthermore, OLI does not appear to meet SMG's contention that it has failed to make a prima facie case for obviousness invalidity. Rather, it notes in reply that "it is [OLI's] position that . . . the admissible evidence of record shows that the [OLI] sign utilizes a three component that is prior art to the 491 Patent as it was widely used in many illuminated signs and lights in the US years before the effective filing date of the 491 patent." (491 Case, Def.'s Resp. to Pl.'s Mot. for Summ. J. 46.) If this is the evidence OLI relies on, it falls short of the evidence required. OLI has not produced evidence of widespread use of the three-component structure. It cites only the SoundOff prototype. Nor has OLI produced evidence of the appropriate person ordinarily skilled in the art. Nor has OLI produced evidence of any secondary, objective factors.

The Court agrees with SMG that OLI has failed to adduce the required evidence sufficient to prove to a jury by clear and convincing evidence that the 491 Patent is invalid for obviousness. Summary judgment for SMG is appropriate.

### (c) Written Description and New Matter

OLI argues that the claim limitations regarding "spacer" and "weather-tight seal" were improperly added as "new matter" during the patent approval process and thus invalid under 35 U.S.C. § 132. Further, OLI argues that these limitations lack written description support and are thus invalid under 35 U.S.C. § 112(a). It moves for summary judgment on these contentions. This Court is not persuaded.

With respect to OLI's new matter argument, it bears emphasizing that the PTO approved the 491 Patent after considering the relevant amendments. The PTO considers whether an amendment impermissibly contains new matter, and thus "[i]mplicit in the action of the Patent Office in permitting the amendment, is a determination that the amendment does not contain new matter within the meaning of [§ 135] and this determination is presumptively correct." *Reeves Bros. v. U.S. Laminating Corp.*, 282 F. Supp. 118, 130 (E.D.N.Y. 1968), *aff'd*, 417 F.3d 869 (2d Cir. 1969); *see also R.E. Phelon Co. v. Wabash, Inc.*, 640 F. Supp. 1383, 1401 (N.D. Ind. 1986), *rev'd on other grounds*. Historically, courts have viewed matter as new when it "involve[s] a departure from or [an] addition to the original disclosure," and not new when it is "something that might fairly be deduced from the original application." *Stearn v. Superior Distrib. Co.*, 674 F.2d 539, 544 (6th Cir. 1982) (internal quotations omitted).

There appears to be very little current binding (or even persuasive) precedent in this area, and OLI points to none. Nor does OLI convince this Court that the PTO erred in approving the patent in light of these amendments. The amendments relate solely to the actual claims of the patent, not to the drawings or specifications. Thus, so long as spacer and weather tight can arguably be fairly deduced from the specifications and drawings, OLI cannot successfully challenge the validity based on new matter.

58

This observation dovetails into OLI's challenge on written description under § 112. Indeed, the predecessor to the Federal Circuit, the Court of Customs and Patent Appeals, noted that "[t]he proper basis for rejection of a claim amended to recite elements thought to be without support in the original disclosure . . . is [§] 112 . . . not [§] 132." *See In re Rasmussen*, 650 F.2d 1212, 1214 (C.C.P.A. 1981).

"A determination that a patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112[a] is a question of fact . . . ." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010). "[T]he test . . . is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* at 1351. Like many aspects of patent law, written description is analyzed in the context of a "skilled reader of the patent disclosure[.]" *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1191 (Fed. Cir. 2014).

OLI has three arguments, none of which is supported by evidence as to how a person ordinarily skilled in the art would read the patent disclosures. First, OLI argues that the limitation in the claim that the spacer "surrounds" the LEDs is unsupported by the specifications. Specifically, it notes that Figure 32 of the 491 Patent does not depict a spacer "surrounding" the LEDs because no full spacer (items 1008 and 1010 in the image below) is fully visible:



**Appx0095**

(491 Patent, PageID.276.)  But a patent specification need not "spell out every detail of the invention," *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005), nor "describe the claimed subject matter in precisely the same terms as found in the claims at issue," *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1331 (Fed. Cir. 2008).  At this stage, it cannot be said that a skilled patent reader would inevitably fail to understand the depicted spacers as "surrounding" the LEDs simply because the figure is only partially visible.  OLI's first argument fails.

Second, OLI argues that the limitation that the spacer "supports" a rear surface of the translucent panel (figure 1006 in the image above) along its "entire perimeter" is unsupported by the specifications.  The "entire perimeter" argument is plainly contradicted by the visual depiction of Figure 32 of the 491 Patent.  For the "supports" argument, OLI appears to rely on the lack of direct contact between the spacer and the translucent panel as being fatal to the challenged limitation.  OLI cites neither case law nor evidence relating to how a person ordinarily skilled in the art would support this contention.  SMG's expert counters that a person ordinarily skilled in the art would understand that contact is not required for support; it also cites case law rejecting interpretations similar to OLI's.  SMG has at least presented sufficient evidence to raise a genuine dispute, and OLI falls short of meeting its clear and convincing evidence burden.  OLI's second argument fails.

Third, OLI argues that the weather-tight seal "between" the translucent panel and spacer, surrounding the "entire perimeter" of the panel is unsupported by the specifications.  Without reference to a person ordinarily skilled in the art, it is somewhat difficult to understand how OLI views the specifications as failing to support the limitation.  The relevant specification itself reads "[i]n some embodiments, a silicone seal encloses the edge of the sign unit between the layers and

prevents dust and moisture from penetrating the unit," referencing figure 1012 in the above image. Together, the drawing and written description depict a weather-tight seal (figure 1012) between the translucent panel (figure 1006) and spacer (1008), whose dimensions appear to surround the entire perimeter of the panel. This matches the claim language, a point also made by SMG's expert. Thus, SMG has at least presented sufficient evidence to raise a genuine dispute. Again, OLI fails to meet its burden, and its third argument fails.

### (d) *Summary*

OLI has failed to produce sufficient clear and convincing evidence to succeed on its invalidity claims. SMG's motion for summary judgment for anticipation and obviousness invalidity will be granted, and OLI's motion for summary judgment for written description will be denied.

### 4. Plaintiff's Motion to Dismiss Defendant's Second and Third Counterclaims

OLI counterclaims on the 491 Patent, alleging SMG violated federal and state antitrust laws and committed tortious interference. SMG moves for a dismissal of both counterclaims for failure to state a claim under Rule 12(b)(6). OLI did not file a response, and the time to do so has passed.

### (a) Violation of Antitrust Laws

OLI alleges violations of both federal and state antitrust laws. 15 U.S.C. § 2 *et seq.*; Mich. Comp. Laws § 445.778(2). Because Michigan's antitrust statute "mirrors" the federal one, courts "apply the same analysis to both federal and state antitrust claims." *Hobart-Mayfield, Inc. v. Nat'l Operating Comm. on Standards for Athletic Equip.*, 48 F.4th 656, 663 (6th Cir. 2022). This Opinion will discuss in terms of the federal analysis.

OLI alleges SMG violated federal antitrust laws in two ways. First, SMG allegedly threatened and ultimately pursued the instant legal action when it knew its patent was invalid

61

and/or that the accused device did not infringe. Second, SMG allegedly contacted "at least one" of OLI's customers to try to convince them to cut off their business relationship in light of the alleged patent infringement. (See 491 Case, Def.'s Answer ¶¶ 14, 19-20, 23.)

SMG argues that OLI has failed to state a claim for its antitrust counterclaims for several reasons, each of which is individually sufficient to dismiss on a 12(b)(6) motion. SMG avers that OLI failed to identify the relevant product market, allege antitrust standing, or conducts violative of the antitrust laws.

The Federal Circuit has exclusive jurisdiction over "any civil action in which a party has asserted a compulsory counterclaim arising under[ ] any Act of Congress relating to patents." 28 U.S.C. § 1295. "[A]ntitrust claims premised on the bringing of a patent infringement suit" are "decided as a question of Federal Circuit law." *NobelPharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998). However, the Federal Circuit "appl[ies] the law of the appropriate regional circuit to issues involving other elements of antitrust law such as relevant market, market power, damages, etc., as those issues are not unique to patent law[.]" *Id.*

OLI brings its antitrust counterclaim primarily under § 2 of the Sherman Act, 15 U.S.C. § 2. Section 2 prohibits illegal monopolization of a market for which a claimant must show "(1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012) (internal quotations omitted).

A claimant must also "first demonstrate that it has standing," a requirement which "is more onerous than the conventional Article III inquiry." This is a "threshold, pleading-stage inquiry

and when a complaint by its terms fails to establish this requirement [district courts] must dismiss it as a matter of law." *Id.*

*Relevant market.* Plaintiffs must "identity the relevant product and geographic markets so the district court can assess 'what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market.'" *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)). While courts are hesitant to grant motions to dismiss on such a fact-intensive inquiry, *see, e.g.*, *United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 2d 665, 672 (E.D. Mich. 2011), plaintiffs must still plead enough facts to establish the proposed boundaries of the relevant market, *see Total Benefits*, 552 F.3d at 437. If there is no identification of the competitors in a given market or the scope of the products and services on which they compete, a court "must dismiss the case for failure to state a claim." *See id.*

OLI does not attempt to define either the relevant product or geographic market in its counterclaim. It asserts "SMG possesses monopoly power in a defined relevant market" and no more. (*See* 491 Case, Def.'s Answer ¶ 17.) This is the sort of "threadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements" that falls short of pleading standards. *Iqbal*, 556 U.S. at 678. The Court is left with no clues as to the geographic scope of the alleged market, the types of products on which the parties compete, or whether the parties are the only competitors in the market. OLI's counterclaim must be dismissed for this reason alone.

*Antitrust standing.* The Court "decides whether a claimant has adequately pleaded antitrust standing by balancing five factors[,]" none of which controls:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the

63

**Appx0099**

injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Static Control*, 697 F.3d at 402. To simplify, these factors focus on the nature of the injury (factors (1), (2), and (3)), the relief sought (factors (3) and (4)), and the nature of competition within the market (factors (2) and (5)).

Evaluating these factors on OLI's complaint alone is a difficult task. Without a relevant product market or an identification of the market's relevant players, the Court has scant information to analyze. However, there is enough to make a determination as to "antitrust injury, which is a 'necessary but not always sufficient,' condition of antitrust standing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986)). To properly plead standing, an antitrust claimant must show that the conduct complained of is an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* (internal quotations omitted). The antitrust laws were intended to protect "competition not competitors." *Brown Shoe*, 370 U.S. at 320. Thus, "even though a claimant alleges that an injury is causally related to an antitrust violation, it will not qualify as an antitrust injury unless it is attributable to an anticompetitive aspect of the practice under scrutiny." *NicSand*, 507 F.3d at 451.

There are two major problems for OLI on its antitrust injury (a component of factors (1), (2), and (3)). First, OLI fails to plead sufficient facts that allow an inference of injury to competition as a whole rather than to OLI as a competitor. Both actions alleged by OLI evoke an individualized injury to OLI, but OLI fails to suggest how those actions harm competition in addition to the competitor. *See Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005) ("Individual injury, without accompanying market-wide injury, does

64

not fall within the protections of the Sherman Act."). Second, most of what OLI complains of is protected by the *Noerr-Penington* doctrine. This point is discussed further below.

Without an adequately pleaded antitrust injury, OLI has failed to establish antitrust standing. OLI's claim must also be dismissed for this reason.

*SMG's Alleged Conduct.* SMG argues that both of its alleged anticompetitive actions, the instant lawsuit and customer communication, are shielded from antitrust liability as a matter of law.

Regarding the lawsuit, the *Noerr-Penington* doctrine recognizes a First Amendment right to petition the courts for redress from harm and thus, as a general matter, filing a lawsuit is immune from antitrust liability. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961); *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). In the patent context, an exception to this immunity is recognized when "the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through . . . fraud . . . or (2) that the infringement suit was a mere sham[.]" *Nobelpharma*, 141 F.3d at 1068; *see also Static Control*, 697 F.3d at 408. Thus, to overcome *Noerr-Penington* immunity, OLI must plead adequate facts that permit an inference of fraud or a sham lawsuit.

OLI alleges both. It alleges the 491 Patent was fraudulently obtained and that SMG "kn[ew] or should [have known] that the claims . . . are invalid and/or that the Accused device does not infringe." (491 Case, Def.'s Answer ¶¶ 16, 40.) With respect to fraud, OLI falls short of the *Twombly/Iqbal* pleading standards, even without considering the heightened pleading standards under Rule 9(b). In fact, it does not identify any of SMG's alleged conduct as fraudulent and instead merely asks for a declaration of fraud in its prayer for relief. The closest it comes to alleging some issue in the patent approval process is when it argues that SMG's application

65

impermissibly introduced new matter. But there are no allegations that SMG withheld information from the PTO, or somehow duped it into approving their application. OLI simply has not pleaded sufficient facts to draw an inference of fraud, and thus cannot defeat *Noer-Pennington* immunity on this basis.

For a lawsuit to be a sham, it "must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless . . . [;] if a suit is not objectively baseless, antitrust defendant's subjective motivation is immaterial." *Nobelpharma*, 141 F.3d at 1072 (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus, Inc.* (PRE), 508 U.S. 49, 60-61 (1993)); *see also Static*, 697 F.3d at 408).

Even without referencing the lack of a (12)(b)(6) motion on infringement or the preceding discussion in this Opinion to show that SMG's lawsuit is not "objectively baseless," OLI fails to plead enough facts in its counterclaim to support such an inference. It asserts that its product does not infringe and points to specific challenged elements, but these challenges to SMG's suit do not support an inference that the suit is "objectively baseless." So long as an "objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*[.]" *PRE*, 508 U.S. at 60-61 (internal citations omitted). At most, OLI has shown that it thinks it can win, not that SMG knows it cannot.

The other conduct that OLI alleges as a violation of the antitrust laws is the threat to "one or more school bus manufacturers" that the purchase of an OLI product will result in being blacklisted from purchasing SMG products. This appears to be an allegation of a vertical restraint on trade, as it deals with a manufacturer, SMG, threatening to cut off business dealings with one or more customers. But "a manufacturer has a right to select its customers and refuse to sell its goods to anyone, for reasons sufficient to itself." *Care Heating & Cooling*, 427 F.3d at 1013. In

66

fact, this sort of vertical restraint is per se legal, because "nonprice vertical restraints rarely tend to restrict competition and decrease output." *Id.* (quoting Dep't of Just., Vertical Restraints Guidelines, § 2, 50 Fed. Reg. 6263 (1985)). OLI does not allege sufficient facts to warrant further scrutiny of this vertical restraint, like the presence of exclusive dealing arrangements or territorial restrictions. *See id.* at 6264.

Without an allegation of conduct that falls afoul of antitrust laws, OLI cannot sustain an antitrust counterclaim. OLI's counterclaim must also be dismissed for this reason.

*Summary.* OLI has failed to state a claim for three independent reasons. It has failed to define the relevant product market, establish antitrust standing, or plead conduct sufficient to establish a violation of the antitrust laws. This Court will grant SMG's motion to dismiss OLI's antitrust counterclaim.

### (b) Tortious Interference

OLI alleges SMG committed tortious interference when it "intended, by its conduct, to interfere in [its relationships with school bus manufacturers] by attempting to convince [OLI]'s known or potential customers to not do [ ] business with [OLI]." (Def.'s Answer ¶ 33.) It also cites SMG's violation of antitrust laws as an act constituting tortious interference. (*Id.* ¶ 34.) OLI does not specify which state laws or common law it brings this counterclaim under, so this Court will apply Michigan's choice-of-law rules as required when exercising supplemental jurisdiction. *See Felder v. Casey*, 487 U.S. 131, 151 (1988).

"In a tort action, Michigan courts recognize a presumption in favor of . . . [the] appl[ication] of Michigan law unless a rational reason to do otherwise exists." *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 693 (6th Cir. 2013). Whether a rational reason exists is a two-step test, which results in "Michigan courts . . . us[ing] another state's laws where the other state has a significant interest and Michigan has only a minimal interest in the matter." *See Hall*

*v. General Motors Corp.*, 582 N.W.2d 866, 868 (Mich. 1998).  Here, neither party alleges facts

that would indicate a foreign state has a greater interest than Michigan.  OLI is incorporated in and

conducts business in Michigan while SMG is a Canadian corporation.  SMG placed the conduct

that forms the basis of the underlying patent action in Michigan, and any counter-injury done to

OLI would impact a Michigan company.  Clearly, Michigan's interest in preventing tortious

interference with its companies is a strong one.  Michigan tort law is thus the appropriate choice

of law.

> In Michigan, the elements of tortious interference with business relationships are:
>
> (1) the existence of a valid business relationship or expectancy that is not
> necessarily predicated on an enforceable contract, (2) knowledge of the relationship
> or expectancy on the part of the defendant interferer, (3) an intentional interference
> by the defendant inducing or causing a breach or termination of the relationship or
> expectancy, and (4) resulting damage to the party whose relationship or expectancy
> was disrupted.

*Courser v. Allard*, 969 F.3d 604, 620-21 (6th Cir. 2020) (citing *Health Call of Detroit v. Atrium*

*Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. 2005).  The third element is often

the focus and requires that "one who alleges tortious interference . . . must allege the intentional

doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for

the purpose of" the interference.  *Adamo Demolition Co. v. Int'l Union of Operating Eng'rs Loc.*

*150, AFL-CIO*, 3 F.4th 866, 874 (6th Cir. 2021) (citing *Derderian v. Genesys Health Care Sys.*,

689 N.W.2d 145, 157-58 (Mich. 2004).  A per se wrongful act is "an act that can never be justified

under any circumstances."  *Id.* (quoting *Prysak v. R.L. Polk Co.*, 483 N.W.2d 629, 635 (Mich.

1992)).

Thus, to survive a motion to dismiss, OLI must have pleaded sufficient facts that would

allow an inference of improper motive of an otherwise legal act (*i.e.*, malice) or an inference that

the alleged act is never justified under any circumstances.  *See Wausau Underwriters Ins. Co. v.*

*Vulcan Dev., Inc.*, 323 F.3d 396, 404 (6th Cir. 2003) (citing *Feldman v. Green*, 360 N.W.2d 881, 891 (Mich. 1994)).  It has failed to do so.

First, OLI argues that SMG's alleged anticompetitive behavior amounts to tortious interference.  Because OLI has failed to state a claim under antitrust laws, its dependent tortious interference claim must also fail.  To put this point in terms of Michigan tort law, because OLI could not plead sufficient facts that permit an inference that SMG has violated antitrust laws through fraud, a sham lawsuit, and/or vertical restraints on competition, it has not pleaded sufficient facts that permit an inference of either a per se wrongful act or a lawful act done with malice.  Thus, the only remaining tortious interference claim is SMG's attempt to convince OLI's customer(s) to not do business with OLI.

There is no indication that merely contacting a customer is itself illegal or per se wrongful.  OLI's claim must thus rely on improper motive.  On its face, SMG's actions appear to have been motivated by a desire to protect its intellectual property by refusing to do business with customers it views as purchasing infringing products.  This would preclude finding malice.  "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference."  *Id.*  Regardless of the ultimate outcome of this case, OLI has not shown that SMG's lawsuit to protect its intellectual property is objectively baseless.  Thus, other actions seeking the same result are similarly not objectively baseless. Further, OLI has failed to plead facts that would permit an inference that it can "demonstrate, with specificity, affirmative acts by [SMG] that corroborate the improper motive of the interference." *SAAB Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 443 (6th Cir. 2014) (affirming dismissal of a Michigan tortious interference claim on a 12(b)(6) motion).

69

**Appx0105**

OLI has failed to state a claim for tortious interference under Michigan common law. It has failed to allege sufficient facts that would permit an inference that SMG's conduct was either per se wrongful or lawful but maliciously motived. This Court will grant SMG's motion to dismiss OLI's tortious interference counterclaim.

## V. CONCLUSION

For the reasons stated above, the Court will: (1) deny OLI's motion for summary judgment on non-infringement and invalidity of the D930 Patent, (2) deny SMG's motion for summary judgment on evidentiary issues related to invalidity of the D930 Patent, (3) grant in part and deny in part OLI's motion for claim construction for the D491 Patent, (4) deny SMG's motion for summary judgment on infringement of the 491 Patent, (5) grant in part and deny in part OLI's motion for summary judgment on infringement of the 491 Patent, (6) grant SMG's motion for summary judgment on invalidity of the 491 Patent, (7) deny OLI's motion for summary judgment on invalidity of the 491 Patent, and (8) grant SMG's motion to dismiss OLI's second and third counterclaims in the 491 Case for failure to state a claim.

An order will enter consistent with this Opinion.

Dated: September 28, 2023          /s/ Hala Y. Jarbou
                                     HALA Y. JARBOU
                                     CHIEF UNITED STATES DISTRICT JUDGE

US00D932930S

(12) **United States Design Patent**

Smith et al.

(10) Patent No.:     **US D932,930 S**

(45) Date of Patent:    ** **Oct. 12, 2021**

(54) **LED LIGHT PANEL**

(71) Applicant: **SMARTREND SUPPLY LTD.**,
Winnipeg (CA)

(72) Inventors: **Kevin Smith**, Winnipeg (CA); **Doug Darvill**, Winnipeg (CA)

(73) Assignee: **SMARTREND SUPPLY LTD**,
Winnipeg (CA)

( * ) Notice: This patent is subject to a terminal disclaimer.

(**) Term: **15 Years**

(21) Appl. No.: **29/630,335**

(22) Filed: **Dec. 20, 2017**

(51) **LOC (13) Cl.** ............................................... **10-05**

(52) **U.S. Cl.**
USPC ........................................ **D10/111**

(58) **Field of Classification Search**
USPC ......... D10/109.1–114.1; D20/10, 13, 15, 22,
D20/27, 28, 41, 42, 99; D12/190, 193,
D12/213, 220
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,130,090 A | | 9/1938 | Imhofe |
| D254,298 S | * | 2/1980 | Sexton ..................... D10/114.1 |
| D516,125 S | * | 2/2006 | Fincher .......................... D20/10 |
| D712,968 S | * | 9/2014 | Gorelick ....................... D20/10 |
| D763,356 S | * | 8/2016 | Takayama ..................... D20/10 |
| D768,242 S | * | 10/2016 | Fallon ............................ D20/42 |
| D776,202 S | * | 1/2017 | Zenoff ........................... D20/42 |
| D776,761 S | * | 1/2017 | Zenoff ........................... D20/42 |
| 9,821,714 B2 | * | 11/2017 | Stevens .................. B60Q 9/008 |
| 9,937,853 B2 | * | 4/2018 | Stevens ................ B60Q 1/2607 |

| | | | |
|---|---|---|---|
| D831,116 S | * | 10/2018 | Banas ............................ D20/10 |
| 2004/0231209 A1 | * | 11/2004 | Love ...................... G09F 13/02 40/591 |
| 2007/0103922 A1 | * | 5/2007 | Rissmiller ................ B60Q 1/50 362/499 |

(Continued)

OTHER PUBLICATIONS

"First Light Safety Products Illuminated Sign" available Jul. 10, 2018, [online], [site visited Oct. 7, 2019]. Retrieved from Internet, URL: https://vimeo.com/279347155 (Year: 2018).*

(Continued)

*Primary Examiner* — Michael C Stout
*Assistant Examiner* — Katrina N Gonzalez
(74) *Attorney, Agent, or Firm* — Alston & Bird LLP

(57) **CLAIM**

The ornamental design for an LED light panel, as shown and described.

**DESCRIPTION**

FIG. **1** is a front elevation view of a first embodiment of the design;
FIG. **2** is a front perspective view thereof;
FIG. **3** is a side elevation view thereof, the opposing side elevation view being a mirror image;
FIG. **4** is a top plan view thereof;
FIG. **5** is a bottom plan view thereof;
FIG. **6** is a rear elevation view thereof;
FIG. **7** is a front elevation view of a second embodiment of the design;
FIG. **8** is a front perspective view thereof.
FIG. **9** is a front elevation view of a third embodiment of the design; and,
FIG. **10** is a front perspective view thereof.
Broken lines are used to illustrated portions of the article that do not form part of the claimed design. The oblique shading lines visible in the front and perspective views denote transparency.

**1 Claim, 4 Drawing Sheets**



PLAINTIFF'S EXHIBIT 1

**US D932,930 S**

Page 2

(56)         **References Cited**

U.S. PATENT DOCUMENTS

2019/0272779 A1*    9/2019  Gamble ............. G09F 13/0413

OTHER PUBLICATIONS

"First Light Safety Products _ Illuminated Destination Signs" available Aug. 28, 2018, [online], [site visited Oct. 7, 2019]. Retrieved from Internet, URL:https://web.archive.org/web/20180828092233/http://firstlightsafety.com/products/destination-signs-7/ (Year: 2018).*

"Led Sign Light Bulbs" [online] [retrieved May 29, 2019], Retrieved from the Internet: <URL:https://www.newyorkbussales.com/wp-content/uploads/2016/04/16-0405-1_led_sign_lights.pdf> dated (2015) pp. 1-5.

"Can you Keep a Secret? Here it is: 'School Bus Drivers Can't See in the Dark'", [online] [retrieved May 29, 2019], Retrieved from the internet: <URL:https://www.linkedin.com/pulse/can-you-keep-secret-here-school-bus-drivers-cant-see-dark-decarlo/> dated Jan. 8, 2017.

Shackleford, C. "How and When to Buy a Used School Bus" [online] [retrieved May 29, 2019], Retrieved from the internet: <URL:https://www.schoolbusfleet.com/article/610459/how-and-when-to-buy-a-used-school-bus> dated Aug. 1, 2017.

Leauby, B. "6 Ways to Address New Overtime Rules", [online] [retrieved May 29, 2019], Retrieved from the internet: <URL:https://www.schoolbusfleet.com/article/717606/6-ways-to-address-new-overtime-rules> dated Nov. 9, 2016.

"School Bus Fleet Magazine Forums" [online] [retrieved May 29, 2019], Retrieved from the internet: <URL:https://www.schoolbusfleet.com/forum/topic.asp?TOPIC_ID=7463> dated (2004).

"SoundOff CVP Driver Alert Message Sign" [online], retrieved from the Internet Feb. 24, 2021, <https://youtu.be/k0Plh2AMxnQ> (dated Mar. 22, 2017), 1 page.

* cited by examiner



FIG. 1



FIG. 2

FIG. 3



FIG. 4

FIG. 5

FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US011348491B2

(12) **United States Patent**
Gamble et al.

(10) Patent No.: **US 11,348,491 B2**
(45) Date of Patent: **May 31, 2022**

(54) **ILLUMINATED SIGNS FOR VEHICLES, MOUNTING SYSTEMS THEREFOR AND RELATED METHODS**

(71) Applicant: **SMARTREND MANUFACTURING GROUP (SMG), INC.**, Winnipeg (CA)

(72) Inventors: **Nick Gamble**, Winnipeg (CA); **Michael Yudelevich**, Winnipeg (CA); **David Beernaert**, Winnipeg (CA); **Kevin Smith**, Winnipeg (CA)

(73) Assignee: **SMARTREND MANUFACTURING GROUP (SMG), INC.**, Winnipeg (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **17/394,814**

(22) Filed: **Aug. 5, 2021**

(65) **Prior Publication Data**

US 2021/0366321 A1    Nov. 25, 2021

**Related U.S. Application Data**

(62) Division of application No. 16/289,818, filed on Mar. 1, 2019, now Pat. No. 11,170,673.

(Continued)

(51) **Int. Cl.**
 *G09F 13/18* (2006.01)
 *G09F 13/04* (2006.01)
 (Continued)

(52) **U.S. Cl.**
 CPC ........... *G09F 13/18* (2013.01); *B60Q 1/2696* (2013.01); *B60Q 1/503* (2013.01); *G09F 13/005* (2013.01);
 (Continued)

(58) **Field of Classification Search**
 CPC ............. G09F 13/18; G09F 2013/1804; G09F 2013/1809; G09F 13/0413; G09F 13/08;
 (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,130,090 | A | 9/1938 | Imhofe |
| 2,877,584 | A | 3/1959 | Dupree |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 207624341 U | 7/2018 |
| JP | 2011081244 A | 4/2011 |

(Continued)

OTHER PUBLICATIONS

"Led Sign Light Bulbs" [online] [retrieved May 29, 2019], Retrieved from the internet: <https://www.newyorkbussales.com/wp-content/uploads/2016/04/16-0405-1_led_sign_lights.pdf> (2015) pp. 1-5.

*Primary Examiner* — Gary C Hoge
(74) *Attorney, Agent, or Firm* — Alston & Bird LLP

(57) **ABSTRACT**

A self-contained illuminated sign for mounting on a vehicle is disclosed. The sign includes a front panel, a rear panel situated opposite and substantially parallel to the front panel in spaced relation therefrom to define a space therebetween, and a light source comprising a plurality of LEDs. The light source is positioned between the front and rear panels and is configured to emit light that emanates from the front panel. The front panel is thus backlit to display indicia. A system for supporting a self-contained illuminated sign on a vehicle is also disclosed. The system includes the sign and a separate mounting frame mountable on a vehicle. The mounting frame is configured to removably receive the sign and, when the sign is received in the mounting frame, to surround a perimeter of the sign while permitting visibility of the front display area. Related methods are also disclosed.

**14 Claims, 35 Drawing Sheets**





**US 11,348,491 B2**

Page 2

### Related U.S. Application Data

(60) Provisional application No. 62/637,173, filed on Mar. 1, 2018, provisional application No. 62/756,882, filed on Nov. 7, 2018.

(51) **Int. Cl.**

| | |
|---|---|
| *G09F 13/08* | (2006.01) |
| *G09F 13/14* | (2006.01) |
| *G09F 13/00* | (2006.01) |
| *G09F 21/04* | (2006.01) |
| *B60Q 1/26* | (2006.01) |
| *B60Q 1/50* | (2006.01) |
| *G09F 13/22* | (2006.01) |
| *G09F 27/00* | (2006.01) |

(52) **U.S. Cl.**

CPC .......... *G09F 13/0413* (2013.01); *G09F 13/08* (2013.01); *G09F 13/14* (2013.01); *G09F 21/048* (2013.01); *B60Y 2200/143* (2013.01); *G09F 13/044* (2021.05); *G09F 13/049* (2021.05); *G09F 13/0445* (2021.05); *G09F 27/005* (2013.01); *G09F 2013/1831* (2013.01); *G09F 2013/1854* (2013.01); *G09F 2013/1881* (2013.01); *G09F 2013/222* (2013.01)

(58) **Field of Classification Search**

CPC ...... G09F 13/14; G09F 21/048; G09F 13/049; G09F 2013/1831; G09F 2013/1854; G09F 2013/222

See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,593,448 | A | 7/1971 | Schoepf |
| 5,339,550 | A * | 8/1994 | Hoffman ................. B60Q 1/503 40/544 |
| 5,692,327 | A * | 12/1997 | Wynne ..................... B60Q 1/56 40/205 |
| 6,050,013 | A | 4/2000 | Heaton |
| 6,698,118 | B2 * | 3/2004 | Tietze ..................... B60R 13/10 40/204 |
| D516,125 | S | 2/2006 | Fincher |
| D712,968 | S | 9/2014 | Gorelick et al. |
| D776,202 | S | 1/2017 | Zenoff |
| 9,738,225 | B1 * | 8/2017 | Au ........................ B60Q 1/503 |
| 2003/0037472 | A1 * | 2/2003 | Nolan .................... G09F 13/04 40/574 |
| 2008/0295371 | A1 * | 12/2008 | Hsu ........................ G09F 13/06 40/570 |
| 2009/0025264 | A1 * | 1/2009 | Daimon ............... G02B 6/0051 40/546 |
| 2009/0033481 | A1 * | 2/2009 | Kuvantrarai .......... B60Q 1/503 340/479 |
| 2010/0043264 | A1 | 2/2010 | Johnson, Jr. |
| 2010/0118403 | A1 * | 5/2010 | Laitinen ............... G02B 6/0076 359/567 |
| 2010/0307041 | A1 * | 12/2010 | Tian ........................ G09F 13/22 40/575 |
| 2011/0069512 | A1 * | 3/2011 | Horst ................... G02B 6/0021 362/613 |
| 2011/0167690 | A1 * | 7/2011 | Bjarnason ............. G09F 13/18 40/582 |
| 2012/0036750 | A1 * | 2/2012 | Ryul ..................... G09F 13/18 40/546 |
| 2012/0182759 | A1 * | 7/2012 | Kokusho ............. G02B 6/0086 362/602 |
| 2012/0224259 | A1 | 9/2012 | Choi |
| 2012/0260546 | A1 * | 10/2012 | Hu ..................... G09F 13/22 40/582 |
| 2013/0088889 | A1 * | 4/2013 | Kim ....................... G09F 13/18 362/602 |
| 2014/0208626 | A1 | 7/2014 | Moon |
| 2015/0068076 | A1 * | 3/2015 | Knapschaefer ....... G09F 21/048 40/209 |
| 2015/0309248 | A1 * | 10/2015 | Xu ..................... G02B 6/006 362/607 |
| 2015/0353031 | A1 | 12/2015 | Cairo |
| 2017/0032717 | A1 * | 2/2017 | Michaelidis .......... F21V 19/003 |
| 2017/0036594 | A1 | 2/2017 | Roberts et al. |
| 2017/0101047 | A1 | 4/2017 | Dellock et al. |
| 2017/0203686 | A1 | 7/2017 | Salter et al. |
| 2018/0037156 | A1 * | 2/2018 | Stevens ................ F21S 43/26 |
| 2018/0074251 | A1 * | 3/2018 | Berard ..................... B60Q 3/43 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 2002/028670 A2 | 4/2002 |
| WO | WO 2015/101664 A1 | 7/2015 |
| WO | WO 2017/180900 A1 | 10/2017 |

#### OTHER PUBLICATIONS

"Can you Keep a Secret? Here it is: 'School Bus Drivers Can't See in the Dark'", [online] [retrieved May 29, 2019], Retrieved from the internet: <https://www.linkedin.com/pulse/can-you-keep-secret-here-school-bus-drivers-cant-see-dark-decarlo/> (Jan. 8, 2017).

Shackleford, C. "How and When to Buy a Used School Bus" [online] [retrieved May 29, 2019], Retrieved from the internet: <https://www.schoolbusfleet.com/article/610459/how-and-when-to-buy-a-used-school-bus> (Aug. 1, 2017).

Leauby, B. "6 Ways to Address New Overtime Rules", [online] [retrieved May 29, 2019], Retrieved from the internet: <https://www.schoolbusfleet.com/article/717606/6-ways-to-address-new-overtime-rules> (Nov. 9, 2016).

"School Bus Fleet Magazine Forums" [online] [retrieved May 29, 2019], Retrieved from the internet: <https://www.schoolbusfleet.com/forum/topic.asp?TOPIC_ID=7463> (2004).

PCT/CA2019/051498 International Search Report and Written Opinion dated Jan. 20, 2020 (15-pages).

"SoundOff CVP Driver Alert Message Sign" [online], retrieved from the Internet Feb. 24, 2021, <https://youtu.be/k0P1h2AMxnQ> (dated Mar. 22, 2017), 1 page.

* cited by examiner



FIG. 1



**FIG. 2**



**FIG. 3**



FIG. 4



**FIG. 5**





**FIG. 8**



**FIG. 9**



**FIG. 10A**



**FIG. 10B**



**FIG. 11**



**FIG. 12**



**FIG. 13A**



**FIG. 13B**

200



# FIG. 14A

10    200



# FIG. 14B

10    300



# FIG. 15



**FIG. 16**



**FIG. 17**



**FIG. 18**



**FIG. 19**

**FIG. 20**

**FIG. 21**



**FIG. 22**



**FIG. 23**



**FIG. 24**



**FIG. 25**



**FIG. 26**



**FIG. 27**



**FIG. 28A**    **FIG. 28B**

**FIG. 28C**



**FIG. 29A**

**FIG. 29B**

**FIG. 29C**

**FIG. 30A**

**FIG. 30B**



**FIG. 31A**



**FIG. 31B**



**FIG. 31C**



**FIG. 31D**

Case: 24-1616    Document: 35    Page: 184    Filed: 06/07/2024



**FIG. 31E**



**FIG. 31F**



**FIG. 31G**



**FIG. 32**



**FIG. 33**



FIG. 34

FIG. 35



**FIG. 36**



**FIG. 37**

1504

1600

1502

1500



1700

**FIG. 38**

1704    1702    1701



**FIG. 39**



**FIG. 40**



**FIG. 41**



**FIG. 42**



**FIG. 43**



FIG. 44



FIG. 45



FIG. 46



**FIG. 47**



**FIG. 48**

US 11,348,491 B2

1

# ILLUMINATED SIGNS FOR VEHICLES, MOUNTING SYSTEMS THEREFOR AND RELATED METHODS

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a divisional of U.S. patent application Ser. No. 16/289,818, entitled "ILLUMINATED SIGNS FOR VEHICLES, MOUNTING SYSTEMS THEREFOR AND RELATED METHODS", filed on Mar. 1, 2019, which claims priority from U.S. Patent Application Ser. No. 62/637,173, entitled "SELF-CONTAINED ILLUMINATED SCHOOL BUS SIGNS", filed on Mar. 1, 2018, and U.S. Patent Application Ser. No. 62/756,882, entitled "SELF-CONTAINED ILLUMINATED SCHOOL BUS SIGNS", filed on Nov. 7, 2018, all of which are incorporated herein by reference in their entirety.

## FIELD

The present invention relates generally to illuminated signs for mounting to vehicles, such as school buses and other purpose-specific vehicles, mounting systems therefor and related methods.

## BACKGROUND

In the interest of optimizing the visual recognition of vehicles, such as school buses, in low light conditions or adverse weather conditions, it has been known to improve the visibility of signage on the vehicles by using a light-reflective backdrop behind black lettering. This solution relies on exposure to external light sources such as street lights or headlights of other vehicles.

Other known solutions require assembly of a hollow compartment with the vehicle structure to accommodate a plurality of incandescent bulbs, along with installation of a glass panel with opaque lettering in a position overlying the bulb-illuminated compartment.

Other known illuminated signs use similar incandescent illumination, for example placing a similar transparent panel with printed indicia at the front of the vehicle over the windshield with a row of incandescent bulbs supported behind the panel on a separate light bar. Another known method of illuminating signs employs a strip of lights mounted externally above or below the lettering on the sign. This method is incapable of providing a notable uniformity of light dispersion throughout the full display area of the sign.

There remains room for improved and alternative solutions in the field of illuminated signage for vehicles.

## SUMMARY

In one aspect, there is provided a self-contained illuminated sign for direct or indirect mounting on a vehicle, the sign comprising: a front panel; an opaque rear panel situated opposite and substantially parallel to the front panel in spaced relation therefrom to define a space therebetween; and a light source comprising a plurality of LEDs, the light source being positioned in the space between the front and rear panels and configured to emit light that emanates from the front panel such that, in operation, the front panel is backlit to display indicia.

In another aspect, there is provided a system for supporting a self-contained illuminated sign on a vehicle, the system

2

comprising: a self-contained illuminated sign having: a front display area, and a built-in light source configured to emit light that emanates from the front display area such that, in operation, the front display area displays indicia; and a separate mounting frame mountable on a vehicle for supporting the sign on the vehicle, the mounting frame being configured to removably receive the sign and, when the sign is received in the mounting frame, to surround a perimeter of the sign while permitting visibility of the front display area.

In another aspect, there is provided a self-contained illumination source for an illuminated vehicle sign, the illumination source comprising in stacked relationship: an opaque rear panel; a light dispersion panel affixed to the rear panel; and one or more LED strips positioned in edge lighting relationship with the light dispersion panel.

In another aspect, there is provided an illuminated sign system for a motor vehicle, the system comprising: a self-contained illuminated sign for direct or indirect external mounting on the motor vehicle, the sign having: a front display area, and a built-in light source comprising a plurality of LEDs configured to emit light that emanates from the front display area such that, in operation, the front display area displays indicia; and a power regulator system for providing a desired power to the sign for consistent illumination, the power regulator system being configured to accept fluctuating power from an electrical system of the vehicle and to output the desired power.

## BRIEF DESCRIPTION OF THE DRAWINGS

Aspects and embodiment of the invention will now be described in conjunction with the accompanying drawings in which:

FIG. 1 is an exploded front isometric view of a self-contained illuminated sign according to the present disclosure.

FIG. 2 is an assembled front elevational view of the sign of FIG. 1.

FIG. 3 is a partial cross-sectional view of the sign of FIG. 2 as taken alone line A-A thereof.

FIG. 4 is an isometric front view of the sign of FIG. 2 during placement thereof within a separate mounting frame, which is shown in an exploded state.

FIG. 5 is an isometric rear view of the sign and mounting frame of FIG. 4.

FIG. 6 is an isometric cross-sectional view of the sign and mounting frame of FIG. 4 once fully assembled, the sign being shown without cross-sectional detail for illustrative simplicity.

FIG. 7 is an enlarged view of the assembled sign and mounting frame of FIG. 6.

FIG. 8 is a perspective view of a front end of a vehicle on which the assembled sign and mounting frame of FIG. 6 has been installed.

FIG. 9 is a perspective view of a rear end of a vehicle on which the assembled sign and mounting frame of FIG. 6 has been installed.

FIG. 10A is a front view of a sign according to one embodiment of the present disclosure.

FIG. 10B is a side view of the sign of FIG. 10A.

FIG. 11 is a perspective view of a portion of a sign according to one embodiment of the present disclosure.

FIG. 12 is a rear view of a portion of the sign of FIG. 11.

FIG. 13A is a top view of a sign according to one embodiment of the present disclosure.

FIG. 13B is a front view of the sign of FIG. 13A.

US 11,348,491 B2

3

FIG. **14**A is a top view of a sign according to one embodiment of the present disclosure.

FIG. **14**B is a front view of the sign of FIG. **14**A.

FIG. **15** is a front view of a sign according to one embodiment of the present disclosure.

FIG. **16** is an exploded perspective view of a sign assembly according to one embodiment of the present disclosure.

FIG. **17** is an exploded perspective view of a sign assembly according to one embodiment of the present disclosure.

FIG. **18** is a perspective view of a sign assembly according to one embodiment of the present disclosure.

FIG. **19** is a close up view of a portion of FIG. **18**.

FIG. **20** is a perspective view of a sign assembly according to one embodiment of the present disclosure.

FIG. **21** is a perspective view of the sign assembly of FIG. **20** installed in a vehicle.

FIG. **22** is a perspective view of a sign assembly according to one embodiment of the present disclosure installed in a vehicle.

FIG. **23** is a perspective view of a sign assembly according to one embodiment of the present disclosure installed in a vehicle.

FIG. **24** is a cross-sectional view of a sign assembly according to one embodiment of the present disclosure installed in a vehicle.

FIG. **25** is a cross-sectional view of a sign assembly according to one embodiment of the present disclosure installed in a vehicle.

FIG. **26** is a cross-sectional view of a sign assembly according to one embodiment of the present disclosure installed in a vehicle.

FIG. **27** is a cross-sectional view of a mounting option for a sign assembly according to one embodiment of the present disclosure.

FIG. **28**A is a front view of a sign assembly according to one embodiment of the present disclosure.

FIG. **28**B is a side view of the sign assembly of FIG. **28**A.

FIG. **28**C is a close up of a hinge portion of the sign assembly of FIG. **28**A.

FIG. **29**A is a front view of the sign assembly of FIG. **28**A in a closed position.

FIG. **29**B is a side view of the sign assembly of FIG. **28**A in a closed position.

FIG. **29**C is a close up of the hinge portion of the sign assembly of FIG. **28**A in a closed position.

FIG. **30**A is a front view of a sign assembly according to one embodiment of the present disclosure.

FIG. **30**B is a side view of the sign assembly of FIG. **30**A.

FIG. **31**A is a rear view of a sign assembly according to one embodiment of the present disclosure.

FIG. **31**B is a perspective view of a frame and sign mounted to a vehicle according to one embodiment of the present disclosure.

FIG. **31**C is a close up of a portion of FIG. **31**B.

FIG. **31**D is a further close up of a portion of FIG. **31**B.

FIG. **31**E is an exploded view of the embodiment shown in FIG. **31**B.

FIG. **31**F is an exploded view of a frame and sign mounted to a vehicle according to one embodiment of the present disclosure.

FIG. **31**G is an exploded view of a frame and sign mounted to a vehicle according to one embodiment of the present disclosure.

FIG. **32** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **33** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

4

FIG. **34** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **35** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **36** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **37** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **38** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **39** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **40** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

FIG. **41** is a front view of a sign according to one embodiment of the present disclosure installed in a vehicle.

FIG. **42** is a cross-sectional view taken along line A-A in FIG. **41**.

FIG. **43** is an exploded perspective view of an illuminated sign system according to one embodiment of the present disclosure.

FIG. **44** is a diagram of a power regulator system according to one embodiment of the present disclosure.

FIG. **45** is diagram of a module of a power regular system according to one embodiment of the present disclosure.

FIG. **46** is diagram of a module of a power regular system according to one embodiment of the present disclosure.

FIG. **47** is diagram of a module of a power regular system according to one embodiment of the present disclosure.

FIG. **48** is an exploded perspective view of a sign according to one embodiment of the present disclosure.

DETAILED DESCRIPTION

The following description describes embodiments according to one embodiment of the present disclosure in detail. It is to be understood that, while many embodiments are described as and show a sign for school buses or other similar activity vehicles, the principles described and disclosed herein may be applicable to a variety of illuminated signs used on vehicles, including, but not limited to, trucks (including ambulances and fire trucks), cars (including taxis), boats, ships, airplanes, etc. Thus, use of the terms bus, "school bus", "school bus sign" and other similar terms are not to be limiting of the scope of the present disclosure.

FIGS. **1** to **3** illustrate a self-contained illuminated sign according to one embodiment of the present invention, which is usable together with a separate mounting frame described herein further below to enable mounting of the sign **10** to the shell of a vehicle, such as a school bus.

FIG. **1** is an exploded view of the sign illustrating its constituent components, including a front panel **12**, an opposing rear panel **14** of similar or equal size and shape to the front panel **12**, a light dispersion panel **16** of similar shape and slightly smaller size than the front and rear panels for sandwiched receipt therebetween, LED light strips **18** for illuminating the light dispersion panel **16**, and a reflective backing sheet **19** of similar shape and slightly smaller size than the light dispersion panel **16** for placement therebehind and in front of the rear panel **14**. Illuminated by the LED light strips **18**, the light dispersion panel **16** forms a built-in LED-based light source for backlighting the front panel **12**, which includes opaquely masked areas forming blacked-out indicia **20** of appropriate wording for the intended school bus application of the sign.

In the illustrated example, the indicia **20** spell out the words "School Bus". Other examples of indicia that are

US 11,348,491 B2

5

commonly used on school buses include "Activity Bus", typically denoting a school bus that is used to transport students for extracurricular activities, field trips, sporting events, etc., where the students are loaded and unloaded only at specific start and stop destinations, as opposed to roadside student pickups and drop offs that occur on a daily scheduled school bus route. Another example of suitable sign indicia is "Ecoliers", the French language term used for school bus signage, which generally translates to "Students" or "Schoolchildren". Accordingly, the particular written message conveyed by the indicia may identify the type of vehicle for which the sign is intended (e.g. School Bus, Activity Bus, etc.), or the type passenger for which the vehicle is intended (Ecoliers, etc.). Activity buses are typically of similar overall construction to routed school buses, but differ primarily in the lack of traffic warning equipment associated with road-side pickup and drop-off, such as swing-out stop signs, crossing arms, flashing warning lights, etc. The generic term "School Bus" is thus used herein to encompass both activity buses and warning-equipped school buses. In addition to "Ecoliers", indicia printed in languages other than English and French may of course by applied in different jurisdictions according to local language standards.

In the illustrated embodiment, the opaquely masked indicia **20** are encompassed by a surrounding transparent or translucent area **22** of the display panel, which in turn is surrounded by an opaquely masked border area **24** that blacks out a margin space of the panel around the full perimeter thereof. The transparent/translucent area **22** is tinted in yellow, white or other colour of notable contrast to the black or darkened appearance of the opaquely masked areas, whether by manufacture of the front panel itself in coloured transparent/translucent material or by application of a coloured film or coating material to the panel, whereby illumination of the light dispersion panel **16** behind the front panel **12** will emit light through the coloured transparent/translucent area **22**, but not through the blacked-out indicia and margin space at the opaquely masked areas **20**, **24**, whereby the blacked-out lettering of the indicia **20** is readily visible in low light conditions due to the backlighting of the surrounding colour tinted area **22**.

In some embodiments, the opaquely masked areas **20**, **24**, may be painted with retro-reflective paint or have a retro-reflective label or decal to improve visibility in low light level conditions.

The light dispersion panel **16** of the illustrated embodiment has a set of grooves **26a**, **26b**, **26c** recessed in a front face thereof. In the illustrated example, the grooves run along three perimeter edges of the panel **16**, particularly along elongated top and bottom perimeter edges of the panel and one of the two shorter side perimeter edges of the panel. The illustrated embodiment features two LED light strips **18a**, **18b**. The first light strip **18a** resides in the upper groove **26a** situated adjacent the top edge of the panel **16**, and the second light strip **18b** resides in the lower groove **26b** situated adjacent the bottom edge of the panel **16**. Connection wiring **28** occupies the third groove **26c** situated adjacent the side perimeter edge of the panel. The LEDs of each strip face inwardly toward the center of the light dispersion panel **16**, away from the respective perimeter edge thereof. The grooves reside closely adjacent the perimeter edges of the panel **16**, whereby a substantial majority of the panel's overall area is located inwardly of the grooves. Activation of the LEDs when connected to a suitable power source will

6

thus emit light inwardly away from the adjacent edge of the panel, and thus illuminate the major central area of the panel **16**.

While in some embodiments the panel **16** is backlit to display the opaque indicia in contrast with surrounding transparent or translucent areas, in other embodiments the panel **16** is backlit to display illuminated indicia in contrast with surrounding opaque areas.

Mounted inside the grooves near the edges of the panel, the LEDs are placed in edge-lighting relation to the panel **16**, but in an embedded manner recessed into the face of the panel **16** itself, thus avoiding the need for an extruded frame or other LED support means spanning externally around the perimeter of the panel **16**. The light dispersion panel and its embedded LEDs thus form a frameless, edge-lit backlighting unit for emitting light through the yellow-tinted transparent/translucent area **22** of the front panel **12**. Use of an LED edge-lit light dispersion panel **16** to backlight the front panel **12** of the sign may provide improved uniformity of illumination relative to prior art placement of incandescent lights in exposed relation behind the sign indicia, and may eliminate the need for separate means for mounting such large-scale incandescent bulbs behind the indicia-carrying display panel. The blacked-out margin space of the masked border area **24** is wide enough to fully cover the grooves **26a**, **26b**, **26c** in the light dispersion panel **16**, and thus conceal the LEDs contained therein from direct exposure through the front panel **12**. This way, only the uniformly illuminated central area of the light dispersion panel **16** is visible through the yellow-tinted transparent/translucent area **22** of the front panel **12**.

The light dispersion panel **16** and the LEDs embedded therein are fully contained within the space between the front and rear panels **12**, **14** of the sign, as best shown in the cross-sectional view of FIG. 3. Turning back to FIG. 1, an electrical routing hole **32a** passes through the light dispersion panel **16** from the front face **16a** thereof to the opposing rear face **16b** thereof at the groove **26c** that is occupied by the connection wiring **28**. This routing hole **32a** accommodates routing of the connection wiring **28**, or an electrical connector **30** coupled thereto, rearwardly through the light dispersion panel **16**. Aligned electrical routing holes **32b**, **32c** in the reflective backing sheet **19** and rear panel **14** align with the routing hole **32a** in the light dispersion panel **16** to accommodate further routing of the wiring **28** or connector **30** rearwardly out the back of the sign. Outside the sign, the connector **30** can be coupled to a suitable power adapter that will be wired into the electrical system of the school bus on which the sign is eventually installed in order to provide suitable operating voltage for the LED strips.

To assemble the sign of the illustrated embodiment, first strips **34** of double sided adhesive tape are applied to the front face **16a** of the light dispersion panel **16**, or the rear face **12b** of the front panel **12**, in positions lying along and closely adjacent all perimeter edges of this panel. The first strips **34** of tape are placed close enough to the perimeter of the panels **12**, **16** to reside in the margin space between the grooves **26a**, **26b**, **26c** of the light dispersion panel **16** and the perimeter edges thereof. With the LED strips **18a**, **18b** and the connection wiring **28** received in the respective grooves **26a**, **26b**, **26c** of the light dispersion panel **16**, the rear face **12b** of the front panel **12** and front face **16a** of the light dispersion panel are pressed together to achieve adhesive coupling via the adhesive tape **34**. Likewise, second strips **36** of double sided adhesive tape are applied to the front face **14a** of the rear panel **14**, or the rear face **16b** of the light dispersion panel **16**, in positions lying along and

US 11,348,491 B2

7

closely adjacent all perimeter edges of this panel. The front face 14a of the rear panel 14 and rear face 14b of the light dispersion panel 16 are pressed together to achieve adhered coupling therebetween via the adhesive tape 36. In the illustrative embodiment, the adhesive strips are positioned around perimeters of the panels to help ensure uniform adhesions and spacing between the panels.

With reference to FIG. 3, the reflective backing sheet 19 between the light dispersion panel 16 and the rear panel 14 may be smaller than both of these panels in order to fit within the area bound by the second strips 36 of adhesive tape. In this way, in the illustrated embodiment, the light dispersion panel 16 and rear panel 14 are directly coupled together by the adhesive tape 36 therebetween, not via the reflective backing sheet 19. An adhesive sealing strip 38 is wrapped around the perimeter of the light dispersion panel 16 that is now adhesively secured in the space between the front and rear panels 12, 14. The sealing strip 38 has a width spanning the full distance between the rear face of the front panel 12 and the front face 14a of the rear panel 14 in order to effectively seal the internal space of the sign in which the edge-lit LED backlighting unit is contained. This aids in preventing exposure of the LEDs and associated wiring to the elements (rainwater, melted snow, etc.).

A secondary outer seal 40 is placed over the sealing strip 38 and embraces externally over the front and rear panels 12, 14 and the interior space therebetween in resiliently stretched relation around the entire perimeter of the front and rear panels. The outer seal 40 has a channel-shaped cross-section with a front lip 42 embracing externally over the front face 12a of the front panel 12 in fluid-tight sealed relation therewith, and a rear lip 44 embracing externally over the rear face 14b of the rear panel 14 in fluid-tight sealed relation therewith. The external fitting of the outer seal over the front and rear panels 12, 14 aids in providing improved weather-tight sealing of the sign's internal space relative to use of the inner sealing strip 38 alone.

In some embodiments, the weather-tight seal spans a perimeter of the sign and embraces internally the front and rear panels from a front face of the rear panel to a rear face of the front panel.

The overall sign construction in the illustrated embodiment is frameless, as there is no metal or rigid plastic extrusion or framework assembled around the perimeter of the assembled panels 12, 14, 16, which are instead adhesively interconnected in a sandwiched assembly, and optionally further held in this assembled state by the flexible outer seal 40 whose channel-sectioned shape further prevents separation of the adhesively sandwiched panels.

To support the frameless sign 10 on a school bus, a separate mounting frame 50 is thus provided. With reference to FIGS. 4 to 6, the mounting frame 50 has a two-piece construction featuring a front sub-frame 52 and a cooperating rear sub-frame 54. When mated together, these sub-frames cooperatively form an internal space in which the frameless sign 10 is installed to enable indirect support of the sign 10 on the shell of a school bus by attachment of the mounting frame 50 thereto.

In the illustrated embodiment, the front sub-frame 52 has a skeletal structure 56 that is shaped to generally conform with the perimeter shape of the sign 10. The skeletal structure 56 has two upright side members 58 that are joined together at their top and bottom ends by an upper cross-member 60 and a lower cross-member 62, respectively. In the illustrated embodiment, where the sign 10 is of generally rectangular shape with parallel top and bottom edges and parallel side edges, the two upright sides 58 of the skeletal

8

structure 56 are likewise parallel with one another, as are the upper and lower cross-members 60, 62. This skeletal structure of generally linear members in parallel pairs imparts a generally rectangular shape to the front sub-frame 52.

However, in other embodiments, the perimeter shape of the sign, and thus the confirming perimeter shape of the front and rear sub frames of the mounting frame, may vary, for example to adopt application-specific shapes dictated by available signage areas on the particular model of school bus concerned. The sides and cross-members of the front sub-frame 52 therefore need not be of linear span, nor parallel with one another. Thus, it will be understood that a variety of possible shapes for frame 50 are within the present disclosure and that the frame 50 may be constructed to accommodate various shapes, size, dimensions, orientations and other attributes of the sign 10.

Moreover, in some embodiments, the skeletal structure 56 may be comprised of more individual components that have been fastened to each other or otherwise connected. For example, the skeletal structure may be made of top and bottom horizontal pieces, right and left-side vertical pieces, and corner pieces used to connect the vertical and horizontal pieces to form the skeletal structure 56.

Regardless of their particular shape and relative orientations, the members of the skeletal structure cooperatively delimit an open window space 64 through which the front face 12a of the front panel 12 of the sign 10 is visible when installed inside the mounting frame. In the illustrated embodiment, the skeletal structure of the front sub-frame 52 is relatively thin so as not to notably obstruct the front panel of the sign. The open window space 64 of the front sub-frame 52 thus occupies a substantial majority of its overall area.

The rear sub-frame 54 is not skeletal in structure, and instead features a solid backing plate 66 of generally conforming shape to the perimeter shape of the sign. A rim 68 projects forwardly from the front side of the backing plate 66 around the full perimeter thereof. The upper cross-member 60 and sides 58 of the front sub-frame 52 each have a generally L-shaped cross-section with an inwardly reaching leg jutting inwardly toward the open window space 64, and a rearwardly reaching leg jutting rearwardly toward the plane of the rear sub-frame's backing plate 66. The upper rim 68a spanning the topside of the rear sub-frame features a pair of hooked catch tabs 70, each situated near a respective end of the upper rim 68a. The rearward leg of the upper cross-member 60 of the front sub-frame 52 features a pair of slots 72 therein at positions aligned with the hooked catch tabs 70 of the rear sub-frame 54.

With reference to the upper half of FIG. 7, the two sub-frames 52, 54 are pivotably coupled together by engagement of each hooked catch tab 70 in the respective slot 72, where the catch tab 70 hooks around the rear edge of the slot 72 to create a hinge-joint whose horizontal pivot axis lies along this rear edge of the slot. When the two sub-frames 52, 54 are initially assembled in this manner, two sub-frames can thus be pivoted relative to one another between an open position in which the lower cross-member 62 of the front sub-frame 52 is swung away from the lower rim 68b of the rear sub-frame 54 to open up access to the interior space for placement of the sign 10 therein, and a closed position in which the lower cross-member 62 of the front sub-frame 52 and the lower rim 68b of the rear sub-frame 54 are brought together to enclose the inserted sign 10 between the inwardly reaching legs of the front sub-frame's skeletal members and the backing plate 66 of the rear sub-frame.

US 11,348,491 B2

9

10

It will be appreciated that forwardly hooked catch tabs may alternatively be placed on the front sub-frame for mating with cooperative slots on the rear sub-frame to achieve a similar hinged connection by which the mounting frame can open or close in this clam-shell style. It will also be appreciated that other means for a pivotal connection may be employed, for example including use of separate hinge hardware rather than integrally formed slot and catch features on the sub-frames that cooperatively form an effective hinge joint therebetween.

The bottom rim $68b$ of the rear sub-frame $54$ features a pair of forwardly-reaching extensions $74$ positioned near the opposite ends of the bottom rim $68b$, for example in alignment with the hooked catch tabs $70$ at the upper rim $68a$. Each extension $74$ terminates in a down-turned fastening flange $76$ at the distal end of the extension furthest from the backing plate $66$. The bottom cross-member $62$ of the front sub-frame $52$ features an L-shaped cross-section, like those of the upper cross-member $60$ and side members $58$, over most of the lower cross-member's length, with the exception of two extended fastening flanges $78$ that are situated near the ends of the lower cross member $62$ in alignment with the down-turned fastening flanges $76$ of the sub-frame $54$. The extended fastening flanges $78$ of the front sub-frame $52$ are coplanar with the inwardly reaching leg of the lower cross-member's otherwise L-shaped cross-section, but extend further downward than the rest of the lower cross-member $62$. When the clam-shell mounting frame $50$ is closed, the extended fastening flanges $78$ of the front sub-frame $52$ abut against the down-turned fastening flanges $76$ of the rear sub-frame $54$. Accordingly, once the sign $10$ has been placed inside the open mounting frame, the mounting frame is then closed, and the front and rear sub-frames are fastened together at the cooperating fastening flanges $76$, $78$ to lock the mounting frame in the closed position securing the sign within the interior space thereof.

Some internal dimensions of the mounting frame slightly exceed the corresponding external dimensions of the sign $10$. The internal dimensions of the mounting frame include an internal height of the mounting frame measured either between the top and bottom rims $68a$, $68b$ of the rear sub-frame $54$, or between the rearwardly reaching legs of the upper and lower cross-members $60$, $62$ of the front sub-frame's skeletal structure; an internal width of the mounting frame measured between the side rims $68c$ of the rear sub-frame, or between the rearwardly reaching legs of the side members $58$ of the front sub-frame's skeletal structure; and an internal depth measured between the backing plate $66$ of the rear sub-frame $54$ and the inwardly reaching legs of the skeletal structure members at the plane of the window opening $64$ in the front sub-frame $52$. The internal height and width of the mounting frame exceed the corresponding external dimensions of the sign $10$, namely the external sign height measured from the topside of the outer seal's upper span $40a$ at to the top of the sign to the underside of the outer seal's lower span $40b$ at the bottom of the sign $10$; and the external sign width measured from between the outer surfaces $40c$ of the outer seal $40$ at the opposite sides of the sign $10$. the sign also has external thickness measured from the outer surface of the outer seal's front lip $42$ to the outer surface of the outer seal's rear lip $44$. However, since the thickness is notably smaller than the height and width dimensions, it is less subject to significant thermal shrinkage and expansion in cold and hot temperatures. Accordingly, the internal depth of the mounting frame need not necessarily exceed the sign thickness, and alternatively may be equal to or slightly less than the sign thickness to provide a conforming fit or slight interference fit in this dimension.

The sign is safely retained within the mounting frame by the rear sub-frame's rim $68$ and the front sub-frame's rearwardly reaching legs, which collectively span across the sides, top and bottom of the sign $10$ to block the sign from sliding upwardly, downwardly or laterally out from the mounting frame, and also by the inwardly reaching legs of the front sub-frame that reach inwardly over the front lip $42$ of the sign's outer seal $40$ to cooperate with the backing plate $66$ of the rear subframe that lies behind the sign's rear panel $14$ in order to block the sign from falling forwardly or rearwardly out of the mounting frame. As described above, the depth of the frame may be dimensioned for a conforming or interference fit with the sign in order to hold the sign relatively firmly therein, while the oversized height and length of the frame leave some open space around the frame. This way, the mounting frame $50$ can be made of the same steel or other metal material as the bus shell and be rigidly mounted thereto, while plastic materials used in the construction of the sign $10$ itself can undergo thermal expansion and contraction in the height and width directions at different rates than the steel used in the mounting frame and bus shell.

Rivets $80$ may be used to fasten the front and rear sub-frames together at the fastening flanges $76$, $78$ once the mounting frame has been closed with a sign $10$ placed therein. While threaded fasteners could alternatively be used, rivets provide the advantage of not coming loose under vibrational loads. To attach the mounting frame to the bus shell, the rear sub-frame $54$ features a set of threaded mounting studs $82$ projecting from the backside of the backing plate $66$, for example a set of four such studs $82$ situated near the four corners of the backing plate $66$. A set of mounting holes are drilled or otherwise formed in the shell of the bus in matching layout to the mounting studs $82$. A resiliently compressible gasket or bulb seal $84$ is applied to the backside $66b$ of the backing plate $66$, which forms a mounting surface placed against the shell of the bus during installation of the mounting frame thereon.

The backing plate $66$ includes an additional routing hole $32d$ therein that aligns with those of the sign $10$ to allow routing of the LED wiring $28$ or connector $30$ rearwardly through the backing plate $66$ from the interior space of the mounting frame and onward through a drilled or otherwise formed routing hole in the bus shell. This routing of the wiring $28$ or connector $30$ enables connections of the sign's LEDs to the bus's electrical system via a suitable power adapter mounted inside the bus shell. As shown in FIG. $5$, the gasket spans at least around the perimeter of the backing plate $66$, including areas around the mounting studs $82$ and the electrical routing hole $32d$. This prevents leakage of rain water or melted snow into the interior of the bus via the mounting holes, electrical routing hole or other openings in the bus shell that may be present behind the mounting frame. The gasket also provides vibration dampening to the installed mounting frame and the sign contained therein. When the sign $10$ is placed inside the mounting frame.

With the gasketed backside $66b$ of the backing plate $66$ placed against the shell of the bus to insert the mounting studs $82$ through the appropriately placed mounting holes in the bus shell, washers and nuts are engaged on the threaded mounting studs $82$, and tightened against the inner surface of the bus shell, thereby drawing the gasketed backside of the mounting frame against the outer surface of the bus shell to form a weather tight seal therewith. This securely attaches the mounting frame to the exterior of the bus shell to indirectly support the self-contained illuminated school bus

**11**

sign **10** thereon. The fastening of the nuts can be performed from the interior space of the bus, or if the warning lights typically mounted beside the designated signage area have been removed or not yet installed, from the outside of the bus via the warning-light mounting holes that are currently open. FIG. **8** illustrates such installation of one sign at the designated front signage area above the front windshield of a school bus, and FIG. **9** illustrates matching installation of another sign at the designated rear signage area above the rear emergency exit door of the school bus.

Since the sign **10** is mounted indirectly to the bus via the mounting frame, service or replacement of the sign can be performed without having to remove the entire installation. With the mounting frame left in place on the bus, service personnel can remove the rivets or other fasteners that hold the mounting frame closed at the fastening flanges (e.g. by drilling out the rivets **80**). The service personnel can then open up the two-piece clamshell mounting frame **50** to gain access to the sign **10**, disconnect the connector **30** from the power adapter, and then fully remove the disconnected sign **10** from the mounting frame. A new sign **10** can be lifted up into place, coupled to the power adapter via the connector **30**, and then placed into the opened mounting frame. Optionally, a fresh application of sealant around the electrical routing hole **32**d in the backing plate **66** of the mounting frame **50** may be provided. New rivets or other fasteners are installed at the fastening flanges to lock the mounting frame closed.

Signs may therefore be replaced in the event of failure, or can be swapped out for signs with different school bus indicia in the event of an intended service type change from school bus to activity bus, or vice versa; or in the event that the bus is being transferred to a service area with different language requirements. In the event it is still in usable condition, the removed sign can be re-used either at a later time on the same bus, or on a different bus, without the indirectly-mounted sign having been marred by any drilled holes or other defects that would otherwise be introduced by direct-mounting techniques.

Use of a separating mounting frame may also allow an installation-ready sign product that can be used on an on-demand basis, particularly where the individual signs and mounting frames have been prefabricated to reduce lead time. For example, at the manufacturer or distributer level, a customer-ready product is only assembled once the customer specifies the particular sign type required (School Bus, Activity Bus, Ecoliers, etc.), at which point the manufacturer selects a sign of appropriate wording from among pre-fabricated signs, and combines it with a pre-fabricated mounting frame of compatible shape and size. The selected sign and frame can be pre-assembled by the manufacturer or distributor, by inserting the selected sign into the mounting frame and riveting or otherwise fastening the frame closed, and then shipping the assembled installation-ready sign product to the customer. Alternatively, the selected sign and frame can be shipped to the customer unassembled for on-site customer assembly. In another instance, instead of pre-fabricating significant volumes of identically shaped but differently worded signs together with a significant volume of mounting frames compatible with that size and shape of sign, a supply of mounting frames can be pre-fabricated, while the signs are instead made at reduced volumes or on an as-needed basis in response to customer orders. Once again, lead times may be reduced compared to on-demand manufacture of a framed, customer-specific direct-mount sign.

**12**

What has been described is merely illustrative of some embodiments of the present disclosure. Other embodiments are possible and will now be described. It will be understood that features from one or more embodiments may be combinable with features from one or more other embodiments without departing from the scope of the present disclosure.

Referring to FIGS. **10**A and **10**B, in some embodiments, the sign may include a camera capable of sending a video signal via wired or wireless methods, for example from the rear of the bus, to the driver or an intermediate transmitter for monitoring locally or remotely. In such embodiments, a sign includes a camera **100** positioned approximately halfway across the width of the sign in a camera housing **102**. Optionally, enclosed transmitter **104** is included to transmit the video signal.

Alternatively, referring to FIGS. **11** and **12**, the camera **100** may be mounted in the upper corner of the frame of the sign **10**. The wiring for the camera **100** may be integrated into the sign assembly **10**, described above. The cabling is routed through a space **105**, such as a channel or groove, behind the seals from the camera **100** to the vehicle. The cabling or wiring for the camera **100** could then be connected to the electrical system of the bus by being passed through the same apertures used to provide the wiring and power to the LED strips and panel of the sign assembly.

Mounting of the camera **100** to the frame may be accomplished utilizing camera mounting hardware **106**, for example the illustrated screws, which run through the sign frame or by using an adhesive to the outside surface of the frame. Alternatively, or in addition, the camera **100** may be held in place in a removable frame corner piece **108** of the frame.

Referring to FIGS. **13**A, **13**B, **14**A and **14**B, in some embodiments, the sign may include a photo sensor **200** which detects light conditions and aids controlling the illumination of the sign such that it is autonomously on/illuminated during low light level conditions. Such a sensor **200** could be located anywhere practical on the outside of the frame **50** or sign assembly **10**, for example the upper left corner as shown in FIGS. **13**A and **13**B and the center top as shown in FIGS. **14**A and **14**B. The sensor **200** may be installed with appropriate sealing to prevent moisture and other elements from entering the frame and/or sign assembly. If wired, the wiring from the sensor may be routed behind the seal through the same apertures used to electrically connect the sign to the electrical system of the bus.

The sensor could also be used to control brightness of the sign based on the amount of ambient lighting. In this embodiment, the sensor **200** would detect an amount of exterior ambient light and send a signal for controlling a brightness of the sign backlighting relative to the amount of detected light. This may allow for optimal backlighting in all conditions. The backlighting could be varied in several discrete steps or by infinitely small steps relative to the sensor reading. The backlighting would be varied without input from a vehicle operator.

Referring to FIG. **15**, in some embodiments, the brightness of the sign **10** may be controlled by a multi-position or continuously variable switch **300** and internal controls. The switch **300**, as shown schematically in FIG. **15**, may be integrated into the bus control panel, be original equipment on the bus, or may be integrated into the sign **10** or a separate sign controller.

In some embodiments, the sign may be illuminated in short periods to create a pulsating or strobe effect. The effect occurs for a set amount of time. It may be periodic or non-periodic. It may alternate between on and off states or

US 11,348,491 B2

13                                                                14

on states with different brightness levels. It may be triggered by other devices on the bus, such as the depression of the brake pedal.

Referring to FIG. **16**, in some embodiments, the illuminated sign may use electrical power and a separate module **400** located external to the sign assembly that controls illumination. In some embodiments, this module includes a printed circuit board that is attached to an enclosure **402** that can be mounted internal to the vehicle on an interior of the vehicle shell **404**. The enclosure may include a heat sink to dissipate heat generated by the electronics. In some embodiments, a cable **406** is used to connect the electronic module to the sign unit. By having the electronic board internal to the vehicle, the risk of damage may be lessened. Additionally, this may allow for the sign unit to be thinner. In some embodiments, the cabling is routed through a grommeted hole of the vehicle shell to aid in preventing any moisture or debris from entering the vehicle. The electronic module **400** may be mounted using adhesives or mechanical fasteners or other suitable methods depending on the installation requirements of the vehicle to which the sign is being mounted.

As discussed above, the illuminated sign **10** may have different geometries and indicia **20**, translucent areas **22** and opaquely masked areas **24**, depending on the requirements and applications of the sign. One such additional embodiment of a sign **500** is shown in FIG. **17**, with a back plate **502**, LED strips **504**, reflector **506**, seal **508**, acrylic backing plate **510** and front lens **512**.

Other embodiments for mounting the combined sign and frame to vehicles are also included in the present disclosure. Different embodiments may be required depending on the configuration of the vehicle to which the frame is mounted. For example, some buses currently available may include a chamber in the overhead section of the bus at the front and rear, with an interior planar surface which faces forward in the front and backward in the rear of the bus. The chamber may have a sealed transparent cover aligned with the outside surface of the bus which allows the interior indicia to be visible to other vehicles approaching the bus from either direction. This cover may be referred to as the front surface regardless of whether it is on the forward or rear facing chamber of the bus. Embodiments of the self-contained illuminated sign according to the present disclosure may be mounted in such a chamber according to one or more of the following methods.

Referring to FIGS. **18** and **19**, the sign **10** may be mounted in the chamber **600** using one or more brackets **602**, which are attached to the sign **10** and to the surrounding surface **604** parallel to the perimeter of the sign **10** by means of threaded fasteners, adhesives, rivets, magnets, vacuum cups, or other known fastening methods.

Referring to FIGS. **20** and **21**, in some embodiments, the sign **10** may be attached, utilizing any of the previously mentioned fasteners, to the interior rear planar surface of the chamber **600** by means of an intermediate bracket **606** which provides both mounting and spacing of the sign from the surface to improve visibility. The intermediate bracket **606** may be comprised of one or more pieces, which have sizes smaller or larger than the sign itself. The pieces may be tubular, rectangular, or any other useful shape.

Referring to FIG. **22**, in some embodiments, the sign may be attached, utilizing any of the previously mentioned fasteners, to the interior front transparent surface **608** of the chamber **600** by means of one or more intermediate brackets **610**. The intermediate bracket **610** may be comprised of one or more pieces which are tubular, rectangular, or any other useful shape. In some embodiments, the bracket **610**

attaches to the outer rim of the sign **10** in such a way that it does not interfere with the visibility of the indicia **20**. The pieces of bracket **610** may be of different lengths and profiles according to the shape of the transparent surface **608** to facilitate vertical mounting of the sign.

Referring to FIG. **23**, in some embodiments, the sign **10** may be surrounded at its perimeter with a frame material **612** of outer perimeter equal to or larger than the interior perimeter of the bus chamber **600**. In some embodiments, the sign and the surrounding material **612** is installed into the chamber **600**. In some embodiments, the material **612** is flexible enough that the installation can be completed without damaging the sign and rigid enough that the sign is held properly in place during operation. The material **612** may be a foam, elastomer, or other suitable material. The material **612** may be fastened to the bus using any of the previously mentioned methods. The material **612** may be of various shapes including the shape of the chamber **600**. The material may be non-homogenous or filled with a fluid.

Referring to FIG. **24**, in some embodiments, the surface of the sign **10** is mounted flush to the bus shell **614** and held in place between a transparent material **608** on the outside surface of the bus and a back plate **616**. In some embodiments, sealing occurs between the border of the transparent material **608** and bus shell **614** by means of a gasket or o-ring.

Referring to FIG. **25**, in some embodiments, the surface of the sign **10** is mounted flush to the bus shell **614**. In some embodiments, the sign **10** is connected to the transparent material **608** which is larger than the opening in the bus shell. In some embodiments, the transparent material **608** is fastened to the bus shell. In some embodiments, sealing occurs between the border of the transparent material **608** and bus shell by means of a gasket or o-ring.

Referring to FIG. **26**, in some embodiments, the surface of the sign **10** is mounted flush to the bus shell **614**. In some embodiments, the sign **10** is connected to the back plate **616** which is larger than the opening in the bus shell **614**. In some embodiments, the back plate **616** is fastened to the bus shell **614**. In some embodiments, sealing occurs between the back plate **616** and the bus shell **614** by means of a gasket or o-ring.

Other embodiments of mounting methods may be used to mount the sign **10** directly on an exterior surface of a vehicle such as a bus. Attachment between the sign or an intermediate frame, enclosure, or mounting bracket may be accomplished according to the following embodiments.

Referring to FIG. **27**, in some embodiments, mounting of the sign may be accomplished using a conical, spherical, or otherwise purposeful shaped object **700** which extends from the sign, intermediate frame, sign enclosure or mounting bracket, generally referred to as **702**, through an aperture **703** in the vehicle shell or other surface **704** and expands an opposing flexible grommet **706**, resisting removal once installed.

In some embodiments, attachment between the sign or an intermediate frame, enclosure, or mounting bracket with the bus shell may be accomplished with the use of a magnet, adhesive, bonding or solidifying material.

Embodiments of framing or providing an intermediate bracket for the sign may also include enclosing or affixing the sign by means of encapsulating with a transparent material (epoxy, overmolded, etc.) or enclosing or affixing the sign **10** with a single piece frame **800** which pivots by means of a hinge **802**, as shown in FIGS. **28**A, **28**B, **28**C, **29**A, **29**B, and **29**C.

US 11,348,491 B2

15                                                        16

Referring to FIGS. 30A, 30B, and 31A, in some embodiments, a frame 900 for the sign 10 may be comprised of three or more layered sub frames 902, closed by means of bolts, rivets, adhesives, external clamping, magnets, or any other suitable fastening technique.

In some embodiments, the frame may be a single piece frame whereby the sign is enclosed by means of intentional deformation of the frame (crimping, stamping, pressing, etc.). In some embodiments, the single piece frame may be comprised of a malleable material which is routed around the perimeter of the sign and is joined thereafter.

Referring to FIGS. 31B through 31E, in some embodiments a frame 904 according to the present disclosure may be comprised of multiple frame sections 906 that are connected together. As shown in the illustrative embodiment, the sections 906 may be assembled to produce the frame 904 having a shape that matches an outline of the sign. When assembled, the frame 904 has a front window that matches or corresponds to the shape of the front display area of the sign 10.

The frame 904 may be composed of horizontal sections 906a and 906b that span lengths of a sign (e.g. sign 10) and vertical sections 906c and 906d that span the height of the sign on either side thereof. Corner sections 908 comply with the shape of the sign and connect together the horizontal sections 906a and 906b with the vertical sections 906c and 906d. In FIG. 31C, the corner section 908 is shown transparent. In FIG. 31D, the horizontal section 906a is shown transparent.

Sections of the frame other than corner sections 908 may be termed elongated sections. The term elongated does not necessarily require that the section be straight. A curved elongated section, such as horizontal section 906a, would be considered elongated within the meaning of the present disclosure. In general, any sections other than corner sections, which are defined as sections that span a corner of 90 degrees or more, are considered to be elongated sections for the purposes of the present disclosure. Internal corner sections, such as the internal corner sections at the top of the sign in FIG. 31G are also included in the definition of corner sections.

In the illustrated embodiment, at least each elongated section comprises an approximately L-shaped cross-section. When the sign is received in the mounting frame, one arm of the L-shaped cross section is generally parallel to an outer edge surface of the sign and the other arm of the L-shaped cross-section is generally parallel with a front surface of the sign, such as a front surface of the front display.

The frame 904 frame retains the sign 10 on the sign's front and outside edges while constraining against either a back panel (not shown) or the vehicle itself depending on desired configuration. In the illustrated embodiment, the frame 904 has foam tape 910 between all contact points with the sign 10 to aid in dampening vibration and allowing for relative expansion of the sign 10. The frame 90 may be mounted via the corner pieces 908 which are screwed into riv-nuts 912 that are mounted into the vehicle using bolts 911. There are sealing washers 914 that aid in preventing leaks at these connection points. Other suitable means for connecting corner sections 908 to the vehicle may also be used.

In the illustrated embodiment, the frame sections 906 are joined to the corner sections 908 with screws 916 that pass through the respective frame section 906 and a jutting portion 918 that juts out from the corner section and into the respective frame section 906 to which the corner section is

being connected. The frame sections 906 have a corresponding aperture 920 to receiving the jutting portion 918.

Referring to FIG. 31F, in some embodiments, an opening 922 in the vehicle shell is already present before installation of the frame 904. To accommodate, an additional intermediate plate 924 is included in the assembly to cover the opening 922 and provide an appropriate mounting surface for the sign 10.

Referring to FIG. 31G, in some embodiments, one or more retention plates 926 are included behind the vehicle shell in order to attach the sign 10 without drilling any holes in the shell. To this end, the shell has a pre-existing opening 922. Nuts 923 behind the retention plates 926 may be used to connect the sign 10. A mounting plate 928 with studs 930 is also included, studs 930 entering corresponding apertures in the vehicle shell. It will be noted that the configuration of frame 904 in FIG. 31G includes additional frame sections 906 and corner sections 908 in order to create a frame 904 that corresponds to the desired shape of the sign 10.

Yet further embodiments of an illuminated sign according to the present disclosure will now be described.

Referring to FIG. 32, in some embodiments, a sign 1000 utilizes several strips of LEDs 1002 combined with an optical diffusion sheet 1004 to provide approximately uniform illumination for the entirety of the sign front lens 1006. In some embodiments, there is a clear plastic spacer 1008 in front of the LEDs 1002 that provide a gap between the diffusion sheet 1004 and the LEDs 1002. In some embodiments, the LED strips 1002 are adhered directly to the back plastic panel 1009. In some embodiments, there is an additional spacer 1010 which permits the clear spacer 1008 to not directly contact the LED strips 1002. In some embodiments, the diffusion sheet 1004 is a film which is applied to the front side of the clear plastic spacer 1008. In some embodiments, the front lens 1006 with the inscribed indicia is the final component of the sign 1000. In some embodiments, a silicone seal 1012 encloses the edge of the sign unit between the layers and prevents dust and moisture from penetrating the unit. In some embodiments, the LEDs 1002 are powered by an electronic source located externally to the sign and inside the vehicle the sign will be mounted to. In some embodiments, the diffusion film 1004 acts to moderate the bright and dark spots provided by the individual LEDs on the rear mounted strips.

Referring to FIG. 33, in some embodiments, a sign 1100 is fully illuminated by means of an embedded electroluminescent panel 1102 which provides illumination across the entire profile of the sign unit 1100 and for the front lens 1101. In some embodiments, the electroluminescent panel 1102 is connected to a controller inside the vehicle which provides the correct electrical power. In some embodiments, the electroluminescent panel 1102 is adhered to the back plastic panel 1104 via an adhesive sheet 1106 and the sign unit is sealed together via a perimeter silicone seal 1108. In some embodiments, due to the flexibility of the materials utilized, the sign 1100 could be used in applications that are not flat.

In some embodiments, the sign may be capable of being blacked out to produce a blacked-out sign (BOS) where the indicia are temporarily no longer visible. BOS is used here synonymously with a sign which is not legible. In such embodiments, illuminated signs according to the present disclosure may be able to be switched from legible to BOS when desired, such as when the sign is powered off.

In some embodiments, the BOS uses edge lighting technology, for example when the light is directed into the plane of a light diffusive plate, such as an etched acrylic plate,

US 11,348,491 B2

17

from the edges towards the center of the sign unit. The light reflects from the etched areas on the diffusive plate and the areas that are not etched reflect significantly lower amount of light. This principle may be used in the BOS.

Thus, referring to FIG. **34**, in some embodiments, a sign **1200** may be comprised of a back panel **1202**, which acts as protective cover on the back of the sign unit; a reflective layer **1204**, which reflects the light from the back of the diffusive plate; LED Strips **1206** (light source, LED strips usually attached to aluminum substrate for better heat dissipation); a diffusive plate **1208**, which diffuses the light uniformly by reflecting the light from the etched areas **1209** on the back of the diffusive plate **1208**, a colored lens **1210** (tinted or painted lens that defines the color of emitted light and/or legend/indicia that appears on the sign); and front cover lens (not shown), which protects the internal components of the BOS. Non-etched areas **1211**, such as the letters that spell out SCHOOL BUS, on the diffusive plate **1208** do not reflect the light or reflect less light than the etched areas **1209**. Some edging may be printed on the front cover lens to hide internal components/transition lines.

When the BOS is not lit, the legend that is not etched on the acrylic diffusive plate (in the illustrated embodiment "SCHOOL BUS") can be barely visible through the front lens. When the BOS is lit up, the legend that is not etched on the acrylic diffusive plate remains dark, but the etched area reflects light.

Other embodiments of an illuminated sign are also within the present disclosure. For example, when vehicles, such as school buses, stop and allow passengers to exit the vehicle, a stop arm is displayed to warn other drivers on the road to stop and allow the passenger to cross the road. The drivers on the road which are following the bus must look around the left side of the bus to see the stop arm. It is possible that the driver will either drive to the left in his existing lane or commit to passing the bus prior to seeing the stop arm. Thus, in some embodiments, the present disclosure provides a sign at the back of the bus that indicates the actions of the bus in a multiple message sign, such as, for example, "Caution", "Stopping", and "Do Not Pass".

In some embodiments, this sign combines two units that light up independently and show different legends with different background colors depending on the circumstances. In some embodiments, this sign may utilize a configuration and components similar to the BOS sign described above.

Referring to FIG. **35**, in some embodiments, a sign **1300** may include a back panel **1302**, first LED strips **1304**, second LED strips **1306**, reflective layer **1308**, light diffusive plate **1310** with etched areas **1309** and non-etched areas **1311**, first translucent lens **1312**, second translucent lens **1314**, a permiter seal **1316** and a clear front cover lens **1318**. Only first LED strips **1304** may be activated when only the etched areas **1309a** behind the first translucent lens **1312** are to be lit up. Similarly, only second LED strips **1306** may be activated when only the etched areas **1309b** behind the second translucent lens **1314** are to be lit up. Moreover, first and second translucent lenses **1312**, **1314** may be provided with the different colouring so as to create a different visual impression depending on which LED strips are activated. For example the first translucent lens **1312** overlayed on the words "CAUTION STOPPING" may have an orange tint while the second translucent lens **1314** overlaying the words "STOP" and "DO NOT PASS" may have a red tint.

It will be understood that through placing of LED strips, varying of the number and shape of translucent lenses and varying the etched areas of the diffusive plate, a wide variety

18

of desired combinations of messages, colouring and lighting may be achieved, all of which are within the present disclosure.

Other locations for illuminated signs according to the present disclosure are also possible. For example, service vehicles, such as buses, often use a marking to indicate information such as, in the case of buses, their route #, bus #, or other bus specific indicia. Often, the indicia changes more frequently than is practical for painting or applying decals to the exterior of the vehicle. In some embodiments, a sign which mounts on the inside window of the vehicle is illuminated due to its visibility and ability to quickly modify the sign indicia.

Such an illuminated sign, for example, a route sign, may be comprised of three main components: a light source, a mounting frame and a replaceable lens.

Referring to FIG. **36**, in some embodiments, the light source **1400** comprises a back panel **1402**, which acts as a protective cover on the back of the sign unit; a reflective layer **1404**, which reflects the light from the back of the diffusive plate; LED strips **1406**, which might be attached to aluminum substrate for better heat dissipation; a seal **1408** that protects internal components from water and dust ingress, and a diffusive plate **1410** that diffuses the light uniformly.

Such a light source **1400** may be combined with a mounting frame suitable for mounting to the interior or exterior of a vehicle. For example, in some embodiments, there is provided a frame that mounts to internal surfaces of the vehicle (side wall, panels, windows) for internal applications, or external surfaces of the vehicle for external applications.

Referring to FIG. **37**, in some embodiments, the mounting frame **1500** may be a frame for mounting on the internal or external surfaces of a vehicle window using suction cups **1502**. Other embodiments that are within the present disclosure include a mounting frame that uses double side adhesive, glue, fasteners and other suitable mounting means.

The mounting frame **1500** is affixed to the light source **1400** and/or the light source **1400** is inserted into the pre-assembled frame **1500**. The frame **1500** also includes a groove or channel **1504** that is dimensioned and sized to receive a replaceable lens **1600**, which may have various background colors, indicia and other features to accommodate a variety of purposes, for example a route number, "School Bus" sign, "Activity Bus" sign etc. In the illustrated embodiment, the replaceable lens includes indicia indicating a route number of "88". The replaceable lens can be slid in or out of the groove **1504** to install and uninstall the lens, respectively.

In some embodiments, a self-contained illuminated sign is constructed similarly to the embodiment described above with respect to FIGS. **1** to **3**, but the front panel is replaced with a transparent panel and an additional front lens with indicia attached to the transparent panel. Thus, referring to FIG. **38**, a sign **1700** may include many or all of the same components as the sign **10** described above that make up a lighting section **1701** (i.e. a section that results in illumination), such as rear panel **14**, sealing strip **38**, reflective backing sheet **19**, second adhesive tape strips **36**, light dispersion panel **16**, wiring **28**, and first adhesive tape strips **34**, but with the front panel being replaced with a transparent panel **1702** and an additional front lens **1704** with indicia attached to the transparent panel **1702**, for example, using a transparent adhesive or other suitable means.

Referring to FIG. **39**, in other embodiments, a front panel **1708**, similar in construction to the front panel **12**, but larger

US 11,348,491 B2

19                                                                20

in size than the lighting section **1701**, is adhered to the lighting section **1701**. The front panel **1708** may not only be larger in size than front panel **12** and lighting section **1701** but also of a different shape or other configuration. The front panel **1708** may be affixed to the lighting section **1701** using adhesive tape **1706** or with other suitable means, such as a transparent adhesive. In some embodiments, the adhesive tape **1706** is considered to be part of the lighting section **1701**.

Both of the embodiments shown in FIGS. **38** and **39** may be installed and used with a suitable variation of the frame **50** as described in respect of FIGS. **4** to **6**. However, the embodiments of FIGS. **38** and **39** may also be installed and used without a frame **50** and using other means. For example, referring to FIG. **40**, the sign **1700** (according to either FIG. **38** or **39**) may be installed using an intermediate bracket (not shown) to attach the lighting section **1701** to the vehicle, such as the bus. An additional rear, flexible bracket **1712** may be used to connect the lighting section **1701** to the front panel **1708** or the transparent panel **1702** with cover or lens **1704** applied. Such a rear bracket **1712** extends width-wise beyond the edges of the lighting section **1701** with an extension **1714** that include adhesive or other suitable fastening methods for attaching to the front panel **1708** or transparent panel **1702**. Similarly, adhesive or other suitable fastening means connect a backing portion **1716** of the rear bracket **1712** to the rear panel of the lighting section **1701**.

In yet further embodiments, the front lens (i.e. a front panel such as front panel **1708** or translucent panel **1702** with lens **1704** applied) may be used in a vehicle but not directly attached to the lighting section. Thus, in some embodiments, the front lens and lighting section are each separately attached to the vehicle.

In yet further embodiments, the lighting section **1701** may not include a rear panel, such that the light dispersion panel is directly mounted to the shell of the vehicle. Such a connection may be made by any suitable means, such as adhesive, fastening, etc. One or more separate mounting bracket may also be used for mounting the light dispersion panel to the shell of the vehicle. Appropriate sealing and/or vibration reducing elements may be included between the light dispersion panel and the shell of the vehicle.

Referring to FIGS. **41** and **42**, in some embodiments, a sign **1800** may be comprised of a separate front lens **1802** and a lighting section **1804**, which are both separately installed in a cavity **1806** or a surface of a vehicle, such as a bus. In the illustrated embodiment, a gap **1808** is present between the front lens **1802** and lighting section **1804**. The front lens **1802** is adhered or otherwise fastened to a jutting portion **1809** that juts from a front portion **1810** of the cavity **1806** that circumscribes the cavity **1806** and acts as a perimeter thereto. The lighting section **1804** may be connected to an interior surface **1812** of the cavity **1806** using a bracket **1814** with known or suitable fastening means. There may be one or more connection points between the lighting section **1804** and the cavity **1806**. In the illustrated embodiment of FIG. **41**, four such fastening points are shown. In some embodiments, an optional gap **1816** is present between the front lens **1802** and the lighting section **1804**.

Referring to FIGS. **43** to **47**, in some embodiments according to the present disclosure, there is provided an illuminated sign system **1900** that includes an illuminated sign, such as the illuminated sign **10** and a power regulator system **1902**. The power regulator include a system of electronics that creates a regulated supply to power the multiple LEDs in the sign **10**. This regulated supply allows for consistent illumination regardless of the electrical power supplied by the vehicle to which the sign is mounted. Additionally, the protection of the regulated supply allows for an extended lifetime of the LEDs as they will be always powered within their optimum range. The application of this regulation also has the effect of a greater efficiency when the power supplied from the vehicle is greater than nominal.

In a typical automotive system the power supplied by the vehicle can have fluctuations which can cause adverse affects to LEDs. By regulating the power the LEDs are protected for damaging events that would drastically shorten their usable lifetime. The electronics are mounted in-line between the power supplied by the vehicle and the LEDs.

While shown enclosed in a separate component (such as separate module **400**) in FIG. **43**, in some embodiments, the power regulator system **1902** could also be incorporated into the sign **10** in whole or in part. For example, the power regulator system may be installed, in whole or in part, between the front and rear panels of the sign **10**. Some components of the power regulator system **1902** could be incorporated into the sign **10** while other components could be positioned on an interior of the vehicle or on an opposite side of the shell of the vehicle from the sign **10**.

When positioned externally of the sign **10**, the power regulator system **1902** is operatively connected to the sign **10** via, for example, cabling **1904** which is fed through one or more openings in the vehicle shell and sign **10**, as described above.

The power regulator system **1902** provides a desired power to the sign for consistent illumination and is configured to accept fluctuating power from an electrical system of the vehicle and to output the desired power.

Referring specifically FIG. **44**, in some embodiments, the power regulator system **1902** incudes the following modules: first transient protection module **1906**, first over/under voltage protection module **1908**, first reverse voltage protection module **1910**, voltage regulator **1912**, short circuit protection module **1914**, second over/under voltage protection module **1916**, second reverse voltage protection module **1918**, and second transient protection module **1920**. The load **1922**, e.g. the sign **10**, is also shown in FIG. **44**.

First over/under voltage protection module **1908** and first reverse voltage protection module **1910**, as well as, in some embodiments, first transient protection module **1906**, may be considered to be an input voltage protection module **1924**, which is configured to protect against over voltage, under voltage and reverse voltage input to the voltage regulator **1912**. Similarly, second over/under voltage protection module **1916** and second reverse voltage protection module **1918**, as well as, in some embodiments, second transient protection module **1920**, may be considered to be an output voltage protection module **1926**, which is configured to protect against over voltage, under voltage and reverse voltage output to the sign **10**.

Example circuits for the input voltage protection module **1924**, the voltage regulator **1912** and the output voltage protection module **1926** are shown in FIGS. **45** to **47**, respectively.

In some embodiments, the power regulator system is configured to output 7.2V at 3.5 A. In embodiments where the illumination brightness of the sign is to be adjusted during operation, such as in embodiments where a photo sensor that detects ambient light aids in automatically controlling the brightness of the sign, the power regulator system may include a controller, or a controller may be combined with the power regulator system, to cause the

US 11,348,491 B2

21                                              22

power regulator system to output different voltage and/or current levels depending on the desired brightness of illumination.

Furthermore, while the illustrated embodiments show voltage regulation modules, it will be understood that the power regulator system may use current regulation modules and/or a combination of voltage and current regulation modules to regulate the power being supplied to the sign.

During intended use of the illuminated sign, weather conditions may result a buildup of snow and/or ice and/or condensation on the lens of the sign which impedes the visibility of the indicia. Referring to FIG. **48**, in order to prevent and/or reduce this impediment, a sign **2000** may include a heating element **2002** in the construction of the sign. The heating element **2002** may be positioned between the rear panel **2004** and a front panel **2006**. In the illustrated embodiment, the front panel is a combined front panel and light dispersion panel. The heating element **2002** may also be included in embodiments of the sign **2000** that do not include the rear panel **2004** and where the lighting section is mounted directly to a vehicle. Seal **2008** may be provided between the front panel **2006** and rear panel **2004** to seal the space therebetween.

Methods related to the above-discussed embodiments, such as methods of manufacturing, producing and/or providing a sign, an illumination source and/or a mounting frame are also within the present disclosure.

Other embodiments are also within the present disclosure.

In some embodiments, there is provided a self-contained illuminated school bus sign comprising:

a front panel defining a front display side of said sign;

a rear panel situated opposite the front panel in spaced relation therefrom to define a rear side of said sign;

an LED based light source that comprises a plurality of LEDs, is fully contained in a space between said front and rear panels, and is positioned to emit light from the sign through the front panel;

opaquely masked indicia areas on the front panel that are encompassed within a surrounding transparent or translucent area and that spell out "school bus", "activity bus" or other indicia representative of an intended use of said sign; and

coloured material occupying or overlying the transparent or translucent areas of the front panel, whereby the front panel is backlit by the fully contained LED based light source to display the opaquely masked indicia in contrast with illumination of the surrounding transparent or translucent area.

In some embodiments, there is provided, in combination, a self-contained illuminated school bus sign and a separate mounting frame that is mountable on a shell of a bus and in which the self-contained illuminated school bus sign is selectively receivable to enable indirect mounting of the sign to the shell of the bus by attachment of the separate mounting frame thereto, said self-contained illuminated school bus sign comprising a front panel defining a front display side of said sign and an on-board light source supported independently of the bus and independently of the separate mounting frame in a backlighting position behind said front panel to emit light through said front panel in manner emphasizing indicia that are visible at the front side of said sign.

In some embodiments, there is provided a method of preparing school bus signs for use in different intended school bus applications, said method comprising:

having access to a plurality of prefabricated mounting frames that are configured for mounting to a bus shell and

that share a matching configuration that is compatible with a standardized size and shape of sign;

according to a particular intended school bus application, either:

(i) producing a particular self-contained illuminated school bus sign having particular indicia thereon dictated by said particular intended school bus application; or

(ii) selecting a particular self-contained illuminated school bus sign from among a plurality of prefabricated self-contained illuminated school bus signs that share said standardized size and shape, but have different indicia thereon representative of said different intended school bus applications; and

combining said particular sign with any one of said plurality of prefabricated mounting frames, whereby the combination of said particular sign with said any one of the plurality of prefabricated mounting frames creates an application-ready mountable sign product by which attachment of the mounting frame to the bus shell indirectly supports the particular sign thereon.

In some embodiments, there is provided a system for modular assembly of differently worded school bus signs for use in different intended school bus applications, said system comprising:

a plurality of self-contained illuminated school bus signs sharing a common size and shape, including at least a first group of signs having a first type of indicia thereon representative of a first type of intended application for said first group of signs, and a second group of signs having a differently worded second type of indicia thereon representative of a different second type of intended application for said second group of signs;

a plurality of mounting frames of matching configuration compatible with the common size and shape shared by the plurality of signs for selective receipt of any of said plurality of signs in any of said plurality of mounting frames, each mounting frame being configured for mounting to a bus shell;

whereby preparation of an installation-ready sign product for a particular bus application is achievable by selection of an appropriate sign from the different groups, and combination of the selected sign with any one of the mounting frames.

Since various modifications may be made to the embodiments of the present disclosure as herein described it is intended that all matter contained herein shall be interpreted as illustrative only and not in a limiting sense.

The invention claimed is:

**1**. An illuminated school bus sign for direct mounting on a school bus, the sign comprising:

opaque lettering positioned on or over a front surface of a translucent panel;

an opaque rear panel situated opposite to the translucent panel in spaced relation therefrom to define a space therebetween;

a light source comprising a plurality of LEDs positioned in the space adjacent to the rear panel and pointing towards a front of the sign; and

frame surrounding a perimeter of the translucent panel and forming a perimeter of the sign for mounting the sign to the school bus,

wherein the translucent panel is spaced by a spacer from the LEDs thereby creating a gap between the LEDs and the translucent panel,

US 11,348,491 B2

wherein the spacer surrounds the LEDs and supports a rear surface of the translucent panel along the entire perimeter of the translucent panel, and

wherein the entire perimeter of the translucent panel is sealed in a weather-tight manner by a weather-tight seal between the translucent panel and the spacer.

**2**. The sign of claim **1**, wherein at least a portion of the translucent panel is retro-reflective.

**3**. The sign of claim **1**, wherein the frame comprises one or more through holes for direct mounting the sign to the school bus.

**4**. The sign of claim **1**, wherein a transparent layer extends over the lettering and the translucent panel.

**5**. The sign of claim **1**, wherein the LEDs are arranged in rows.

**6**. The sign of claim **1**, wherein the LEDs are mounted to the rear panel.

**7**. The sign of claim **1**, wherein the LEDs emit light directly onto the translucent panel without any intervening layers.

**8**. The sign of claim **1**, wherein the frame is a single piece.

**9**. The sign of claim **1**, wherein the gap is sized to provide substantially uniform illumination emitted from the translucent panel.

**10**. The sign of claim **1**, wherein the lettering spells the words SCHOOL BUS.

**11**. The sign of claim **1**, wherein a contact between the translucent panel and the spacer is sealed in a weather-tight manner.

**12**. The sign of claim **1**, wherein the translucent panel is adhered to the spacer.

**13**. The sign of claim **1**, wherein the spacer is connected to the rear panel.

**14**. The sign of claim **1**, wherein the spacer has a width parallel to the translucent panel and is positioned behind the perimeter of the translucent panel.

\* \* \* \* \*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation pursuant to Fed. R. App. P. 32(a)(7)(B)(i). The foregoing brief contains 8,163 words of Times New Roman 14-point proportional type. The word processing software used to prepare this brief was Microsoft Word 365.

Dated: June 7, 2024          */s/ Gaëtan Gerville-Réache*

Gaëtan Gerville-Réache
Warner Norcross + Judd LLP
150 Ottawa Avenue NW, Suite 1500
Grand Rapids, MI 49503-2832
Telephone: (616) 752-2207
E-mail: greache@wnj.com

Vito A. Ciaravino
Warner Norcross and Judd LLP
2715 Woodward Avenue, Suite 300
Detroit, MI 48201
Telephone: (313) 546-6179
E-mail:  vciaravino@wnj.com

Attorneys for Defendant-Appellant

212775.212775 #30654681